ACCEPTED
14-15-00028-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
4/7/2015 4:26:25 PM
CHRISTOPHER PRINE
CLERK

## NO. 14-15-00028-CV

## IN THE FOURTEENTH COURT OF APPEALS, HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/7/2015 4:26:25 PM
CHRISTOPHER A. PRINE
Clerk

## MICHAEL JUSTIN JACOBS,

*Appellant*

## v.

## ADANA ALT,

*Appellee*

On Appeal from the 395th District Court
Williamson County, Texas
Trial Court Cause No. 10-0968-F395

## BRIEF OF APPELLANT MICHAEL JUSTIN JACOBS

Paige Frankenberry
State Bar No. 24074226
FRANKENBERRY LAW FIRM
4425 S. Mopac Expy, Suite 105
Austin, Texas 78735
(512) 252-9937 Telephone
(512) 852-5937 Facsimile
paige@frankenberrylaw.com

ATTORNEY FOR APPELLANT
MICHAEL JUSTIN JACOBS

## APPELLANT REQUESTS ORAL ARGUMENT

## IDENTITY OF PARTIES AND COUNSEL

The following information is provided pursuant to Rule 38.1(a) of the Texas Rules of Appellate Procedure and for this Court to determine issues of disqualification and recusal under Rule 16 of the Texas Rules of Appellate Procedure:

| APPELLANT | COUNSEL FOR APPELLANT |
|---|---|
| Michael Justin Jacobs | Paige Frankenberry<br>FRANKENBERRY LAW FIRM<br>4425 S. Mopac Expy, Suite 105<br>Austin, Texas 78735<br>(512) 252-9937 Telephone<br>(512) 852-5937 Facsimile<br>paige@frankenberrylaw.com<br>*Appellate and Trial Counsel*<br><br>Ryan S. Dougay<br>1607 Nueces<br>Austin, Texas 78701<br>(512) 469-0092 Telephone<br>*Trial Counsel through September 2012*<br><br>James Winegardner<br>1711 Grassy Creek Dr.<br>Allen, Texas 75002<br>(817) 253-0957 Telephone<br>*Trial Counsel through March 2011* |

| APPELLEE | COUNSEL FOR APPELLEE |
|---|---|
| Adana Alt | Robert D. Ettinger<br>P.O. Box 50323<br>Austin, Texas, 78763<br>robert@ettlaw.com<br>(512) 478-4754 Telephone<br>(512) 478-9542 Facsimile<br>*Appellate and Trial Counsel* |

# TABLE OF CONTENTS

Page

REQUEST FOR ORAL ARGUMENT ..................................................................... cover

IDENTITY OF PARTIES AND COUNSEL ............................................................ ii

TABLE OF CONTENTS ........................................................................................ iii

INDEX OF AUTHORITIES ................................................................................... iv-vii

STATEMENT OF THE CASE ............................................................................... viii-x

ISSUES PRESENTED ............................................................................................ xi

STATEMENT OF FACTS ...................................................................................... 1

    A. BACKGROUND AND DEFAULT HEARING ................................................... 1

    B. SUBSEQUENT LITIGATION AND BILL OF REVIEW ...................................... 3

    C. REGISTERED PEDOPHILIA SEX-OFFENDER UNCLE GILBEY ENTERS THE PICTURE 4

    D. UNDOING THE DEFAULT HEARING, SORT OF ............................................. 6

    E. THE GAME CHANGER: PLAYING PRINCESS TAG WITH UNCLE GILBEY ...... 9

    F. POST-TRIAL MOTIONS ............................................................................. 20

SUMMARY OF THE ARGUMENT ..................................................................... 21

STANDARDS OF REVIEW .................................................................................. 24

    A. ABUSE OF DISCRETION ............................................................................ 24

    B. LEGAL SUFFICIENCY ............................................................................... 25

    C. FACTUAL SUFFICIENCY ........................................................................... 26

    D. DE NOVO ................................................................................................. 27

ARGUMENT AND AUTHORITIES ..................................................................... 28

    ISSUE I . VICARIOUS CONSENT ..................................................................... 28

    ISSUE II. PSYCHOLOGICAL EXAMINATION ..................................................... 36

    ISSUE III. CONSERVATORSHIP ....................................................................... 41

    ISSUE IV. NO ORIGINAL ORDER TO MODIFY ................................................. 61

PRAYER ................................................................................................................. 62

CERTIFICATE OF SERVICE ............................................................................... 63

CERTIFICATE OF COMPLIANCE ...................................................................... 64

APPENDIX ............................................................................................................. 65

# INDEX OF AUTHORITIES

Page

## CASES

*Alameda v. State*, 181 S.W.3d 772 (Tex.App.—Fort Worth 2005) ........................31

*Alameda v. State*, 235 S.W.3d 218 (Tex. Crim. App. 2007) ...................................31

*Allen v. Mancini*, 170 S.W.3d 167 (Tex.App.-Eastland 2005, pet. denied) ............30

*Cain v. Bain*, 709 S.W.2d 175 (Tex.1986) (per curiam). .......................................26

*City of Keller v. Wilson,* 168 S.W.3d 802 (Tex.2005)..............................................25

*Collins v. Collins*, 904 S.W.2d 792 (Tex.App.-Houston [1st Dist.] 1995)..............31

*CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship,* 164 S.W.3d 675 (Tex.App.-Austin 2005, no pet.) ......................................................................................................26

*Doe v. Franklin*, 930 S.W.2d 921 (Tex.App.-El Paso 1996, no writ) ....................48

*Dow Chemical Co. V. Francis,* 46 S.W.3d 237 (Tex. 2001)....................................26

*Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864 (Tex. 1999) (citations omitted) ..............................................................................................40

*Gillespie v. Gillespie*, 644 S.W.2d 449 (Tex. 1982).................................................24

*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757 (Tex. 2003) ...................27

*Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976) ................................................42, 58

*In re A.A.M.,* No. 14-05-00740-CV, 2007 WL 1558701 (Tex. App.--Houston [14th Dist.] May 31, 2007, no pet.) (mem. op.) ........................................................45

*In re A.L.E.*, 279 S.W.3d 424 (Tex. App.-Houston [14th Dist.] 2009, no pet.).......44

*In re A.V.*, 113 S.W.3d 355 (Tex.2003) (citations omitted) ...................................43

*In re C.A.M.M.*, 243 S.W.3d 211, 216 (Tex. App.-Houston [14th Dist.] 2007, pet. denied)................................................................................................................44

*In re H.A.P.*, No. 11–05–00180–CV, 2006 WL 648312 (Tex.App. – Eastland

March 16, 2006, no pet.) (mem. op.) ................................................48

*In re J.I.O.*, No. 11-05-00369-CV 2007 WL 1644579 (Tex.App.-Eastland June 7, 2007, no pet.) (mem. op.) ................................................48

*In re J.K.*, No. 09-10-00226-CV, 2011 WL 2119770 (Tex.App.-Beaumont May 19, 2011, no pet.) (mem. op.) ................................................45

*In re K.B.*, No. 03–09–00366–CV, 2010 WL 5019368 (Tex.App.-Austin Dec. 9, 2010, no pet.) (mem.op.) ................................................45

*In re Kubankin*, 257 S.W.3d 852 (Tex.App.-Waco 2008, orig. proceeding) (per curiam) ................................................50

*In re L.C.*, 145 S.W.3d 790 (Tex.App.-Texarkana 2004, no pet.) ................................................47

*In re L.C.L.*, 396 S.W.3d 712 (Tex. App.-Dallas 2013, no pet.) ................................................45

*In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758 (Tex.App.-Austin 2005, no pet.) (mem. op.) (citations omitted) ................................................45

*In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.-San Antonio 1997, pet. denied) (citation omitted) ................................................46

*In re S.E.K.*, 294 S.W.3d 926, 928 (Tex. App.-Dallas 2009, pet. denied) ................................................44

*In re S.N.*, 272 S.W.3d 45 (Tex. App.-Waco 2008, no pet.) ................................................48

*In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126 (Tex. App.-Fort Worth, Feb. 9, 2006, no pet.) (mem. op.) ................................................48

*In re T.N.C.*, No. 13-11-00305-CV, 2011 WL 5282679 (Tex. App.-Corpus Christi Nov. 3, 2011, no pet.) (mem. op.) ................................................45

*In re V.L.K.*, 24 S.W.3d 338 (Tex. 2000) ................................................42, 44

*Isaacson v. Isaacson*, No. CIV-10-678-M (W.D. Okla. Apr. 6, 2011) ................................................28

*Jackson v. Axelrad*, 221 S.W.3d 650, (Tex. 2007) ................................................34

*Johnson v. Johnson*, 804 S.W.2d 296 (Tex.App.-Houston [1st Dist.] 1991, no writ) ................................................48

*Kittman v. Miller*, No. 12-13-00097-CV 2013 WL 4680575 (Tex. App. – Tyler
    Aug. 29, 2013, pet. denied) (mem. op.) ...................................................36

*K-Mart Corp. v. Honeycutt,* 24 S.W.3d 357 (Tex. 2000).......................................24

*Lenz v. Lenz*, 79 S.W.3d 10 (Tex.2002).............................................................42, 58

*McCraw v. Maris*, 828 S.W.2d 756 (Tex.1992)......................................................41

*McDonald v. Dankworth, 212 S.W.3d 336 (Tex.App.-Austin 2006, no pet.)*..........25

*Nationwide Ins. Co. v. Elchehimi,* 249 S.W.3d 430 (Tex. 2008) ...........................40

*Pollock v. Pollock,* 154 F.3d 601 (6th Cir.1998).....................................................29

*Saavedra v. Schmidt*, 96 S.W.3d 533 (Tex.App.-Austin 2002, no pet.) ..................42

*Shook v. Walden*, 304 S.W.3d 910, 916-17 (Tex.App.-Austin 2010, no pet.)
    (citations omitted) .................................................................................27

*State v. Heal,* 917 S.W.2d 6 (Tex.1996)..................................................................27

*Sylvia v. Tex. Dep't of Family and Protective Servs*., No. 03-09-00427-CV 2010
    WL 1507827 *13 (Tex. App.–Austin Apr. 15, 2010, no pet. h.) (mem. op.).......44

*Thompson v. Dulaney*, 838 F.Supp. 1535 (D.Utah 1993) .......................................28

*Ussery v. State*, 03-07-00116-CR, 2008 WL 269439 (Tex. App.–Austin, Jan. 30,
    2008, pet. ref'd) (mem.op., not designated for publication) ...............................28

*Van Heerden v. Van Heerden,* 321 S.W.3d 869 (Tex. App.-Houston [14th Dist.]
    2010, no pet.) .........................................................................................41

*Wagner v. Wagner*, 64 F.Supp.2d 895 (D.Minn.1999) ..........................................28

*Weaver v. State*, No. 10-06-00326-CR, 2007 WL 4157237 (Tex. App.–Waco Nov.
    21, 2007, pet. denied) (mem.op., not designated for publication) .......................28

*Wichita County v. Hart,* 917 SW2d 779 (Tex.1996).............................................34

*Williams v. Willaims*, 150 S.W.3d 436 (Tex. App.-Austin 2004, pet. denied) ........47

*Zeifman v. Michels,* 212 S.W.3d 582 (Tex. App.-Austin 2006, pet. denied) ..........24

## STATUTES

18 U.S.C. § 2511(2)(d) ..................................................................................28

Tex. Fam. Code § 153.001(a) .....................................................................42, 43

Tex. Fam. Code § 153.004 .............................................................................42

Tex. Fam. Code § 153.132 .............................................................................50

Tex. Fam. Code § 161(D), (E) .......................................................................46

Tex. Fam. Code § 32.005 ..............................................................................39

Tex. Fam. Code Ann. § 153.002 ....................................................................58

Tex. Pen. Code §16.02(c)(4)(B) ....................................................................28

Tex. Pract. & Civ. Rem Code § 123.001(2) ...................................................28

Tex. R. Civ. Pro § 329b(f) .............................................................................61

## OTHER AUTHORITIES

McAlinden, Anne-Marie. '*Setting'Em Up': Personal, Familial and Institutional Grooming in the Sexual Abuse of Children.* Social & Legal Studies 15.3 (2006): 339-362. .................................................. Tab F

Samantha Craven , Sarah Brown & Elizabeth Gilchrist (2006) *Sexual grooming of children: Review of literature and theoretical considerations.* Journal of Sexual Aggression. 12:3, 287-299. .........................................................................Tab G

Smith, Daniel W., et al. *Delay in disclosure of childhood rape: Results from a national survey.* Child abuse & neglect 24.2 (2000): 273-287..........................Tab H

NO. 14-15-00028-CV

IN THE FOURTEENTH COURT OF APPEALS,
HOUSTON, TEXAS

MICHAEL JUSTIN JACOBS,

*Appellant*

v.

ADANA ALT,

*Appellee*

BRIEF OF APPELLANT MICHAEL JUSTIN JACOBS

TO THE HONORABLE COURT OF APPEALS:

Michael Justin Jacobs, Appellant in this Court, respectfully submits his brief in support of his appeal from an "Order in Suit to Modify Parent-Child Relationship" signed by the trial court on August 29, 2014, that was four and one-half years in the making.

## STATEMENT OF THE CASE

This appeal arises from an April 2010 suit originally filed by Appellee Adana Alt ("Adana") requesting that the trial court adjudicate parentage and enter an order that included parenting plan provisions. (CR 8-10). Appellant, Michael

"Justin" Jacobs, is the father of the parties' five year-old daughter, the subject of the suit, and Justin properly answered the suit. (CR 11-12). The parties agreed to visitation and child support without formal temporary orders.

In April 2011, a default judgment was entered against Justin that was subsequently overturned by a Bill of Review in October of 2013 due to Justin's lack of notice of the final hearing. (CR 17-44, 224). Nonetheless, the trial court proceeded on a motion to modify that Justin's former attorney had filed after the default judgment. (3RR 98:20-25).

Following a contested injunction hearing in May 2013 (before the Bill of Review was granted), the trial court granted Justin's request to enjoin Adana from allowing the parties' then four-year-old child to be within 500 feet of Adana's brother, a registered sex offender and convicted pedophile who was on the verge of being released from prison. (CR 159-160).

After a bench trial on Temporary Orders in October 2013, the trial court rendered a final order in a February 2014 letter to counsel without a final hearing (CR 252-53). The parties were appointed Joint Managing Conservators with Adana being granted all Texas Family Code § 153.132 rights, and the trial court ordered a permanent injunction on the child being within 500 feet of Adana's brother. (CR 252-53).

Before the trial court's final order was entered, the child made an outcry to

her father and Child Protective Services that she had been playing a "touch" game with her registered sex offender and pedophile uncle in violation of the trial court's injunction. Justin filed requests to re-open evidence, for immediate possession of the child, for the right to determine the primary residence of the child and other Section 153.132 rights, and for supervised, or otherwise restricted, access for Adana. (Suppl CR __). After three hearings and nearly four months in Justin's custody, the trial court returned the child to Adana as the primary custodian. (CR 291-322). This appeal follows.

# ISSUES PRESENTED FOR REVIEW

## ISSUE I.

Did the trial court err (or alternatively abuse its discretion) by excluding a recorded telephone call obtained by vicarious consent due to father's good-faith, objectively reasonable belief that recording the call was in the child's best interest because the mother was continuing to violate protective injunctions and coach the child to deny the mother's violations?

## ISSUE II.

Did the trail court err (or alternatively abuse its discretion) in excluding expert testimony that the child was afraid of her uncle, a convicted pedophile, when the evidence was permissibly obtained.

## ISSUE III.

Did the trial court err (or alternatively abuse its discretion) by designating the mother as the parent with the exclusive right to designate the child's residence, by granting the mother other exclusive rights, and by allowing the mother to have unsupervised possession of the child  where the evidence was legally and factually insufficient to support that such findings and orders were in the best interest of the child?

## ISSUE IV.

Is a judgment on a modification void where the evidence is legally and factually insufficient to show that an original order existed *to* modify?

# STATEMENT OF FACTS

## A. Background and Default Hearing

Justin and Adana began dating when Justin was twenty-one and Adana was in her early thirties after they met through Justin's sister. After a couple of years of dating, their daughter was born in March 2009. When their daughter was one month old, the couple moved from Adana's mother's and step-father's home in Liberty Hill, Texas, to a home Justin's mother helped Justin purchase in Granbury, Texas. (3RR 68:17-23) Justin found employment as a commission-only life insurance salesman after the move. (3RR 79:14-16).

A week after the child's first birthday in March 2010, Adna's mother and step-father, Nancy and Luis Buitron, arrived in Granbury for a visit. (4RR 32:10-12). Within hours of the Buitrons' arrival, Adana's mother announced to Justin that Adana needed a temporary hiatus from their relationship, so Adana and the child would be accompanying the Buitrons' back to their home in Liberty Hill that day. (4RR 32:10-12). Less than two weeks later, Adana filed a "Petition to Adjudicate Parentage" in Williamson County and included a request for the court to set out a parenting plan. (CR 8-10). Justin hired a local Granbury attorney who responded to the suit. (CR 11-12). Counsel for the parties negotiated a series of agreements regarding Justin's visitation and child support in lieu of adjudicating Temporary

1

Orders. (3RR 63:6-9, 127:11-12, 145:15-19).

Justin's employment became untenable in late 2010 when the insurance company he worked for charged back to him several thousand dollars in commission many months after the original sale date, which meant Justin would not be paid commission on future sales until the charge-back was satisfied. (3RR 80:1-25). Justin's counsel filed a withdraw motion on January 18, 2011 after Justin told him that he would not have the resources for afford further representation at that time. (CR 13-14). On February 25, 2011, Adana's counsel set the matter for a final hearing on April 27, 2011, and notified Justin's withdrawing counsel of same. (Suppl 3RR 3). Justin's attorney failed to notify Justin a final hearing had been set before withdrawing in March 2011, and a default judgment was entered at the April hearing in favor of Adana for all relief she requested. (CR 17, 224). The parties were appointed Joint Managing Conservators of the child with Adana named as the parent with the exclusive right to determine the child's primary residence and the exclusive right to determine all other Texas Family Code Section 153.132 rights. (CR 17). The trial court set Justin's child support obligation based on Adana's testimony that Justin had earned $3,900 per month gross resources a year earlier when the parties' separated.[1] (Suppl 2RR 11:1-3). On the date of the

---

[1] Although, Justin's tax returns through 2011 do not demonstrate an income for any year greater than $2,280 per month. (3RR 76:16-77:2, 79:8-10, 7RR 134-135).

default hearing, Justin had just begun working a mile over the Texas border at a nuclear power plant in New Mexico making $500 per week. (3RR 81:1-11).

**B. Subsequent Litigation and Bill of Review**

Within weeks of the default judgment, a steel beam fell on Justin while working at the power plant. (3RR 81:12-15). He recuperated in Lubbock where his extended family lives. (3RR 82:11-15). Within a few weeks of healing from the injury, Justin suffered six ischemic strokes and more than one hundred transient ischemic strokes. (3RR 82:11-20, 83:10-19). After discharge from nearly a month in the hospital, the doctors ordered him to forgo physical exertion and driving for several months due to the high risk of recurrence. (3RR 84:2-25, 85:1-7). Justin remained in Lubbock and re-enrolled in college during this period of limbo to gain credits toward a paramedic degree. (3RR 86:1-16).

Also during this period of time, Justin contacted an attorney to learn what remedies were available to overturn the default judgment or otherwise reduce child support that he could not afford. Justin's new attorney filed a suit for modification in November 2011, which was followed by a child support enforcement action by Adana. (CR 45, 82). Justin sought new counsel after he felt pressured by his counsel to settle both the temporary orders on the modification and the enforcement suit, both at the same child support obligation rate (save for three

3

months) that was ordered in his absence at the default hearing.[2] (CR 89, 56).

In late summer of 2012, when the child was three years old, apparently Adana began taking the child to a young, licensed clinical social worker named Lauren Scott.[3]

After a review of Justin's files, current counsel filed a Bill of Review on Justin's behalf in March of 2013. (CR 94).

## C. Registered Pedophilia Sex-Offender Uncle Gilbey enters the picture

While the Bill of Review was pending, Justin asked Adana to agree through counsel that the parties' daughter would not be in the presence of Adana's brother who was on the verge of being released from a nine-year prison sentence. (2RR 10:19-23). Adana's brother, Gilberto Buitron, known to his nieces and nephews as "Uncle Gilbey," is a lifetime registered sex offender who was convicted of aggravated sexual assault of a child on December 18, 1997.[4] (4RR 14:7-8, 17:19-21; 2RR 10:7-10). Seven years later and still on parole for his first offense, Mr.

---

[2] Justin was told that by his former counsel that he would likely fare worse or be put in jail if the parenting plan or child support matters were heard by the trial court, and that, therefore, Justin just needed to agree to the orders being offered by opposing counsel even though Justin felt the terms were as inequitable as the terms contain in the default hearing order. (3RR 103:13-20).

[3] It is unknown whether Ms. Scott was licensed at the time the child began seeing this counselor or if she practiced under the supervision of another practitioner at the ministry where she is employed. (4RR 53:4-5).

[4] The offense date was March 10, 1997. (2RR 42:2-3).

Buitron was found to be in possession of one or more child pornography videos on his personal laptop computer on January 13, 2005. (2RR 10:2-6, 29, 30:7-12). Both offenses occurred while Mr. Buitron was living at home with his parents, Adana's mother and step-father, where he currently resides. (2RR 29:2-7, 11:7-8).

Because Adana and the Buitron family have repeatedly denied that Mr. Buitron is a pedophile, they believe he presents no risk of harm to children. (2RR 12:24-25, 21:1-3, 24-25, 34:4-12, 35:1-3; 4RR 83:7-12). Adana has described her brother's aggravated sexual assault of a child as a fun, innocuous, and victimless "circle jerk" with youths in the community. (4RR 82:20 – 83:12). Thus, Adana refused to agree to an order prohibiting the child to be in the presence of Uncle Gilbey–even after the trial court telegraphed its intent by granting a Temporary Restraining Order before Mr. Buitron's release. (2RR 9:16-18). Instead, Adana appeared with her mother at the injunction hearing to implore the trial court to allow the parties' then 4 year-old daughter to enjoy the company of Uncle Gilbey. (2RR). Adana's counsel even suggested that the child could not have a "happy Christmas" without her and Uncle Gilbey being together. (2RR 7:19-25, 8:1).

When Adana was asked during the May 2013 injunction hearing why she beleived it was a good idea for the child to be around her brother, she replied, "Because he's my brother, regardless… I don't see that there is going to be a risk there." (2RR 12:20-25). Adana also said, when asked on direct examination, that

she would be perfectly willing to abdicate her responsibility to protect her child from her pedophile-brother to her step-father, her sister, or the mother who physically assaulted and battered Adana when Adana was herself a minor.[5] (2RR 13:10-20, 14:3-12, 15:12-17; 6RR 59:5-10). Adana and her parents did not want to be inconvenienced by excluding Uncle Gilbey, especially during birthdays, holidays, and other family events, just because "the family" consists of both young children and a convicted pedophile. (2RR 6:7-10, 16:15-17, 28:7-11, 39:13-14).

The trial court granted Justin's request for the injunction stating that the court was there to protect the child from this "child molester," not make sure that he had "a happy family reunion" after release from prison. (2RR 41:7-8, 43:8-10, 25, 44:1-4).

In June 2013, the counselor Adana had taken the child to wrote Adana's counsel a letter stating that the child was not attached to Justin because Justin was "not present for the first few months of her life," which are "critical" for attachment development, but that the child was securely attached to her mother and grandmother, to which the counselor could "testify." (7RR 155).

### D. Undoing the Default Hearing, Sort Of

The trial court granted Justin's Bill of Review in a letter to counsel on

---

[5] Adana wholly contradicted her willingness to rely on others to protect her child from a pedophile when her own counsel subsequently prompted the opposite response on cross-examination with a leading question. (2RR 17:5-7).

October 15, 2013, owing to Justin's lack of notice of the final hearing in 2011. (CR 224). Rather than wiping the slate clean, the trial court let stand the parties' modification temporary orders and enforcement settlement, both of which were agreed to after the default judgment but prior to the filing, or granting, of the Bill of Review. (CR 224, 252-53).[6] [7]

In a bench trial the following week, the trial court considered testimony regarding Justin's historical earnings to redress some of Justin's past, and future, child support obligation as well as testimony regarding Justin's visitation travel costs and work schedule. (3RR). Justin also requested a geographic restriction on the child's residence. In the same hearing, the trial court considered Adana's motion for enforcement on the above-guideline child support obligation that Justin had never been able to afford. (3RR).

Adana testified that Justin was capable of earning more money during the time the couple lived together in Granbury (from April 2009-April 2010), but that his income was limited by his monthly (more or less) binge drinking. (3RR 134:4-21). Despite this assertion, Adana had not requested that Justin's visitation be supervised or limited at the default hearing when this binge drinking would have

---

[6] Despite the fact that, by virtue of the Bill of Review being granted, there was no original order *to* modify or to enforce.

[7] As a result, Justin's above-guideline child support was not reduced through August 31, 2012.

been occurring.[8] (2RR). Justin testified that he felt he was drinking more than he should have been in 2011 *after* Adana left because he had been depressed over her leaving and taking their child with her. (3RR 119:5-8). Justin went to alcohol "rehab" voluntarily because he felt he needed to address, primarily, his depression. (3RR 119:9-14). Justin testified that he received a charge for Driving While Intoxicated four months after completing rehab in 2011 while in college, but that he did not drink very often, and, in fact, had not had a drink in last three and a half months, since June, before his daughter's summer visitation.[9] (3RR 160:15-23)

Justin requested that the court modify Adana's exclusive right to make decisions regarding medical, psychological, and educational decisions because Adana had taken the child to a counselor without telling him for a year. (3RR 61: 14-18). He further requested that Adana be prohibited from drinking while in possession of the child because Adana had historically drank alcohol frequently enough to cause him some concern. (3RR 61:19-20, 96:8-19). Adana testified that she drinks one to two glasses of wine only one to two times per week (3RR 127:15-18). Adana testified that she drinks beer occasionally in addition to wine. (3RR 127:20-24).

---

[8] The pre-drafted orders presented to the trial court at the default hearing contained an alcohol injunction, but Adana did not mention alcohol at the default hearing. (2RR).

[9] Justin testified in August of 2014, that, in fact, he completely stopped drinking in the summer of 2013. (6RR 38:10-11).

At the end of the hearing, the court retroactively reduced Justin's child support back to May 2013 and took other issues under advisement while acknowledging the hearing and ruling was for temporary orders only. (3RR 98:20-99:6). Adana's counsel prepared an order adjusting the current child support and the court entered these temporary orders on October 30, 2014. (CR 229)

The trial court issued a final ruling via letter to counsel in February 2014 *without ever conducting a final hearing.* (CR 6).

**E. The Game Changer: Playing Princess Tag With Uncle Gilbey**

On April 20, 2014, before the trial court's final order was entered, the child made an outcry to Justin and his wife that she had been playing "Princess Tag" with her Uncle Gilbey, and that Adana told the child not to tell Justin that the child had ever met or been around Uncle Gilbey; that it was their little "secret." (4RR 13:17-14:19; Suppl CR ___). Justin immediately alerted his attorney, who made a report to Child Protective Services ("CPS").

On April 24, 2014, Jaclyn Roberts with CPS conducted a surprise, recorded interview with the child at the child's daycare center. (4RR 28:18-22). While the child readily told Ms. Roberts that Uncle Gilbey was among the persons living at her maternal grandparent's house, when the child was directly asked if she ever sees Uncle Gilbey there, the child denied it in accordance with her mother's admonishments. (4RR 29:17-23). Being a seasoned CPS veteran and child

interviewer, Mr. Roberts began asking the child what kind of games she likes to play, where she plays them, and with whom she plays the games.[10] (4RR 29:23-24). The child said she plays "Princess Tag" with her Uncle Gilbey at her grandparents' home and that once, on a Friday after school, Uncle Gilbey was too tired to play, so they watched television. (4RR 29:24-30:4, 42:2-13).

Ms. Roberts informed both Adana and Justin's counsel of the contents of the child's interview the same day. (5RR 9:6-17). Justin filed requests with the trial court the next day for a writ of possession and/or a temporary restraining order, to re-open evidence, for the right to determine the primary residence of the child and other Section 153.132 rights, and for supervised access to the child for Adana. (Suppl CR ___). That afternoon in chambers, the trial court ordered Adana to relinquish possession of the child to Justin immediately and set a hearing for the following week.

### April Hearing

At the April hearing, Ms. Roberts testified as to what the child told her, including that the game "Princess Tag" it is just like "regular tag," except that the child is the "princess" and whoever catches her is her "prince." (4RR 42:11-13). When asked if her recommendation was that the child remain at Justin's house,

---

[10] Ms. Roberts testified that she has worked for CPS for seven years and interviewed "thousands" of children. (4RR 28:4-13).

Ms. Roberts testified that she had "significant concerns" about the child being around the maternal family because they do not believe that Uncle Gilbey is a danger to the child, and that if the child remained in Lubbock, the child should see a counselor in Lubbock. (4RR 39:12-18; 37:17-19).

The child's counselor testified that she was "very certain" that continued removal from her mother would cause the child emotional harm. (4RR 49:19-23). However, in forming that opinion, the counselor admitted that she relied on false information provided to her by Adana that Justin was not present in the child's life during the child's first year, which is "critical" for attachment, when, in fact, Adana and Justin lived together during the child's first year. (4RR 53:22-54:4, 56:3-14, 32:10-12). The counselor further testified that she counseled the child under this presumption for a year without attempting to verify the information through Justin or any disinterested collateral contacts. (4RR 61:23-62:10; 6RR 80:1-5). The trial court subsequently dismissed any notion that the child was not bonded to Justin or would be emotionally harmed by separation from her mother when, after remaining with Justin for several weeks, the counselor reported the child was doing was doing well and was enjoying her time at Justin's house. (5RR 37:1-7, 77:5-10).

Justin testified that Adana and "her whole family believe that [Uncle Gilbey is] innocent and that he was framed and that the State had planted evidence." (4RR

15:9-11).

The trial court determined from the testimony that the child had, in fact, been in the presence of, and had played games with, Uncle Gilbey in violation of the injunction. (4RR 66:10-16, 111:7-10). And while Adana and her parents told Ms. Roberts and testified that the child had never been in the presence of Uncle Gilbey, the trial court found that their testimony lacked credibility; that "they're down here saying what's necessary to get what they want." (4RR 106:17-19). The court stated it was "not going to wait until this little girl is fondled to do something about it," and ordered Justin to maintain custody. (4RR 107:7-8). The trial court also ordered the child to have a forensic interview at the Child Advocacy Center ("CAC") and one session with the child's therapist in an attempt to ascertain more information about the child's contact with Uncle Gilbey and who told the child what before returning to update the court the following month. (4RR 110:5-111:12). The trial court stated that it trusted the child's counselor "is not going to try to hide things from us." (4RR 110:16-17).

Justin took the child to the CAC interview directly after the April hearing, and to the first 'post-removal' counseling session the following week. (5RR 17:11-16).

**May Hearing**

At the May 2014 hearing, the CAC interviewer testified that the child *denied*

*having any uncles whatsoever,* despite the fact that the child has a second uncle she frequently visits. (5RR 6:11-22, 10:6-14). As a result, Ms. Roberts testified that she was concerned that the child got in trouble with Adana for admitting to Ms. Roberts that she played with her Uncle Gilbey. (5RR 10:6-23). At the April hearing, Adana's mother testified that "Princess Tag" was the game the child played with the grandmother's neighbor's children. (4RR 88:10-24). Upon interviewing the parents of the neighbor children in question, however, those parents said they had never heard of the game "Princess Tag." (5RR 11:11-22).

Ms. Scott, the child's counselor, reported that the child admitted that Adana had told the child not to talk to anyone about her Uncle Gilbey, but that Dad had not told the child to say, or not say, anything. (5RR 29:3-8, 19-21). Ms. Scott also testified that the child told her that the child lied to CPS–because she was "shy and nervous" and "her mind was out of it"–and that the child never told Justin that she had seen Uncle Gilbey. (5RR 31:4-5; 35:9-18). Ms. Scott said she believed the child's new version because she and the child have a "rapport," even though the child told the counselor in the same breath that she had been coached by her mother, and even though, the counselor admitted, there would be no reason for Adana to coach the child about Uncle Gilbey if the child had never been in the presence of Uncle Gilbey. (5RR 39:7-40:4, 32:11-14).

Because 1) the CAC interview and counseling session were unproductive

13

with respect to learning whether or not the child had been touched sexually, 2) the child was now saying she had never seen Uncle Gilbey, and 3) the child's current therapist recommended the child see a psychologist, Justin took the child to a child and family psychologist, Dr. Mark White, in Lubbock the following week. (5RR 18:1-21; 6RR 61:23-25).

Justin also hired a psychologist local to the trial court, Dr. Kelley Baker, after the child told Dr. White that she was afraid of Uncle Gilbey and witches, which her grandfather told her "get little girls." Although Dr. White shared with Dr. Baker what the child expressed, the trial court refused to allow Dr. Baker to testify to these facts because, the trial court stated, Justin was not authorized to take the child to a psychologist. (5RR 51:1-11). Dr. Baker testified that young children can easily be coached to tell "first order" lies, which are lies in response to simple, direct "first order" questions. (5RR 46:19 - 48:12). Dr. Baker said that typically children under the age of six have difficulty telling "second order" lies when the question is presented in a way that the child is not able to understand that they are essentially being asked for the same information. (5RR 46:19 - 48:12). For example, a child might say, "No," when asked if she has ever seen someone, but then say that she plays games with that person, as the child did here during the CPS interview. (4RR 29:17-30:4, 42:2-13).

Adana testified that she had cut-off all contact with her parents since the

14

April hearing. (5RR 60:1-6).

At the conclusion of the May hearing, the trial court again ordered that Justin was to maintain custody, ordered Adana to take a protective parenting class, allowed Adana to have some visitation with the child, and imposed an injunction on the child being in the presence of the child's maternal grandparents. (5RR 83:11-21). Additionally, the court ordered a series of counseling sessions with the child's counselor along with what the content of the sessions should be. (5RR 80:2-14, 19-21; 82:2-5, 84 12-13). The court further ordered that the child was not to see another counselor besides Ms. Scott. (5RR 77:19-20).

In a session with the child's counselor at the end of June, the child told the counselor that there was something–a lie with respect to Uncle Gilbey–that she had not told *anyone* about yet. (CR 284). Despite prodding by the counselor, the child would not say what she had yet to reveal. (CR 284). The following month the child told Justin, then the counselor during a session with the child, that Adana spanks the child in the mouth when the child says something that she is not supposed to say. (CR 284, 6RR 85:12-23). The child demonstrated to the counselor how Adana hits her on the mouth using a doll. The child's counselor reported Adana's behavior to CPS (6RR 85:12-23). In early August while the child was spending a week of summer possession with Adana, the child told Justin in a telephone call that she had finally gotten to fly her kite, but that her kite did not go as far up in the

15

air as her grandfather's kite. (CR 285; RR 45:7-8; Pet'r's Ex 3, audio recording).[11]

Justin detailed these three concerns in an affidavit and filed a second temporary restraining order requesting that Adana return the child to Lubbock early, that further visitation be restricted to the Lubbock, and that a replacement counselor be appointed since the child was withholding information about Uncle Gilbey.[12] [13] (CR 281).

Adana returned the child to Lubbock following the child's one-week visit at Adana's house. (RR 45:4-13). Justin began recording the child's telephone conversations with Adana at that time, he said, due to his concerns that Adana was continuing to violate the trial court's injunctions. (6RR 45:4-25). In a telephone call between the child and Adana the day after Adana returned the child to Lubbock, Adana "remind[s]" the child that "we"…"you and me," had flown kites the week before. (6RR 44:2-13, 47:3-16).

### August Hearing

At the April hearing At the status hearing on August 20, 2014, Justin attempted to introduce the "you and me" recording between the child and Adana as

---

[11] The trial court had enjoined the child from being in the presence of her grandparents ten weeks earlier.

[12] Adana told Justin in August that she was considering moving to the Lubbock area since she was no longer associating with her family. (6RR 63:11-22).

[13] The trial court denied the request over the phone as the judge (as well as opposing counsel) were at a family law seminar in San Antonio.

direct evidence of Adana's coaching the child. (6RR 45:21-25). The trial court refused to admit the recording opining that Justin did not meet the best interest of the child threshold found in *Alemeda v. State*, and therefore, allowing the recording to be heard or admitted would be tantamount to the trial court violating the "federal wiretap laws."[14] (6RR 51:16-19, 52:7-16, 55:15-17). Justin also testified that the child cried in her bedroom a lot after coming home from Adana's two separate one-week summer visits with the child. (6RR 39:1-3).

Justin testified that he no longer drinks alcohol and had not had a drink in over a year.[15] (3RR 160:15-23; 6RR 38:10-11). Justin said that if the child stayed in Lubbock, the child would not be subject to daycare or after-care once she started school because his wife is a stay-at-home-mom with Justin's younger daughter. (6RR 62:19-23).

Justin testified that he was concerned that Adana spanking the child in the mouth was how Adana controlled what the child revealed, and that Adana's actions were the result of a cycle of abuse. (6RR 58:116-59:10). Adana had previously admitted that she emancipated herself as a minor, which she told Justin was due to her mother hitting her in the head and face with a hairbrush, but Adana claimed she

---

[14] *Alemeda v. State* does not address federal wiretap laws, but rather state 'wiretap' law. See *infra*, pg. 31.

[15] Further, Justin's wife provided in her affidavit supporting the April 2014 request for a restraining order (in order to address any concerns about Justin's drinking that Adana alleged at the October 2013 hearing) that she and Justin live an alcohol-free lifestyle (Suppl CR ___).

emancipated herself because she wanted to live with her boyfriend. (2RR 14:17-15:19). The child's counselor admitted that it is possible that what Adana is doing to the child is the result of a cycle of abuse. (6RR 89:2-8).

The child's counselor also testified that she still does not believe (as she did not at the May hearing), that the child has ever been in the presence of Uncle Gilbey. (6RR 84:19-24). Ms. Scott also testified that she "clarified" with the child, during a session in which Adana was also present in the room, that the child had flown kites with her grandfather a long time ago, but not so long ago with her mom. (6RR 83:9-24).

Adana testified that she drank the equivalent of one to two glasses of Franzia wine three to four times per week. (6RR 9:23-10:10, 10:21-23). This amount represents twice the amount Adana testified in October 2013 that she regularly consumes, but she was aware at this point that the contents of her trash had just been appropriated. (3RR 127:15-18; 6RR 15:16-19). Justin testified he requested that a private investigator appropriate Adana's curbside trash because he had noted that Adana sometimes seemed intoxicated when he spoke to her while she was in possession of the child. (6RR 38:12-20). The court had previously declined his request to impose an alcohol injunction on Adana. (3RR 96:8-12; CR229).

The trash collected from Adana's home by the investigator one week before the August hearing contained three large cans of beer and six empty 5-liter boxes

of Franzia wine, which would equate to consumption of *forty bottles of wine per week.* (CR 161-169 (investigator's report); 6RR 28:5-30:13, 32:18-33:8). The receipts also contained in the trash confirmed that Adana purchased three of the 5-liter boxes (equating to twenty bottles) within a four-day period, one of which Adana purchased while Adana was in possession of the child. (CR 165; 6RR 33:20-25, 38:17-20). Adana's trash also contained an empty prescription bottle of Fioricet, which contains a barbiturate, and an empty over-the-counter analgesic/sleep-aid combination, as well as refill receipts for both of these central nervous system depressants. (7RR 162). Packaging for both medications contain warnings against mixing these drugs with alcohol. (7RR 162). Adana said she had stored the empty wine boxes over a period of months and that she gave one of the three boxes she purchased over a four-day period to a friend. (6RR 981-18).

At the end of the hearing, after Justin had custody of the child in Lubbock for four months, the trial court returned the child to Adana's primary custody and lifted the injunctions on the child being in the presence of, or in the home of, the maternal grandparents, which is also Mr. Buitron's home. (CR 291). The court maintained the injunction on the child being in the presence of Mr. Buitron. (CR 317). That is, the trial court requested that Adana's counsel provide it with the same order rendered in February 2014 via letter before the child's outcry, and the trial court entered the same on August 29, 2014. (6RR 112:13-16).

19

**F. Post-Trial Motions**

Justin requested Findings of Facts and Conclusions of Law within twenty days after the final order was entered, and timely filed notice of past due Findings and Conclusions. (CR 323, 329). Justin filed a Motion for New Trial and a Motion to Modify, Correct, or Reform Judgment within thirty days after the final order was entered. (CR 324, 327). After receiving Findings of Facts and Conclusions of Law from the trial court, Justin timely requested Additional and Amended Findings and Conclusions, to which the trial court did not respond. (CR 336).

## SUMMARY OF THE ARGUMENT

### I. and II.

The trial court erred, or abused its discretion, by excluding a telephone recording between the child and mother and by excluding testimony from a psychologist. The trial court believed that Justin did not have the authority to obtain the evidence under federal wiretap laws, under the existing trial court orders, or under Section 32.005 of the Texas Family Code.

The vicarious consent doctrine provided the consent required under federal wire tap statutes to record the call because Justin had a good-faith, objectively reasonable belief that recording the call was in the best interest of the child.

Justin took the child to a psychologist to have the child examined, as is his right (and duty) as the child's joint managing conservator. The trial court's orders only addressed psychological *treatment*, not *examination*. Even if Justin did not have authority under the trial court's order, Justin had authority under Section 32.005 that allows a psychologist with reasonable grounds to suspect a child has been abused or neglected to examine a child.

The excluded evidence was material to the issues of conservatorship, and excluding the evidence was harmful to the outcome of the case.

## III.

Appellant argues that, despite the trial court stating that it was "not going to wait until this little girl is fondled to do something about it," that is, in effect, exactly what the trial court did by failing to provide *the child* any greater protection than the child all ready had when the child revealed that she was playing 'touch' games with her registered pedophilia sex offender uncle with the knowledge and consent of the child's mother. In fact, since the evidence in this case was re-opened in the summer of 2014, Justin learned of other abuses Adana was imposing on the child, but the trial court did not address them at all. The trial court's interest seemed to focus on returning to "status quo," even if status quo meant the child will continue to be endangered, coached, and abused.

The orders are contrary to the great weight and preponderance of the evidence. The orders are clearly unjust (especially *to the child*, who will ultimately be the one to suffer the harmful consequences) and should shock the conscience of this court. Justin has been left with no real way to protect his daughter from a sexual predator of children, and the child has been left without any protections from a mother who has shown she will physically and emotionally abuse and endanger the child. Therefore, the trial court abused its discretion in rending such an order.

IV.

The modification judgment is void because there is no evidence to show that an original order existed to modify. The original judgment was overturned by Bill of Review, and, therefore, Justin is entitled to an original trial.

# STANDARDS OF REVIEW

## A. ABUSE OF DISCRETION

A trial court's decision in family law cases regarding conservatorship, modification, and parental rights and duties is reviewed under an abuse of discretion standard. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *See also*, *Zeifman v. Michels,* 212 S.W.3d 582, 587 (Tex. App.-Austin 2006, pet. denied). A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without regard to any guiding rules and principles. *K-Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex. 2000). There is no abuse of discretion if evidence of a substantive and probative character exists to support the trial court's decision. *Zeifman*, 212 S.W.3d at 587.

Under the abuse of discretion standard of review in family law cases, challenges to the sufficiency of the evidence are not independent grounds of error but are relevant considerations in assessing whether the trial court abused its discretion. *Id.* at 587. When assessing whether the trial court abused its discretion in light of the sufficiency of the evidence, the reviewing court employs a two-pronged inquiry: (1) did the trial court have sufficient information upon which to exercise its discretion, and (2) did the trial court err in its application of discretion. *Id.* at 588. The trial court's factual determinations are reviewed for sufficiency

under the first prong, then the reviewing court determines whether, based on the evidence, the trial court's decision was reasonable. *Id.*

B. LEGAL SUFFICIENCY

The legal sufficiency of evidence to support a particular fact-finding is a question of law. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). In a legal sufficiency challenge, the reviewing court credits favorable evidence supporting the finding if a reasonable fact-finder could, and disregards contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. If the evidence at trial would enable reasonable and fair-minded people to reach the same conclusions, the evidence is legally sufficient. *Id.* at 827. When the evidence falls within the zone of reasonable disagreement, a reviewing court may not substitute the judgment of the trial court. *McDonald v. Dankworth, 212 S.W.3d 336, 339 (Tex.App.-Austin 2006, no pet.)* (citations omitted). A reviewing court cannot disregard undisputed evidence that allows of only one logical inference. *Keller,* 168 S.W.3d at 814.

A reviewing court sustains a legal sufficiency challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered o prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810 (citation

25

omitted). In determining whether the evidence is legally sufficient to support a fact-finder's determination, the reviewing court must determine whether the evidence would allow reasonable and fair-minded people to find the facts at issue. *Id.* at 827.

Where a party bearing the burden of proof challenges a the legal sufficiency of a finding, a reviewing court determines whether the evidence establishes, as a matter of law, all of the facts in support of an issue. *Dow Chemical Co. V. Francis,* 46 S.W.3d 237, 241 (Tex. 2001).

## C. FACTUAL SUFFICIENCY

In reviewing a question of factual sufficiency, the reviewing court considers all of the evidence in the record, both in favor of, and contrary to, a challenged finding in a neutral light. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam). Where a party bears the burden of proof, a factual sufficiency challenge is sustained if the finding is so against the great weight and preponderance of the evidence that it is clearly unjust, shocks the conscience, or clearly demonstrates bias. *CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship,* 164 S.W.3d 675, 680 (Tex.App.-Austin 2005, no pet.)

A reviewing court must not merely substitute its judgment for that of the trier of fact when conducting a factual sufficiency review. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). However, the reviewing court

26

may conclude that a finding is against the great weight and preponderance of the evidence even if the record contains "some evidence of probative force" to support the finding. *Id.*

D. DE NOVO

In reviewing a question of law, the reviewing court engages in an analysis de novo without deference to the lower court's determination. *State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996). A "trial court has no `discretion' in determining what the law is or applying the law to the facts," and, therefore, abuses its discretion if it misinterprets or misapplies the law. *Shook v. Walden,* 304 S.W.3d 910, 916-17 (Tex.App.-Austin 2010, no pet.) (citations omitted).

# ARGUMENTS AND AUTHORITIES[16]

## ISSUE I.

**Did the trial court err (or alternatively abuse its discretion) by excluding a recorded telephone call obtained by vicarious consent due to father's good-faith, objectively reasonable belief that recording the call was in the child's best interest because the mother was continuing to violate protective injunctions and coach the child to deny the mother's violations?**

Both federal and state "wiretap" statues prohibit intercepting or recording a telephone conversation unless one of the parties to the conversation has consented to the interception or recording.[17] However, the federal and Texas courts considering the doctrine of "vicarious consent" have *all* held that the necessary consent may be vicariously provided by a parent (or guardian) on behalf of the minor child when the consenting adult has a good-faith, objectively reasonable belief that recording the communication is necessary and in the best interest of the child.[18]

---

[16] Citations to the record are included if not previously cited in the Statement of Facts.

[17] 18 U.S.C. § 2511(2)(d); Tex. Pen. Code §16.02(c)(4)(B); Tex. Pract. & Civ. Rem Code § 123.001(2)

[18] Other than the federal and state cases cited herein, the other federal and state cases are, *Wagner v. Wagner*, 64 F.Supp.2d 895, 896 (D.Minn.1999); *Campbell v. Price*, 2 F.Supp.2d 1186 (E.D.Ark. 1998); *Thompson v. Dulaney*, 838 F.Supp. 1535, 1544 (D.Utah 1993); *Isaacson v. Isaacson*, No. CIV-10-678-M (W.D. Okla. Apr. 6, 2011); *Weaver v. State*, No. 10-06-00326-CR, 2007 WL 4157237, at *2 (Tex. App.–Waco Nov. 21, 2007, pet. denied) (mem.op., not designated for publication); *Ussery v. State*, 03-07-00116-CR, 2008 WL 269439, at *1 (Tex. App.–Austin, Jan. 30, 2008, pet. ref'd) (mem.op., not designated for publication).

28

The Texas opinions affirming the vicarious consent doctrine are the progeny of *Pollock v. Pollock,* 154 F.3d 601 (6th Cir.1998), which was the first, and is the only, federal circuit court to address vicariously consented telephone recordings. *Id.* at 606. In *Pollock*, a mother recorded telephone calls between her daughter and her ex-husband and his new wife after the mother became concerned that her daughter was being "emotionally abused" by the father. *Id.* at 603. Specifically, the mother believed that her daughter's father and step-mother were subjecting the fourteen-year-old child to mounting "psychological and emotional pressure" to do whatever necessary for the daughter to convince her mother that the father should have custody of the daughter. *Id.* at 604.

The mother had noted a gradual change whereby her daughter demonstrated an "excessive or compulsive desire to be with her father" and a "deteriorating relationship" with her mother. *Id.* The mother said she began recording calls because of her "concern for her child's well being." *Id.* The court noted that it was important to the determination to consider that the recordings were made in the context of a bitter and protracted custody dispute. *Id.* at 603.

In one recorded call between the child and her step-mother, the child expressed wanting to kill the mother's two attorneys. In turn, the step-mother added the trial court judge to the "hit list." *Id.* The father and step-mother filed suit against the mother for violating federal wiretap statutes prohibiting interception

and disclosure of telephone conversations without consent of one of the parties. *Id.* at 605.

The *Pollock* court found that the mother's concerns about her daughter's welfare provided vicarious consent to record and disclose the content of the telephone calls, and thus, the recordings did not violate federal wiretap laws. *Id.* at 610. Specifically, after surveying each state and federal district court opinion on the issue at that time, the *Pollock* Court held that:

> [A]s long as the guardian has a good faith, objectively reasonable basis for believing that it is necessary and in the best interest of the child to consent on behalf of his or her minor child to the taping of telephone conversations, the guardian may vicariously consent on behalf of the child to the recording.

*Id.*

In *Allen v. Mancini*, 170 S.W.3d 167 (Tex.App.-Eastland 2005, pet. denied), a father recorded telephone conversations between his minor child and the child's mother during the child's summer vacation with father. *Id.* at 170, 172. The father became aware during the visitation that the mother was attempting to interfere in the child's relationship with the father by telling the child that her father did not love the child, the father stole money and was going to jail, the father had

30

"kidnapped" the child, and instructed the child not to call the father "Dad." *Id.* at 170. The recordings were admitted into evidence during a subsequent custody modification proceeding. *Id.* at 172. The mother objected to the admissibility under both state and federal wiretap statutes.[19] *Id.* at 172-73. The appellate court held that the father had provided vicarious consent "under the criteria set forth in *Pollock,*" and, therefore, neither Texas nor federal wiretap laws were violated. *Id.* at 173.

The Texas Court of Criminal Appeals has likewise ruled on vicarious consent. *Alameda v. State*, 235 S.W.3d 218 (Tex. Crim. App. 2007). In *Alameda*, a mother suspected that her thirteen-year-old daughter was having an inappropriate, but *not* sexual, relationship with a former male tenant who had roomed at mother's home for a year. *Id.* at 220. The mother believed that the former tenant and her daughter were continuing to have contact without the mother's knowledge or permission because the man's relatives would tell the mother things about herself that they would not otherwise know if her daughter and the man were not still in contact. *Id.* at n.1 (majority opinion); *Alameda v. State*, 181 S.W.3d 772, 780 (Tex.App.—Fort Worth 2005). Continued contact concerned the child's mother because the man had allowed the child to do things the mother did not approve of

---

[19] The *Allen* opinion infers that, since the mother cited *Collins v. Collins*, 904 S.W.2d 792 (Tex.App.-Houston [1st Dist.] 1995), writ den'd, 923 S.W.2d 569 (Tex.1996), and *Collins* addressed only Section 123 of the Texas Practice and Civil Remedies Code, the mother in *Allen* was not implicating the Texas Penal Code. 170 S.W.3d at 172.

during his tenancy, such as drive a car. *Alemeda,* 235 S.W.3d. at n.1 (majority opinion). The mother recorded all incoming and outgoing telephone calls and discovered the man and her daughter were engaging in a sexual relationship. *Id.* at 220. The recordings were turned over to the police, and the man was charged accordingly. *Id.* At trial, the defendant moved to suppress the recordings as inadmissible under Article 38.23 of the Texas Code of Criminal Procedure (exclusionary rule) claiming the recordings were illegally obtained per § 16.02 of the Texas Penal Code. 235 S.W.3d at 220. The trial court held that vicarious consent was provided due to the mother's concerns. *Id.* Both the intermediate appellate court and the Court of Criminal Appeals adopted the standard set out in *Pollock* and affirmed on that basis.[20] *Alameda,* 181 S.W.3d at 778; *Alameda*, 235 S.W.3d at 223.

In the instant case, Justin's good-faith, objectively reasonable concerns were a matter of record long before he began recording calls between the child and Adana. The child made an outcry to Justin and to CPS that the child had been around her pedophilia uncle in violation of an injunction. In fact, the uncle had

---

[20] The verbiage of the Forth Worth Court of Appeals' holding differed slightly from *Pollock*, stating that: "[A]s long as a parent has a good faith, objectively reasonable basis *for believing that the taping of telephone conversations is in the best interest* of the parent's minor child, the parent may vicariously consent to the recording on behalf of the child." *Alameda v. State*, 181 S.W.3d 772, 778 (Tex.App.—Fort Worth 2005) (emphasis added). The Court of Criminal Appeals used both the *Pollock* language and the Fort-Worth appellate court's language in their opinion. 235 S.W.3d at 223.

been touching the child via a uniquely created version of tag that made the child a "princess" and whoever caught her, her "prince." It is well established that early *physical* pedophilia grooming often includes body-contact games or play-acting, and early *psychological* grooming often includes making the child feel "special."[21] Even the trial court voiced concern over the dynamic of the princess/prince role playing, and Ms. Roberts agreed the dynamic was worrisome. (4RR 42:17-24).

Then, after Adana received a call from CPS letting Adana know what the child told her, the child recanted her story, denying that she even had any uncles at all. CPS joined Justin in his concern that Adana had punished the child for her outcry. A few months later, the child revealed Adana's mode of punishment when the child says things the child is not supposed to say: spanking the child in the mouth.

In the few days before Justin began recording telephone calls between his daughter and Adana, it became apparent to Justin that Adana had again violated a court injunction when the child told Justin in a phone call that she had flown kites with her paternal grandfather that day (Justin is unaware if the child's grandmother or Uncle Gilbey, who both reside with the grandfather, was also present). The court had specifically enjoined Adana just ten weeks earlier from having the child

---

[21] Anne-Marie McAlinden, *'Setting 'Em Up': Personal, Familial and Institutional Grooming in the Sexual Abuse of Children*, 2006, at 347; Samantha Craven, *Sexual Grooming of Children: Review of Literature and Theoretical Considerations*, 2006, at 295.

in her parents' presence during Adana's limited summer possession. (5RR 83:11-21). Justin felt it was in the child's best interest for him to be able to document the continued violations so that the trial court would have sufficient information to put safeguards in place.

In both *Pollock* and *Alemeda*, the parents only suspected inappropriate conduct by the other parent or third party at the time the courts deemed their suspicions were enough to provide vicarious consent. Justin already knew Adana had engaged in inappropriate conduct with the child, and had good reason to believe she was still violating injunctions, which necessarily meant she was still coaching the child. Exacting secrecy also has the effect of interfering in the child's relationship with the other parent, as was the case in *Pollock* and *Allen*.

The trial court and CPS shared Justin's concerns about Adana's conduct and about whether the child had been, or would be, harmed, which is why the trial court removed the child from Adana's possession and awarded Justin temporary custody. The fact that others would, and did, have the same concerns is a likely gauge for "good-faith, objectively reasonable basis." *See Wichita County v. Hart,* 917 SW2d 779, 784-85 (Tex.1996) (reviewing "good faith" definitions in various contexts and holding that "good faith" is "honesty in fact" in the Whistleblower context); *see also, Jackson v. Axelrad*, 221 S.W.3d 650, 655-56 (Tex. 2007) (the traditional reasonable-person standard takes into account both the knowledge and

34

skill of an ordinary person). Given that others did have serious concerns about Adana's conduct, Justin's vicarious consent to record telephone calls between the child and Adana meets the standard articulated in *Pollock*, *Alemeda,* and *Mancini*.

As the cases on vicarious consent demonstrate, recording a child's telephone conversations often produces the only direct and irrefutable evidence that the other parent or a third-party is engaging in behavior harmful to the child. In this case, while there was evidence that Adana had coached the child and that she spanks the child in the mouth to control what the child says, the recording was the only evidence that Adana was *continuing* to coach the child after undertaking a protective parenting class that the court seemed confident would reform Adana. Thus, contrary to the trial court's finding that Adana was "successfully progressing in protective parenting classes," the excluded recording would have demonstrated to the trial court that, *despite* embarking on a protective parenting class, Adana was *continuing* to ignore injunctions and then *continuing* to mentally and emotionally abuse the child in an attempt to exonerate herself. (CR 334:27)

Moreover, the trial court specifically told Adana at the April hearing after the child was removed from her possession that she was not to coach the child, and stated, "*If you think it's bad now, get caught doing that*," referring to coaching the child. (4RR 114:20-115:2). Because at the same hearing the trial court refused to order any specific visitation for Adana with the child, the statement "if you think

35

it's bad now," clearly implied the trial court would continue to severely limit Adana's access to the child if she were "caught" coaching the child. (4RR 114:16-19, 115:3-13, 116:4-9).

But without the irrefutable evidence "catching" Adana continuing to coach the child even as late as August, instead of limited access, the trial court returned the child to Adana's possession at the conclusion of the August hearing. That is, by the trial court's *own sentiments*, the exclusion of the "you and me" recording evidencing Adana's continued coaching likely caused a rendition that the court would not have otherwise made. *Kittman v. Miller*, No. 12-13-00097-CV 2013 WL 4680575 at *8-9 (Tex. App. – Tyler Aug. 29, 2013, pet. denied) (mem. op.) (excluded testimony that showed a parent behaved inappropriately on *more* than one occasion probably caused an improper rendition). Therefore, the trial court erred, or alternatively, abused its discretion, and a new trial should be granted.

## ISSUE II.

**Did the trail court err (or alternatively abuse its discretion) in excluding expert testimony that the child was afraid of her uncle, a convicted pedophile, when the evidence was permissibly obtained.**

At the initial hearing after the child made an outcry (April hearing), the trial court ordered that the child have a CAC interview and a session with the child's counselor. Justin took the child to a psychologist, Dr. White, for an examination shortly before the May hearing as well. During basic get-to-know you questions,

36

such as what do you like/dislike, what are you afraid of, the child spontaneously said that she was afraid of witches and Uncle Gilbey. (5RR 51:1-11). Justin did not expect the child to mention Uncle Gilbey since the child had denied having uncles or ever seeing Uncle Gilbey to CAC and her regular counselor, respectively, in the weeks before owing do Adana's coaching. The fact that she did mention Uncle Gilbey demonstrated to Justin that the child does not feel free, or safe, to talk to the counselor Adana and her mother take the child to see–the one who reached out to Adana's counsel offering her 'testimony.' After this disclosure to Dr. White, Justin hired a psychologist, Dr. Kelley Baker, local to the trial court, to consult with Dr. White so that Dr. Baker could testify as to her and Dr. White's impressions, the fears the child expressed (statements made for the purpose of medical diagnosis), and offer therapy suggestions the following week at the May hearing.

During the May hearing, and in the trial court's findings of fact and conclusions of law, the trial court found that Justin was not authorized to have the child examined by a psychologist because Adana was the parent with "the exclusive right…to consent to psychiatric and psychological *treatment,*" and the trial court had neither provided authorization. (5RR 19:1-20:25, 53:15-54:24; CR 232, 333:24, 335:3) (emphasis added). However, Justin testified, and Justin's counsel made it clear, that Justin took the child for an examination or assessment only, not for treatment. (5RR 19:14-20:25). The parties' orders did not address a

37

parent taking a child to a psychologist, or any other health care provider, for an *examination*. The only limitation was regarding *treatment* of the child, and Dr. White did not provide treatment.

Under the parties' order Justin had, and has, a duty of care and protection of the child during his periods of possession. At the time the child was examined by Dr. White, Adana had no right to any possession of the child whatsoever. In fact, the trail court expressly refused to order any visitation between the April and May hearings. (4RR 116:4-9). The right to have the child examined, therefore, arises under Justin's duty to protect the child if he is not otherwise prohibited, otherwise Justin would merely be warehousing his daughter without any ability to determine what specialized care he may need to provide for her. And Justin was not prohibited from having his child independently examined under the parties' or the trial court's orders at that time. (4RR, CR 229, 252).

Should this court interpret Justin's authority to consent to an examination under the parties' orders differently, Section 32.005 of the Texas Family Code expressly entitles, inter alia, a psychologist to examine a child "*without the consent of the child, the child's parents or other person authorized to consent to treatment under this subchapter*" if the psychologist has "reasonable grounds to believe the child's physical or mental condition has been adversely affected by abuse or neglect," unless consent is prohibited by a court order. Tex. Fam. Code §

32.005(a), (c). In the instant case, no injunction existed that prohibited Justin from taking the child to a psychologist.

It appears that § 32.005 (or its sister statute 32.004) have never been considered by Texas appellate courts. However, sections in Subchapter A ("Consent to Medical Dental, Psychological, and Surgical Treatment") allow minors to consent for themselves to various treatments, including surgery, under certain conditions and allow various providers to treat or examine minors without any consent whatsoever, provided they have reasonable grounds to do so. Tex. Fam. Code §§ 32.001-32.005. The "subchapter" provides a laundry list of "other persons" from whom a psychologist does not need consent in order to examine a child (besides the child and the child's parents), including various family members, various institutions, *a court having jurisdiction over a suit affecting the parent-child relationship of which the child is a subject*, *managing conservators*, and guardians. Tex. Fam. Code §§ 32.001(a), 32.004(b).

In its conclusions of the law, the trial court seems to interpret § 32.005 to mean that a psychologist may only examine a child when a psychologist discovers facts warranting reasonable grounds on their own. (CR 335). Appellant is unclear how a psychologist might independently discover such facts without someone close to the child–who will transport the child to the psychologist, such as a parent or guardian–relating facts to the psychologist. The trial court further opines that a

parent should not be allowed "to create" reasonable grounds to believe that his child's physical or mental condition had been adversely affected by abuse or neglect. (CR 335). Appellant agrees with this statement. However, here, Justin did not create the reasonable grounds, but rather the reasonable grounds were all ready created by Adana (as evidenced by the trial court removing the child from her possession, of which Dr. White was aware since he knew Justin prior to the child's removal). Justin merely related the removal facts to the psychologist who then formed his own beliefs as to whether he had reasonable grounds.

Indeed, it would seem impermissible under the first rule of statutory construction to insert qualifiers after "reasonable grounds" such as "which he or she independently discovers" or "the facts of which were not communicated by a parent" into the text of a statute. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999) (citations omitted) ("[F]irst…look[] to the plain and common meaning of the statute's words"); *Nationwide Ins. Co. v. Elchehimi,* 249 S.W.3d 430, 434 (Tex. 2008) (declining to adopt an "integral part test" because the test was "not present in the text of the statute…")

Due to the trial court's erroneous interpretation of Justin's authority (or the psychologist's under § 32.005), the court was offended that Justin took the child to a psychologist even though Justin only sought to have the child examined for clues of molestation since the CAC forensic interview ordered was ineffectual likely due

40

to Adana punishing the child for the outcry. Instead of allowing Dr. Baker (or Ms. Scott) to offer suggestions on how to proceed with therapy considering the child was saying she was scared of a 'non-existent' uncle, the trial court ordered the content of the child's therapy.

Dr. Baker's excluded testimony was evidence material to the issue of conservatorship, including present and future emotional needs of, and danger to, the child. *See Van Heerden v. Van Heerden,* 321 S.W.3d 869, 877 (Tex. App.-Houston [14th Dist.] 2010, no pet.). Dr. Baker's testimony would provide the *only* evidence that the child was scared of Uncle Gilbey for some reason. The trial court exclusion's of this evidence, therefore, was an error, or alternatively, an abuse of discretion and probably caused an improper rendition of the case. *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex.1992). It is unlikely that the trial court would have returned the child to Adana if the trial court had considered the testimony, which tended to show that the yet-to-be revealed secret about the registered pedophilia sex offender uncle that the child had been playing "touch" games with is something that makes the child as scared of him as she is of witches, who "get little girls."

**ISSUE III.**

**Did the trial court err (or alternatively abuse its discretion) by designating the mother as the parent with the exclusive right to designate the child's residence, by granting the mother other exclusive rights, and by**

41

**allowing the mother to have unsupervised possession of the child where the evidence was legally and factually insufficient to support that such findings and orders were in the best interest of the child?**

### A. Conservatorship

The determination of conservatorship issues is "intensely fact driven." *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex.2002). The burden of proof in conservatorship cases is a preponderance of the evidence. *Id*.; § 105.005; *In re W.M.*, 172 S.W.3d 718, 724 (Tex.App.-Fort Worth 2005, no pet.). The Texas Supreme Court has developed best interest factors to guide the courts in making such determinations in conservatorship and modification of conservatorship cases. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000). The Texas legislature has provided the courts with public policy imperatives for the courts to observe in applying the best interest factors to the facts in each conservatorship case. *Id*. at 14; Tex. Fam. Code § 153.001(a). Many statues in the Texas Family Code reveal how seriously the legislature takes its public policy imperatives and *parens patriae* role in the protection of children within its borders from abuse and neglect at the hands of a child's own parent. *See, e.g.*, Tex. Fam. Code §§ 153.004, 153.131, 156.104, 156.1045, 161.001; *Saavedra v. Schmidt*, 96 S.W.3d 533, 544 (Tex.App.-Austin 2002, no pet.).

### B. Safety of the Child Controls

Collectively, the guidance provided by the Texas Supreme Court and

legislature mandate that the safety of the child controls. Also collectively, the guidance as applied to the facts in this case dictate that Adana should not be appointed the conservator with the exclusive right to designate the child's residence or to consent to the child's psychological treatment, and that her periods of possession should provide for monitoring or other protective safeguards for both the physical *and* emotional safety of the child.

Section 153.001(a) sets out the state's public policy imperatives:

(a)  The public policy of this state is to:

(1)  assure that children will have frequent and continuing contact with parents *who have shown the ability to act in the best interest* of the child;

(2)  provide a *safe*, stable, and *nonviolent* environment for the child; and

(3)  encourage parents to *share* in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

Tex. Fam. Code § 153.001(a) (emphasis added).

At the outset of the conservatorship statutes, the legislature qualifies which parents may be assured of frequent and continuing contact with their children when a court decides conservatorship and possession issues. *In re A.V.,* 113 S.W.3d 355, 361 (Tex.2003) (citations omitted) ("The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities."). The statute further

43

provides that courts will first and foremost seek to provide a safe, stable, and nonviolent environment. Without a safe environment, which necessarily includes nonviolence, stability is of little import. *Id.* ("[P]rotection of the child is paramount…"). A court that effectively makes the same assurance to a parent who has not shown that he or she would keep their child safe, renders the policy nonexistent and leaves the child at risk of harm. *See generally, Sylvia v. Tex. Dep't of Family and Protective Servs.*, No. 03-09-00427-CV 2010 WL 1507827 at *13 (Tex. App.–Austin Apr. 15, 2010, no pet. h.) (mem. op.) (citations omitted) (mother's parental rights terminated for failure to protect children from sexual abuse because she disbelieved her husband was intentionally exposing himself to her children); *In re A.L.E.,* 279 S.W.3d 424, 431-32 (Tex. App.-Houston [14th Dist.] 2009, no pet.) (mother's possession was supervised unless she provided father with negative drug *and* alcohol test results prior to each possession period).

The Texas Supreme Court and many courts of appeals have held that the presumptions in Chapter 153 of the Texas Family Code do not apply to Chapter 156 conservatorship modifications. *In re V.L.K.,* 24 S.W.3d 338, 343 (Tex.2000); *In re S.E.K.,* 294 S.W.3d 926, 928 (Tex. App.-Dallas 2009, pet. denied); *In re C.A.M.M.,* 243 S.W.3d 211, 216 (Tex. App.-Houston [14th Dist.] 2007, pet. denied). And while this interpretation means that the 'safety of the child' presumptions contained in Chapter 153 where there has been a showing of abuse

44

and neglect are not statutorily available to the child in a modification proceeding, certainly evidence of abuse and neglect must still be considered. *See, S.E.K.*, 294 S.W.3d at 929. The 'safety presumptions' available to protect the child in an original proceeding provide that a parent who has a history or pattern of, inter alia, child neglect or abuse may not be appointed joint managing conservator and should have supervised visitation with the child. Tex. Fam. Code § 153.004(b), (e); *In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758, *7 (Tex.App.-Austin 2005, no pet.) (mem. op.) (citations omitted); *Contra In re L.C.L.*, 396 S.W.3d 712, 719 (Tex. App.-Dallas 2013, no pet.).

Spanking a child in the mouth, for any reason, much less to silence a child, is physical and emotional abuse. Cases where testimony reveals that a parent hit a child in the mouth are noted in appellate opinions, likely owing to the fact that such behavior is universally recognized as physical *and* emotional abuse. *In re A.A.M.*, No. 14-05-00740-CV, 2007 WL 1558701, at *2 (Tex. App.--Houston [14th Dist.] May 31, 2007, no pet.) (mem. op.); *In re T.N.C.*, No. 13-11-00305-CV, 2011 WL 5282679, at *3 (Tex. App.-Corpus Christi Nov. 3, 2011, no pet.) (mem. op.); *In re K.B.*, No. 03–09–00366–CV, 2010 WL 5019368, at *2, 6 (Tex.App.-Austin Dec. 9, 2010, no pet.) (mem.op.); *In re J.K.*, No. 09-10-00226-CV, 2011 WL 2119770 at *3, 13 (Tex.App.-Beaumont May 19, 2011, no pet.) (mem. op.).

While terminating Adana's parental rights was never a question or request in

the case at bar, the statutes and case law on termination are instructive since termination was ordered in cases similar to this case. That is, in cases where a parent knowingly placed a child in an environment at high risk for sexual abuse, or neglect due to alcohol abuse, and then refused to change their behavior, or were too slow to change their behavior. Section 161.001 provides that if a trial court finds that termination of the parent-child relationship is in the best interest of the child and that, by clear and convincing evidence, inter alia, *any one* of the following has occurred, the parent-child relationship may be terminated:

> (D) *knowingly placed* or *knowingly allowed the child to remain* in conditions or surroundings which endanger the physical or emotional well-being of the child, or
>
> (E) *engaged in conduct* or *knowingly placed* the child with persons who engaged in conduct with endangers the physical or emotional well-being of the child.

Tex. Fam. Code § 161(D), (E).

Subsection D permits termination for a single act of endangerment, whereas Subsection E requires a course of conduct. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.-San Antonio 1997, pet. denied) (citation omitted). Subsection D speaks to the parent's act or omission causing a child to be placed or remain in an endangering environment, whereas Subsection E speaks to a parent's conduct that itself causes

46

endangerment. *Id*.

In the instant case, the trial court found that the child had been in the presence of a registered pedophilia sex offender *due to Adana's conduct*. (CR 332:21, CR 317). Regardless of whether Adana wants to believe that her brother is guilty of the pedophilia offenses for which he was convicted, she is aware of the convictions, thus, her acts, omissions, and conduct meet, not just one, but all 'four' of the alternative conditions in Subsections D and E. *In re L.C.*, 145 S.W.3d 790, 796 (Tex.App.-Texarkana 2004, no pet.) (mother's parent-child relationships terminated where mother, "at a minimum, knew of the potential for danger of sexual abuse" and "failed to adequately protect the children from that risk."). There is no a requirement that exposing the child to endangerment resulted in harm in order to terminate a parent's legal relationship to their child. *Williams v. Willaims,* 150 S.W.3d 436, 450 (Tex. App.-Austin 2004, pet. denied) ("conduct need not have caused an actual injury…to constitute conduct that endangers the child's physical or emotional well-being").

Surely, then, based on Adana exposing the child to a high risk of sexual abuse because she refuses to "see that there's going to be a risk," reasonable minds could only come to one conclusion: that the trial court abused its discretion by allowing Adana to have primary custody of the child and not safeguarding the child. *In re J.I.O.*, No. 11-05-00369-CV 2007 WL 1644579, at *3 (Tex.App.-

Eastland June 7, 2007, no pet.) (mem. op.) (father awarded custody where mother did not "see a problem" with her sex offender boyfriend being around the child as there was no evidence the child was yet harmed); *Doe v. Franklin*, 930 S.W.2d 921, 928 (Tex.App.-El Paso 1996, no writ) ("It is foreseeable that a child will be victimized if left alone or brought into close proximity with a pedophile. A *reasonable* parent will protect a child… from [that] predatory behavior…").

Adana is, of course, also aware of her excessive alcohol intake, (along with prescription barbiturates), which alone will support a finding that termination is in the child's best interest. *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.-Waco 2008, no pet.) ("Evidence of illegal drug use *or alcohol abuse*…is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child.") (emphasis added); *In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *7-8 (Tex. App.-Fort Worth, Feb. 9, 2006, no pet.) (mem. op.) (considering mother's continuous abuse of prescription drugs in analyzing trial court's subsection (E) finding); *Johnson v. Johnson*, 804 S.W.2d 296, 301 (Tex.App.-Houston [1st Dist.] 1991, no writ) (mother awarded sole custody while father's visitation was supervised due to the fact that father was abusing alcohol); *In re H.A.P.*, No. 11–05–00180–CV, 2006 WL 648312, at *2 (Tex.App. – Eastland March 16, 2006, no pet.) (mem. op.) (upholding supervised-visitation only for father due to his alcohol abuse).

The trial court implied during the May hearing and in its findings of fact that returning to the prior orders or "status quo" was the goal and in the best interest of the child. (5RR 82:23-25; CR 28). But as the cases above all demonstrate, when "status quo" is endangering, abusing, and neglecting the child, all of which demonstrate an improper bond between the parent and child, status quo is anything but in the best interest of the child. Safety controls.

**C. The Evidence, the Findings, and Best Interest of the Child**

The trial court found that the child had been in the presence of Uncle Gilbey during the first hearing after the CPS child interviewer testified that the child reluctantly revealed to her that the child had played the "touch" game of Princess Tag with her Uncle Gilbey. This finding is also reflected in the trial court's findings of fact. (CR 332:21). Even the evidence submitted by Adana's counsel showed that *every day* in 2014 that Uncle Gilbey was not at work or he left work early, Adana's mother, with whom Uncle Gilbey lives, picked the child up from daycare as if the family is going out of their way to foster a relationship between the child and her registered pedophilia sex offender uncle. (7RR 159, 160).

While Justin did not seek custody of the child when he filed a modification, he did once the child told him that she had been playing Princess Tag with Uncle Gilbey. Learning that his child was being touched by a pedophile, along with the evidence of Adana coaching the child, spanking her in the mouth, and abusing

49

alcohol, was, as Justin put it, "***definitely a game changer***." (6RR 64:18-24). It would be a game changer for any reasonable trier-of-fact. Nonetheless, and while there were no concerns about Justin's parenting or the environment the child lives in with Justin, the trial court found it not only to be in the best interest of the child for Adana to have primary custody, but in the child's best interest for Adana to have all of the exclusive rights contained in Section 153.132, which is tantamount to giving *Adana* sole managing conservatorship of the child. Tex. Fam. Code § 153.132; *In re Kubankin,* 257 S.W.3d 852, 860 (Tex.App.-Waco 2008, orig. proceeding) (per curiam) (order providing a joint managing conservator with seven exclusive rights corresponds to a sole managing conservatorship).

## *Undisputed***, Relevant Substantive Conservatorship Evidence**

- Justin will go to great lengths to protect his child from a pedophilia sex offender.

- Adana *fought* to have the child establish a personal relationship with her pedophilia sex offender brother as he was being released from a nine-year prison sentence, saying that she just does not "see that there is going to be a risk there." (2RR 12:20-25).

- Adana exacted secrecy from the child by coaching her not to talk about Uncle Gilbey to anyone.

- Adana has spanked the child in the mouth.

50

- Child's counselor reported Adana to CPS.

- Adana drinks alcohol every week.

- Adana had six empty 5-Liter boxes of wine (equating to forty empty bottles) in her weekly curbside trash.

- Adana purchased three 5-Liter boxes of wine (equating to twenty bottles) in a four-day period.

- Adana regularly takes a prescription containing barbiturates.

## Credibility Issues

The trial court, the sole judge of credibility, stated at the April hearing that the testimony of Adana and her family lacked any credibility. "So their testimony of their belief [that Mr. Buitron is a pedophile] to me is disingenuous. I don't believe–I think they're down here saying what's necessary to get what they want." (4RR 106:17-19). Thus, it would be unreasonable for a trier-of-fact to give *any* of Adana's sworn testimony credibility.

Indeed, subsequent testimony by Adana was just as incredible since Adana's testimony varied substantially between hearings and her versions of events were, at times, the exact opposite of credible evidence. For example, the amount of alcohol to which Adana testified she drank every week doubled from one hearing to the next.

Adana maintained at the August hearing that the child never met Uncle

51

Gilbey (even after the trial court stated months earlier that it disbelieved her when she said there had been no contact between the two). However, she *also* testified at the August hearing that, "…if I had been told–if that restraining order (sic) said…'Do not go to anybody's house that has, you know, [Uncle Gilbey] in their house,' if that's what it said, I would have done that." By this ambiguous statement, Adana appeared to be blaming the injunction (or the court) for the contact between the child and Uncle Gilbey because the injunction did not list all the places the child might run into her uncle, such as the home he lives in. (5RR 60: 1-6).

Adana testified at the August hearing that the reason she purchased three 5-Liter wine boxes on August 6th and 10th–just ten and fourteen days prior to her testimony–was because she "thinks" her best friend was in town, or that she was going to her best friend's house, "or something." (6RR 98:12-15). It would not be very difficult for most people to recall whether or not they have seen their out-of-town best friend during the last two weeks.

At the original injunction hearing regarding Uncle Gilbey, Adana's counsel stated that if the trial court would see fit to deny Justin's request for the injunction against Uncle Gilbey, Adana would ensure that when the child and Uncle Gilbey were together, "[Uncle Gilbey] will have, *absolutely, no physical contact with the child, not a handshake, not a hug, not a pat on the back*." (2RR 6: 4-6).

52

Regarding the child saying in a recorded phone call that she "finally" got to fly her kite, but that it did not go as high as her grandfather's (indicating Adana had again violated an injunction imposed to safeguard the child), Adana's counsel elicited the following testimony:

Q. Did you and Sierra go fly kites, recently?
A. Yes, we did in our backyard.
…
Q. The first week of August?
A. Yes.
Q. Did Sierra make some comment about how high her kite flew?
A. Yes, we got -- we had some really good wind, and it went really high.
Q. When is the last time she flew a kite with her step-grandfather?
A. I think it was my birthday last year, but I'm not positive.
Q. When was that?
A. October. But, I mean, he may have -- they may have done it, or tried to. *That was the whole thing, they tried to fly a kite, and it didn't work out*.
…
Q. Ha[ve] [the grandparents] had any contact with Sierra since May 21, 2013?
A. No.
Q. Does Sierra say *when she was flying a kite that it went higher than the last time she flew one with grandpa*?
A. Yes, *she said it flew higher than her grand-dad's dragon kite*.
Q. Okay. And we're now facing an allegation that because she said that, somehow grandpa had to be there that day?
A. Well -- and I can see why [Justin] thought that, but, no, [the child's grandfather] wasn't there. She was just saying *that our kite*, because she was holding it, she let the string go, go, go, and it *went really high*. [The child's grandfather] had -- *he didn't get his up*.

53

(6RR 22:1-25, 23:1-13) (emphasis added).

But if the child had flown the kite with Adana rather than with grandfather on August 4, 2014, as the child reported, then Adana would have known that her child's kite did not go "really high" at all, much less fly away, according to the child. In fact, the exact opposite thing happened: the child's kite did not go "so way up in the air," but her "*granddad's* kite *did*" go way up in the air. (Pet'r's Ex 3, audio recording).

The testimony from Adana's parents was equally as incredible. Adana's mother testified that Princess Tag was the game that the child played with the three boys next door to their home (the home where Uncle Gilbey lives). (4RR 88:10-24). Yet in a subsequent interview by CPS with the parents of the neighbor children in question, those parents stated they had never heard of Princess Tag. (5RR 11:11-22)

On the other hand, the trial court never questioned Justin's credibility, nor was his testimony ever impeached by Adana's counsel, nor did his testimony vary over the five hearings. Additionally, there were no concerns voiced about Justin's parenting skills, parenting ability, or his protectiveness, as evidenced by: 1) the lack of concerns listed in the findings, 2) the trial court giving the child to Justin for four months, 3) the child's counselor and CPS testifying that they had no concerns about Justin's parenting or his home.

**Incompetent Evidence**

Testimony from Ms. Scott about there being emotional harm to the child if she stayed too long with Justin or if Justin maintained custody is wholly incompetent. Ms. Scott provided no basis specific to this child to opine that the child would be harmed. Ms. Scott's information has largely been fed to her from Adana directly or from Adana through the child, since the evidence shows that Adana has told the child to deny to Ms. Scott that she has been in contact with Uncle Gilbey. The trial court largely recognized Ms. Scott's testimony about harm to the child was unsupported by fact when Ms. Scott testified that the child was enjoying being at Justin's Lubbock home.

**Trial Court Findings**

Finding 13: Justin testified that he worked in Eunice, New Mexico, which is only a few miles over the Texas border. Justin never resided there.

Finding 16: The last sentence in this finding is not supported by the record. In the April hearing there was considerable discussion with Ms. Scott, Ms. Robert (CPS), and the court about transitioning to a Lubbock counselor so that Justin would not have to drive twelve hours round trip for one fifty-minute session with Ms. Scott. (4RR 37:17-19, 97:8-98:3). The discussion included Ms. Scott Skyping with the child's new counselor. (4RR 97:24-98:3). At the conclusion of the April hearing, alternatives regarding transitioning to a Lubbock counselor were still up in

55

the air as evidenced by the trial court stating that it would like "Ms. Scott to have, at least, one face-to-face with the child." (4RR 99:4-6, 110-13-15). As to whether Ms. Scott is a neutral counselor, it is very unusual for a therapist to counsel a child for a year without verifying facts about the child from both parents or collateral contacts. It is also very unusual for a counselor to write a letter to an attorney with an opinion about visitation based on one-sided contact and offer-up "testimony" should it be needed. And, still, Ms. Scott does still not believe the child had contact with Uncle Gilbey despite the court finding that the child did have contact.

Finding 17: The inference that Justin did not participate in the child's counseling is not supported by the record. Justin testified that he not know that the child was seeing Ms. Scott until a year after the child began seeing Ms. Scott (another secret, perhaps). Ms. Scott testified that after she called Justin (a year into counseling), he called her back within a week, and he was receptive to what she had to say. (4RR 60:11-61:7). Ms. Scott had not heard from Justin for a few days after she called Justin, she wrote a letter to Adana's counsel saying that he "never" called her back, apparently not realizing that Justin is a truck driver so that returning calls during business hours is not always feasible. Adana also testified that he called the counselor. (3RR 125:2-4).

Finding 18: This finding is not supported by the record. Instead, Adana testified that she advised Justin she would be taking the child to counseling before

56

she took the child (which Justin disputes), and that Justin supposedly said that he did not want to talk about it, and he did not say *anything* else. (3RR 124:3-6, 156:4-8).

Finding 23: This finding is a mischaracterization of the CAC interview, on two levels. First, the child could not make an outcry about abuse at the hands of an uncle that she refused to acknowledge even existed. Second, an "outcry of abuse" was made if one considers, as did CPS, that, all of a sudden, denying the existence of uncles (the child has two) is an implied outcry that the child was punished by Adana (or possibly even by Uncle Gilbey) for revealing the secret. (5RR 10:6-23).

Finding 24: The absence of evidence is not itself evidence. The original concern is still outstanding: no one knows whether the child has been sexually abused. The new concern that arose during the CAC interview–that the child has been utterly silenced–has not been addressed, and will not be addressed by Ms. Scott since she does not believe the child has had contact with the uncle about which silencing would be necessary. Ms. Scott maintains her belief even though the child told her that there is something she has not revealed about Uncle Gilbey, and then the child told Dr. White that she is afraid of Uncle Gilbey, but would not say why.

Finding 27: Again, the absence of evidence is not itself evidence.

**Best Interest of the Child**

57

In suits regarding conservatorship and possession of, and access to, children, the best interest of the children "shall always be the primary consideration of the court" in suits regarding conservatorship. Tex. Fam. Code Ann. § 153.002; *Lenz,* 79 S.W.3d at 14. The eleven best interest of the child factors identified by the Texas Supreme Court for guidance in modification of conservatorship cases are:

1. the desires of the child;
2. the emotional and physical needs of the child now and in the future;
3. the emotional and physical danger to the child now and in the future;
4. the parental abilities of the individuals seeking custody;
5. the programs available to assist these individuals to promote the best interest of the child;
6. the plans for the child by these individuals or by the agency seeking custody;
7. the stability of the home or proposed placement;
8. the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one;
9. any excuse for the acts or omissions of the parent;
10. the child's need for stability; and
11. the need to prevent constant litigation in child custody cases.

*Holley,* 544 S.W.2d at 371-72; *V.L.K.,* 24 S.W.3d at 343.

The evidence shows that Justin has a close relationship with his daughter and that she feels safe with him. The fact that she disclosed to Justin the secret Adana told her not to tell anyone demonstrates that she is aware that Justin is a protective parent and trustworthy parent. The evidence shows that Justin has gone to great lengths to protect his daughter's physical and emotional health, even if that means multiple hearings and an appeal that he can ill-afford as a short-haul truck

driver. (6RR 72:7-9) The evidence shows that Justin is concerned about his daughter's mental health (and did drive twelve hours round-trip for fifty-minute counseling sessions with Ms. Scott), and he wants her to continue in counseling, although he would like the child to see a psychologist with training and experience in trauma. (4RR 18:21-23, 5RR 44:8-22).

Justin testified that if his daughter stayed in Lubbock she would go to a five-star elementary school five blocks from his home, and that his two daughters were inseparable when they are together with him and his wife. (4RR 10:23-11:1). The testimony also showed that Justin is a willing co-parent in spite of Adana's endangerment to the child, as evidenced by Adana speaking with Justin for forty-five minutes about him helping Adana move to Lubbock. (6RR 12:10-17).

The remaining concerns about Adana are serious, including: 1) her continuing to violate protective injunctions even after the child was removed, 2) her and her family's disbelief that Uncle Gilbey is a risk to the child, 3) her exacting secrecy from the child, 4) her spanking the child in the mouth, 5) her alcohol abuse, 6) her prescription narcotic use, and 7) her mixing alcohol and narcotics.

In exacting secrecy, through punishment or otherwise, Adana is using the child to exonerate herself for violating the injunctions. This is s serious concern all of its own since the effect that exacting secrecy has *all ready* had on the child is

59

that the child is too scared to disclose something she has not told *anyone* yet. Young children who are sexually abused by family members commonly delay disclosures longer than older children or children sexually abused by non-family members even where they were not sworn to secrecy or threatened.[22]

### D. Abuse of Discretion

Despite the fact that the trial court stated on April 30, 2014 that it was "not going to wait until this little girl is fondled to do something about it," that is, in effect, exactly what the trial court did by not providing *the child* any greater protection than the child all ready had when the court discovered that the child was playing 'touch' games with a registered pedophilia sex offender with the mother's consent and knowledge. (4RR 107:7-8). Therefore, the trial court abused its discretion.

There is no evidence, or alternatively, insufficient evidence, to support the trial court's finding that it is in the best interest of the child to return the child to Adana along with all Section 153.132 rights and no safeguards for the child. Even the trial court's findings do not support Adana having primary custody. Such a best interest finding is contrary to the great weight and preponderance of the evidence. The orders are clearly unjust (especially *to the child*, who will ultimately be the one to suffer the harmful consequences), are likely the result of bias toward

---

[22] Daniel W. Smith, *Delay in disclosure of childhood rape: Results from a national survey.* Child abuse & neglect 24.2, 2000, at 283-84.

returning to "status quo," and should shock the conscience of this court. Justin has been left with no real way to protect his daughter from a sexual predator of children, and the child has been left without protections from a mother who has demonstrated that she will violate any injunction and abuse the child. Therefore, the trial court abused its discretion in rending such an order, and this case should be reversed or remanded for a new trial.

## ISSUE IV.

**Is a judgment on a modification void where the evidence is legally and factually insufficient to show that an original order existed *to* modify?**

After the default judgment, Justin's second attorney filed a suit to modify the original judgment, and the parties agreed to temporary orders as well as agreeing to an enforcement action brought by Adana on the original default judgment. *Subsequently*, the trail court set aside the parties' original judgment by granting Justin's Bill of Review. Tex. R. Civ. Pro § 329b(f). Nonetheless, the trial court proceeded on the parties' agreed temporary orders on the modification suit and on the parties' agreed resolution to the enforcement on the original default judgment. (CR 224).

However, one cannot modify, or agree to an enforcement of, an original order, where an original order does not exist. Therefore, the parties' "Order in Suit to Modify Parent-Child Relationship" is void. (CR 291). Appellant could not locate

authority for finding a modification order void where no original suit exits. However, the proposition is one of logic.

The harm Appellant suffered is the presumptions relating to a history or pattern of past or present child neglect or physical abuse that a trial court is bound to under an original proceeding, but not under a modification proceeding. It is unlikely that Adana could have, or would, overcome these statutory presumptions in an original proceeding given that there is credible evidence that Adana allowed the child to have contact with her brother in violation of injunctions and that Adana coaches the child and spanks her in the mouth to exonerate Adana and keep secret Adana's endangerment of the child.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, MICHAEL JUSTIN JACOBS respectfully requests this Court reverse and render judgment removing Adana as the parent with the exclusive right to designate the primary residence of the child and granting Justin all other Section 153.132 rights. Alternatively, MICHAEL JUSTIN JACOBS respectfully requests that the case be remanded to re-try all conservatorship issues while finding that the important excluded evidence should be admitted at the new trial. Because Justin has never been afforded a hearing on the original suit, MICHAEL JUSTIN JACOBS respectfully requests

62

that the case be remanded for an original suit affecting the parent-child relationship. MICHAEL JUSTIN JACOBS respectfully requests that this Court grant him such other and further relief as to which he may show himself to be justly entitled.

Respectfully submitted,

FRANKENBERRY LAW FIRM
4425 S. Mopac Expy, Suite 105
Austin, Texas 78735
(512) 252-9937 Telephone
(512) 852-5937 Facsimile

ATTORNEY FOR APPELLANT
MICHAEL JUSTIN JACOBS

By: _____
Paige Frankenberry
State Bar No. 24074226
paige@frankenberrylaw.com

ATTORNEY FOR
MICHAEL JUSTIN JACOBS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellant Brief and Appendix has been served upon opposing counsel, Mr. Robert Ettinger, Law Office of Robert D. Ettinger, P.O. Box 50323, Austin, Texas, 78763, via electronic mail to robert@ettlaw.com, on the 7th day of April 2015.

_____
Paige Frankenberry

# CERTIFICATE OF COMPLIANCE

I hereby certify that this Appellant's Brief contains 14,844 words excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix.

_____
Paige Frankenberry

NO. 14-15-00028-CV


IN THE FOURTEENTH COURT OF APPEALS,
HOUSTON, TEXAS


## MICHAEL JUSTIN JACOBS,

*Appellant*

v.

## ADANA ALT,

*Appellee*


Appendix to Appellant's Brief


**List of Documents:**

Tab A – [Final] Order in Suit to Modify Parent-Child Relationship

Tab B - Docket Sheet, page 1

Tab C – Findings of Facts and Conclusions of Law

Tab D – Exhibit: Wine boxes photo

Tab E – Exhibit: Trash Pull Report from Investigator

Tab F – Article: *'Setting 'Em Up'*

Tab G – Article: *Sexual grooming of children*

Tab H – Article: *Delay in disclosure of childhood rape*

Tab I – Texas Family Code Section 32.005

Tab J – Days Maternal Grandmother picked up child from Daycare and Days Uncle Gilbey off work or left work early

# Tab A

FILED
at 9:26 o'clock A M

SEP 0 2 2014 KSM

NO. 10-0968-F395

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT~~District Clerk, Williamson Co., TX.~~ |
| | § | |
| SIERRA JACOBS | § | 395 JUDICIAL DISTRICT |
| | § | |
| A CHILD | § | WILLIAMSON COUNTY, TEXAS |

### ORDER IN SUIT TO MODIFY PARENT-CHILD RELATIONSHIP

On October 23, 2013 the Court heard this case. On April 30, 2014 the Court heard the motion to re-open evidence and the Court re-opened the evidence. On April 30, 2014, May 21, 2014 and August 20, 2014 additional evidence was submitted to the court during evidentiary hearings.

*Appearances*

Petitioner, Justin Jacobs, appeared in person and through attorney of record, Paige Frankenberry, and announced ready for trial and post trial hearings.

Respondent, Adana D. Alt, appeared in person and through attorney of record, Robert D. Ettinger, and announced ready for trial and post trial hearings.

*Jurisdiction*

The Court, after examining the record and the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case. All persons entitled to citation were properly cited.

*Jury*

A jury was waived, and all questions of fact and of law were submitted to the Court.

*Record*

The record of testimony was duly reported by the court reporter for the 395 Judicial District Court.

1

*Child*

The Court finds that the following child is the subject of this suit:

Name: Sierra Jacobs
     Sex:    female
     Birth date:    March 20, 2009
     Home state:    Texas
     Social Security number:    withheld
     Driver's license number and issuing state:    N/A

*Findings*

The Court finds that this order is in the best interest of the child.

*Parenting Plan*

The Court finds that the provisions in these orders relating to the rights and duties of the parties with relation to the child, possession of and access to the child, child support, and optimizing the development of a close and continuing relationship between each party and the child constitute the parenting plan established by the Court.

*Conservatorship*

The Court finds that the following orders are in the best interest of the child.

IT IS ORDERED that Justin Jacobs and Adana D. Alt are removed as managing conservators and that Justin Jacobs and Adana D. Alt are appointed Joint Managing Conservators of the following child: Sierra Jacobs.

IT IS ORDERED that, at all times, Adana D. Alt, as a parent joint managing conservator, shall have the following rights:

1.    the right to receive information from any other conservator of the child concerning the health, education, and welfare of the child;

2.    the right to confer with the other parent to the extent possible before making a decision concerning the health, education, and welfare of the child;

3.    the right of access to medical, dental, psychological, and educational records of

2

the child;

4.     the right to consult with a physician, dentist, or psychologist of the child;

5.     the right to consult with school officials concerning the child's welfare and educational status, including school activities;

6.     the right to attend school activities;

7.     the right to be designated on the child's records as a person to be notified in case of an emergency;

8.     the right to consent to medical, dental, and surgical treatment during an emergency involving an immediate danger to the health and safety of the child; and

9.     the right to manage the estate of the child to the extent the estate has been created by the parent or the parent's family.

IT IS ORDERED that, at all times, Justin Jacobs and Adana D. Alt, as parent joint managing conservators, shall each have the following duties:

1.     the duty to inform the other conservator of the child in a timely manner of significant information concerning the health, education, and welfare of the child; and

2.     the duty to inform the other conservator of the child if the conservator resides with for at least thirty days, marries, or intends to marry a person who the conservator knows is registered as a sex offender under chapter 62 of the Code of Criminal Procedure or is currently charged with an offense for which on conviction the person would be required to register under that chapter. IT IS ORDERED that this information shall be tendered in the form of a notice made as soon as practicable, but not later than the fortieth day after the date the conservator of the child begins to reside with the person or on the tenth day after the date the marriage occurs, as appropriate. IT IS ORDERED that the notice must include a description of the offense that is the basis of the person's requirement to register as a sex offender or of the offense with which the person is charged. WARNING: A CONSERVATOR COMMITS AN OFFENSE PUNISHABLE AS A CLASS C MISDEMEANOR IF THE CONSERVATOR FAILS TO PROVIDE THIS NOTICE.

IT IS ORDERED that, during her periods of possession, Adana D. Alt, as parent joint managing conservator, shall have the following rights and duties:

1.     the duty of care, control, protection, and reasonable discipline of the child;

2.     the duty to support the child, including providing the child with clothing, food, shelter, and medical and dental care not involving an invasive procedure;

3

3.     the right to consent for the child to medical and dental care not involving an invasive procedure; and

4.     the right to direct the moral and religious training of the child.

IT IS ORDERED that, during his periods of possession, Justin Jacobs, as parent joint managing conservator, shall have the following rights and duties:

1.     the duty of care, control, protection, and reasonable discipline of the child;

2.     the duty to support the child, including providing the child with clothing, food, shelter, and medical and dental care not involving an invasive procedure;

3.     the right to consent for the child to medical and dental care not involving an invasive procedure; and

4.     the right to direct the moral and religious training of the child.

IT IS ORDERED that Adana D. Alt, as a parent joint managing conservator, shall have the following rights and duty:

1.     the exclusive right to designate the primary residence of the child within the State of Texas west of the Interstate 35 corridor;

2.     the exclusive right to consent to medical, dental, and surgical treatment involving invasive procedures;

3.     the exclusive right, after written consultation with Justin Jacobs, to consent to psychiatric and psychological treatment of the child. It is ORDERED that the child remain in therapy with the current therapist until discharged by that therapist;

4.     the exclusive right to receive and give receipt for periodic payments for the support of the child and to hold or disburse these funds for the benefit of the child;

5.     the exclusive right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child;

6.     the exclusive right to consent to marriage and to enlistment in the armed forces of the United States;

7.     the exclusive right to make decisions concerning the child's education;

8.     except as provided by section 264.0111 of the Texas Family Code, the exclusive

4

right to the services and earnings of the child;

9.      except when a guardian of the child's estate or a guardian or attorney ad litem has been appointed for the child, the exclusive right to act as an agent of the child in relation to the child's estate if the child's action is required by a state, the United States, or a foreign government; and

10.     the exclusive duty to manage the estate of the child to the extent the estate has been created by community property or the joint property of the parent.

The Court finds that, in accordance with section 153.001 of the Texas Family Code, it is the public policy of Texas to assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child, to provide a safe, stable, and nonviolent environment for the child, and to encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. IT IS ORDERED that the primary residence of the child shall be the State of Texas west of the Interstate 35 corridor, and the parties shall not remove the child from the State of Texas west of the Interstate 35 corridor for the purpose of changing the primary residence of the child until modified by further order of the court of continuing jurisdiction or by written agreement signed by the parties and filed with the court.

IT IS FURTHER ORDERED that Adana D. Alt shall have the exclusive right to designate the child's primary residence within the State of Texas west of the Interstate 35 corridor.

IT IS FURTHER ORDERED that this geographic restriction on the residence of the child shall be lifted if, at the time Adana D. Alt wishes to remove the child from the State of Texas west of the Interstate 35 corridor for the purpose of changing the primary residence of the child, Justin Jacobs has moved at least 75 miles further from the Williamson County line than he lived on October 23, 2013.

*Possession and Access*

1.    *Standard Possession Order*

IT IS ORDERED that each conservator shall comply with all terms and conditions of this Standard Possession Order. IT IS ORDERED that this Standard Possession Order is effective immediately and applies to all periods of possession occurring on and after the date the Court signs this Standard Possession Order. IT IS, THEREFORE, ORDERED:

(a)    Definitions

1.    In this Standard Possession Order "school" means the primary or secondary school in which the child is enrolled or, if the child is not enrolled in a primary or secondary school, the public school district in which the child primarily resides.

2.    In this Standard Possession Order "child" includes each child, whether one or more, who is a subject of this suit while that child is under the age of eighteen years and not otherwise emancipated.

(b)    Mutual Agreement or Specified Terms for Possession

IT IS ORDERED that the conservators shall have possession of the child at times mutually agreed to in advance by the parties, and, in the absence of mutual agreement, it is ORDERED that the conservators shall have possession of the child under the specified terms set out in this Standard Possession Order.

(c)    Parents Who Reside 100 Miles or Less Apart

Except as otherwise expressly provided in this Standard Possession Order, when Justin Jacobs resides 100 miles or less from the primary residence of the child, Justin Jacobs shall have the right to possession of the child as follows:

1.    Weekends –

On weekends that occur during the regular school term, beginning at 6:00 p.m., on the first, third, and fifth Friday of each month and ending at 6:00 p.m. on the following Sunday.

On weekends that do not occur during the regular school term, beginning at 6:00 p.m., on the first, third, and fifth Friday of each month and ending at 6:00 p.m. on the following Sunday.

6

2.      Weekend Possession Extended by a Holiday –

Except as otherwise expressly provided in this Standard Possession Order, if a weekend period of possession by Justin Jacobs begins on a student holiday or a teacher in-service day that falls on a Friday during the regular school term, as determined by the school in which the child is enrolled, or a federal, state, or local holiday that falls on a Friday during the summer months when school is not in session, that weekend period of possession shall begin at 6:00 p.m. on the immediately preceding Thursday.

Except as otherwise expressly provided in this Standard Possession Order, if a weekend period of possession by Justin Jacobs ends on or is immediately followed by a student holiday or a teacher in-service day that falls on a Monday during the regular school term, as determined by the school in which the child is enrolled, or a federal, state, or local holiday that falls on a Monday during the summer months when school is not in session, that weekend period of possession shall end at 6:00 p.m. on that Monday.

3.      Thursdays - On Thursday of each week during the regular school term, beginning at 6:00 p.m. and ending at 8:00 p.m.

4.      Spring Vacation in Even-Numbered Years - In even-numbered years, beginning at 6:00 p.m. on the day the child is dismissed from school for the school's spring vacation and ending at 6:00 p.m. on the day before school resumes after that vacation.

5.      Extended Summer Possession by Justin Jacobs –

With Written Notice by April 1 - If Justin Jacobs gives Adana D. Alt written notice by April 1 of a year specifying an extended period or periods of summer possession for that year, Justin Jacobs shall have possession of the child for thirty days beginning no earlier than the day after the child's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation in that year, to be exercised in no more than two separate periods of at least seven consecutive days each, with each period of possession beginning and ending at 6:00 p.m on each applicable day, as specified in the written notice. These periods of possession shall begin and end at 6:00 p.m. on each applicable day.

Without Written Notice by April 1 - If Justin Jacobs does not give Adana D. Alt written notice by April 1 of a year specifying an extended period or periods of summer possession for that year, Justin Jacobs shall have possession of the child for thirty consecutive days in that year beginning at 6:00 p.m. on July 1 and ending at 6:00 p.m. on July 31.

Notwithstanding the Thursday periods of possession during the regular

school term and the weekend periods of possession ORDERED for Justin Jacobs, it is expressly ORDERED that Adana D. Alt shall have a superior right of possession of the child as follows:

1. Spring Vacation in Odd-Numbered Years - In odd-numbered years, beginning at 6:00 p.m. on the day the child is dismissed from school for the school's spring vacation and ending at 6:00 p.m. on the day before school resumes after that vacation.

2. Summer Weekend Possession by Adana D. Alt - If Adana D. Alt gives Justin Jacobs written notice by April 15 of a year, Adana D. Alt shall have possession of the child on any one weekend beginning at 6:00 p.m. on Friday and ending at 6:00 p.m. on the following Sunday during any one period of the extended summer possession by Justin Jacobs in that year, provided that Adana D. Alt picks up the child from Justin Jacobs and returns the child to that same place and that the weekend so designated does not interfere with Father's Day possession.

3. Extended Summer Possession by Adana D. Alt - If Adana D. Alt gives Justin Jacobs written notice by April 15 of a year or gives Justin Jacobs fourteen days' written notice on or after April 16 of a year, Adana D. Alt may designate one weekend beginning no earlier than the day after the child's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation, during which an otherwise scheduled weekend period of possession by Justin Jacobs shall not take place in that year, provided that the weekend so designated does not interfere with Justin Jacobs's period or periods of extended summer possession or with Father's Day possession.

(d)    Parents Who Reside More Than 100 Miles Apart

Except as otherwise expressly provided in this Standard Possession Order, when Justin Jacobs resides more than 100 miles from the residence of the child, Justin Jacobs shall have the right to possession of the child as follows:

1. Weekends - On weekends that occur during the regular school term, beginning at 6:00 p.m. on the first, third, and fifth Friday of each month, and ending at 6:00 p.m. on the following Sunday, and on weekends that do not occur during the regular school term, beginning at 6:00 p.m. on the first, third and fifth Friday of each month and ending at 6:00 p.m. on the following Sunday.

2. Weekend Possession Extended by a Holiday –

Except as otherwise expressly provided in this Standard Possession Order, if a weekend period of possession by Justin Jacobs begins on a student holiday or a teacher in-service day that falls on a Friday during the regular school term, as

8

determined by the school in which the child is enrolled, or a federal, state, or local holiday during the summer months when school is not in session, that weekend period of possession shall begin at 6:00 p.m. on the immediately preceding Thursday

Except as otherwise expressly provided in this Standard Possession Order, if a weekend period of possession by Justin Jacobs ends on or is immediately followed by a student holiday or a teacher in-service day that falls on a Monday during the regular school term, as determined by the school in which the child is enrolled, or a federal, state, or local holiday that falls on a Monday during the summer months when school is not in session, that weekend period of possession shall end at 6:00 p.m. on that Monday.

3.     Spring Vacation in All Years - Every year, beginning at 6:00 p.m. on the day the child is dismissed from school for the school's spring vacation and ending at 6:00 p.m. on the day before school resumes after that vacation.

4.     Extended Summer Possession by Justin Jacobs –

With Written Notice by April 1 - If Justin Jacobs gives Adana D. Alt written notice by April 1 of a year specifying an extended period or periods of summer possession for that year, Justin Jacobs shall have possession of the child for forty-two days beginning no earlier than the day after the child's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation in that year, to be exercised in no more than two separate periods of at least seven consecutive days each, with each period of possession beginning and ending at 6:00 p.m. on each applicable day, as specified in the written notice. These periods of possession shall begin and end at 6:00 p.m. on each applicable day.

Without Written Notice by April 1 - If Justin Jacobs does not give Adana D. Alt written notice by April 1 of a year specifying an extended period or periods of summer possession for that year, Justin Jacobs shall have possession of the child for forty-two consecutive days beginning at 6:00 p.m. on June 15 and ending at 6:00 p.m. on July 27 of that year.

Notwithstanding the weekend periods of possession ORDERED for Justin Jacobs, it is expressly ORDERED that Adana D. Alt shall have a superior right of possession of the child as follows:

1.     Summer Weekend Possession by Adana D. Alt - If Adana D. Alt gives Justin Jacobs written notice by April 15 of a year, Adana D. Alt shall have possession of the child on any one weekend beginning at 6:00 p.m. on Friday and ending at 6:00 p.m. on the following Sunday during any one period of possession by Justin Jacobs during Justin Jacobs's extended summer possession in that year, provided that if a period of possession by Justin Jacobs in that year exceeds thirty

9

days, Adana D. Alt may have possession of the child under the terms of this provision on any two nonconsecutive weekends during that period and provided that Adana D. Alt picks up the child from Justin Jacobs and returns the child to that same place and that the weekend so designated does not interfere with Father's Day possession.

2.    Extended Summer Possession by Adana D. Alt - If Adana D. Alt gives Justin Jacobs written notice by April 15 of a year, Adana D. Alt may designate twenty-one days beginning no earlier than the day after the child's school is dismissed for the summer vacation and ending no later than seven days before school resumes at the end of the summer vacation in that year, to be exercised in no more than two separate periods of at least seven consecutive days each, during which Justin Jacobs shall not have possession of the child, provided that the period or periods so designated do not interfere with Justin Jacobs's period or periods of extended summer possession or with Father's Day possession. These periods of possession shall begin and end at 6:00 p.m. on each applicable day.

(e)    Holidays Unaffected by Distance

Notwithstanding the weekend and Thursday periods of possession of Justin Jacobs, Adana D. Alt and Justin Jacobs shall have the right to possession of the child as follows:

1.    Christmas Holidays in Even-Numbered Years - In even-numbered years, Justin Jacobs shall have the right to possession of the child beginning at 6:00 p.m. on the day the child is dismissed from school for the Christmas school vacation and ending at noon on December 28, and Adana D. Alt shall have the right to possession of the child beginning at noon on December 28 and ending at 6:00 p.m. on the day before school resumes after that Christmas school vacation.

2.    Christmas Holidays in Odd-Numbered Years - In odd-numbered years, Adana D. Alt shall have the right to possession of the child beginning at 6:00 p.m. on the day the child is dismissed from school for the Christmas school vacation and ending at noon on December 28, and Justin Jacobs shall have the right to possession of the child beginning at noon on December 28 and ending at 6:00 p.m. on the day before school resumes after that Christmas school vacation.

3.    Thanksgiving in Odd-Numbered Years - In odd-numbered years, Justin Jacobs shall have the right to possession of the child beginning at 6:00 p.m. on the day the child is dismissed from school for the Thanksgiving holiday and ending at 6:00 p.m. on the Sunday following Thanksgiving.

4.    Thanksgiving in Even-Numbered Years - In even-numbered years, Adana D. Alt shall have the right to possession of the child beginning at 6:00 p.m. on the day the child is dismissed from school for the Thanksgiving holiday and

ending at 6:00 p.m. on the Sunday following Thanksgiving.

5. Child's Birthday - If a parent is not otherwise entitled under this Standard Possession Order to present possession of the child on the child's birthday, that parent shall have possession of the child beginning at 6:00 p.m. and ending at 8:00 p.m. on that day, provided that that parent picks up the child from the other parent's residence and returns the child to that same place.

6. Father's Day - Justin Jacobs shall have the right to possession of the child each year, beginning at 6:00 p.m. on the Friday preceding Father's Day and ending at 6:00 p.m. on Father's Day, provided that if Justin Jacobs is not otherwise entitled under this Standard Possession Order to present possession of the child, he shall pick up the child from Adana D. Alt's residence and return the child to that same place.

7. Mother's Day - Adana D. Alt shall have the right to possession of the child each year, beginning at 6:00 p.m. on the Friday preceding Mother's Day and ending at 6:00 p.m. on Mother's Day, provided that if Adana D. Alt is not otherwise entitled under this Standard Possession Order to present possession of the child, she shall pick up the child from Justin Jacobs's residence and return the child to that same place.

(f) Undesignated Periods of Possession

Adana D. Alt shall have the right of possession of the child at all other times not specifically designated in this Standard Possession Order for Justin Jacobs.

(g) General Terms and Conditions

Except as otherwise expressly provided in this Standard Possession Order, the terms and conditions of possession of the child that apply regardless of the distance between the residence of a parent and the child are as follows:

1. Surrender of Child by Adana D. Alt - Adana D. Alt is ORDERED to surrender the child to Justin Jacobs at the beginning of each period of Justin Jacobs's possession at the residence of Adana D. Alt.

2. Return of Child by Justin Jacobs - Justin Jacobs is ORDERED to return the child to the residence of Adana D. Alt at the end of each period of possession. However, it is ORDERED that, if Adana D. Alt and Justin Jacobs live in the same county at the time of rendition of this order, Justin Jacobs's county of residence remains the same after rendition of this order, and Adana D. Alt's county of residence changes, effective on the date of the change of residence by Adana D. Alt, Justin Jacobs shall surrender the child to Adana D. Alt at the residence of Justin Jacobs at the end of each period of possession.

11

3. Surrender of Child by Justin Jacobs - Justin Jacobs is ORDERED to surrender the child to Adana D. Alt, if the child is in Justin Jacobs's possession or subject to Justin Jacobs's control, at the beginning of each period of Adana D. Alt's exclusive periods of possession, at the place designated in this Standard Possession Order.

4. Return of Child by Adana D. Alt - Adana D. Alt is ORDERED to return the child to Justin Jacobs, if Justin Jacobs is entitled to possession of the child, at the end of each of Adana D. Alt's exclusive periods of possession, at the place designated in this Standard Possession Order.

5. Personal Effects - Each conservator is ORDERED to return with the child the personal effects that the child brought at the beginning of the period of possession.

6. Designation of Competent Adult - Each conservator may designate any competent adult to pick up and return the child, as applicable. IT IS ORDERED that a conservator or a designated competent adult be present when the child is picked up or returned.

7. Inability to Exercise Possession - Each conservator is ORDERED to give notice to the person in possession of the child on each occasion that the conservator will be unable to exercise that conservator's right of possession for any specified period.

8. Written Notice - Written notice, including notice provided by electronic mail or facsimile, shall be deemed to have been timely made if received or, if applicable, postmarked before or at the time that notice is due.

9. Changing weekend visitation-If Justin Jackson gives Adana Alt 90 days written notice he may substitute a 2nd or 4th weekend for a 1st, 3rd or 5th weekend in any given month.

This concludes the Standard Possession Order.

2. *Duration*

The periods of possession ordered above apply to the child the subject of this suit while that child is under the age of eighteen years and not otherwise emancipated.

3. *Noninterference with Possession*

Except as expressly provided herein, IT IS ORDERED that neither conservator

shall take possession of the child during the other conservator's period of possession unless there is a prior written agreement signed by both conservators or in case of an emergency.

4.    *Termination of Orders*

The provisions of this order relating to conservatorship, possession, or access terminate on the marriage of Justin Jacobs to Adana D. Alt unless a nonparent or agency has been appointed conservator of the child under chapter 153 of the Texas Family Code.

5.    *Long-Distance Access and Visitation*

IT IS ORDERED that, until a child reaches the age of five years, the following arrangements for the travel of that child shall control:

Adult to Accompany Child - IT IS ORDERED that Justin Jacobs shall travel with the child between the residence of Adana D. Alt and that of Justin Jacobs at the beginning and end of each period of possession. In place of this requirement, Justin Jacobs is authorized to designate a responsible adult known to the child and to the mother to travel with the child between the residence of Adana D. Alt and that of Justin Jacobs. IT IS FURTHER ORDERED that the child shall not travel alone between the residence of Adana D. Alt and that of Justin Jacobs until the child reaches the age of five years.

Expenses Paid by Justin Jacobs - IT IS ORDERED that Justin Jacobs shall pay all travel expenses, charges, escort fees, and air fares incurred for the child from the time Justin Jacobs takes possession of the child from Adana D. Alt at the beginning of a period of possession until the time Justin Jacobs returns the child to the possession of Adana D. Alt at the end of the period of possession.

IT IS ORDERED that the following provisions shall govern the arrangements for

13

the travel of the child to and from Justin Jacobs after the child reaches the age of five years.

Notice of Place and Time of Possession - IT IS ORDERED that, if Justin Jacobs desires to take possession of the child at an airport near Justin Jacobs's residence, Justin Jacobs shall state these facts in a notice letter to Adana D. Alt sent at least 30 days prior to the date of travel:

a.      the airport where Adana D. Alt is to surrender the child;

b.      the date and time of the flight on which the child is scheduled to leave;

c.      the airline and flight number of the airplane on which the child is scheduled to leave;

d.      the airport where the child will return to Adana D. Alt at the end of the period of possession;

e.      the date and time of the flight on which the child is scheduled to return to that airport; and

f.      the airline and flight number of the airplane on which the child is scheduled to return to Adana D. Alt at the end of the period of possession.

Flight Arrangements - IT IS ORDERED that Justin Jacobs shall make airline reservations for the child only on major commercial passenger airlines on flights having no change of airplanes between the airport of departure and the airport of final arrival (a "nonequipment change flight"). IT IS FURTHER ORDERED that Justin Jacobs shall make airline reservations for the child on flights that depart from a commercial airport near the residence of Adana D. Alt that offers regularly scheduled passenger flights to various cities throughout the United States on major commercial passenger airlines.

14

Delivery and Pickup by Adana D. Alt - IT IS ORDERED that Adana D. Alt shall deliver the child to the airport from which the child is scheduled to leave at the beginning of each period of possession at least one hour before the scheduled departure time. IT IS FURTHER ORDERED that Adana D. Alt shall surrender the child to a flight attendant who is employed by the airline and who will be flying on the same flight on which the child is scheduled.

IT IS FURTHER ORDERED that Adana D. Alt shall take possession of the child at the end of Justin Jacobs's period of possession at the airport where the child is scheduled to return and at the specific airport gate where the passengers from the child's scheduled flight disembark.

Pickup and Return by Justin Jacobs - IT IS ORDERED that Justin Jacobs shall take possession of the child at the beginning of each period of possession at the airport where the child is scheduled to arrive and at the specific airport gate where the passengers from the child's scheduled flight disembark.

IT IS FURTHER ORDERED that Justin Jacobs, at the end of each period of possession, shall deliver the child to the airport where the child is scheduled to depart at least one hour before the scheduled departure time and surrender the child to a flight attendant who is employed by the airline and who will be flying on the same flight on which the child is scheduled to return.

Missed Flights - IT IS ORDERED that any conservator who has possession of the child at the time shall notify the other conservator immediately if the child is not placed on a scheduled flight at the beginning or end of a period of possession. IT IS FURTHER ORDERED that, if the child should miss a scheduled flight, the conservator having

15

possession of the child when the flight is missed shall schedule another nonequipment change flight for the child as soon as is possible after the originally scheduled flight and shall pay any additional expense associated with the changed flight and give the other conservator notice of the date and time of that flight.

Expenses Paid by Justin Jacobs - IT IS ORDERED that Justin Jacobs shall purchase, in advance, the round-trip airline tickets (including escort fees) to be used by the child for the child's flight. IT IS FURTHER ORDERED that Justin Jacobs shall make necessary arrangements with the airlines and with Adana D. Alt in order that the airline tickets are available to the child before a scheduled flight. IT IS FURTHER ORDERED that Justin Jacobs shall pay any other traveling expenses and charges incurred for the child from the time Adana D. Alt surrenders possession of the child by placing the child on the scheduled nonequipment change flight at the beginning of a period of possession until the time Adana D. Alt takes possession of the child at the termination of the scheduled nonequipment change flight at the end of the period of possession. IT IS FURTHER ORDERED that Justin Jacobs shall reimburse Adana D. Alt for travel expenses of the child if, because of circumstances beyond Adana D. Alt's control, Adana D. Alt is required to pay travel expenses of the child on a nonequipment change flight to or from the possession of Justin Jacobs.

Miscellaneous Expenses - IT IS ORDERED that the expenses of a conservator incurred in traveling to and from an airport, as well as related parking and baggage-handling expenses, are the sole responsibility of the conservator delivering or receiving the child at the airport.

*Child Support*

IT IS ORDERED that Justin Jacobs is obligated to pay and shall pay to Adana D. Alt child support of four hundred eighty dollars ($480.00) per month, with the first payment being due and payable on March 1, 2014 and a like payment being due and payable on the first day of each month thereafter until the first month following the date of the earliest occurrence of one of the events specified below:

1.    the child reaches the age of eighteen years or graduates from high school, whichever occurs later, subject to the provisions for support beyond the age of eighteen years set out below;

2.    the child marries;

3.    the child dies;

4.    the child enlists in the armed forces of the United States and begins active service as defined by section 101 of title 10 of the United States Code; or

5.    the child's disabilities are otherwise removed for general purposes; or

If the child is eighteen years of age and has not graduated from high school, IT IS ORDERED that Justin Jacobs's obligation to pay child support to Adana D. Alt shall not terminate but shall continue for as long as the child is enrolled-

1.    under chapter 25 of the Texas Education Code in an accredited secondary school in a program leading toward a high school diploma or under section 130.008 of the Education Code in courses for joint high school and junior college credit and is complying with the minimum attendance requirements of subchapter C of chapter 25 of the Education Code or

2.    on a full-time basis in a private secondary school in a program leading toward a high school diploma and is complying with the minimum attendance requirements imposed by that school.

IT IS FURTHER ORDERED that Michael Justin Jacobs is excused from paying any child support for the months of June 2014 and July 2014.

Withholding from Earnings

IT IS ORDERED that any employer of Justin Jacobs shall be ordered to withhold from earnings for child support from the disposable earnings of Justin Jacobs for the support of Sierra Jacobs.

IT IS FURTHER ORDERED that all amounts withheld from the disposable earnings of Justin Jacobs by the employer and paid in accordance with the order to that employer shall constitute a credit against the child support obligation. Payment of the full amount of child support ordered paid by this order through the means of withholding from earnings shall discharge the child support obligation. If the amount withheld from earnings and credited against the child support obligation is less than 100 percent of the amount ordered to be paid by this order, the balance due remains an obligation of Justin Jacobs, and it is hereby ORDERED that Justin Jacobs pay the balance due directly to the state disbursement unit specified below.

On this date the Court signed an Income Withholding for Support.

Payment

IT IS ORDERED that all payments shall be made through the state disbursement unit at Texas Child Support Disbursement Unit, P.O. Box 659791, San Antonio, Texas 78265-9791, and thereafter promptly remitted to Adana D. Alt for the support of the child. IT IS ORDERED that each party shall pay, when due, all fees charged to that party by the state disbursement unit and any other agency statutorily authorized to charge a fee.

Change of Employment

IT IS FURTHER ORDERED that Justin Jacobs shall notify this Court and Adana D. Alt

18

by U.S. certified mail, return receipt requested, of any change of address and of any termination of employment. This notice shall be given no later than seven days after the change of address or the termination of employment. This notice or a subsequent notice shall also provide the current address of Justin Jacobs and the name and address of his current employer, whenever that information becomes available.

Clerk's Duties

IT IS ORDERED that, on the request of a prosecuting attorney, the title IV-D agency, the friend of the Court, a domestic relations office, Adana D. Alt, Justin Jacobs, or an attorney representing Adana D. Alt or Justin Jacobs, the clerk of this Court shall cause a certified copy of the Income Withholding for Support to be delivered to any employer.

*Health Care*

1. IT IS ORDERED that Justin Jacobs and Adana D. Alt shall each provide medical support for the child as set out in this order as additional child support for as long as the Court may order Justin Jacobs and Adana D. Alt to provide support for the child under sections 154.001 and 154.002 of the Texas Family Code. Beginning on the day Justin Jacobs and Adana D. Alt's actual or potential obligation to support the child under sections 154.001 and 154.002 of the Family Code terminates, IT IS ORDERED that Justin Jacobs and Adana D. Alt are discharged from the obligations set forth in this medical support order, except for any failure by a parent to fully comply with those obligations before that date. IT IS FURTHER ORDERED that the cash medical support payments ordered below are payable through the state disbursement unit and subject to the provisions for withholding from earnings provided above for other child support payments.

2. Definitions -

"Health Insurance" means insurance coverage that provides basic health-care services, including usual physician services, office visits, hospitalization, and laboratory, X-ray, and emergency services, that may be provided through a health maintenance organization or other private or public organization, other than medical assistance under chapter 32 of the Texas Human Resources Code.

"Reasonable cost" means the cost of health insurance coverage for a child that does not exceed 9 percent of Justin Jacobs 's annual resources, as described by section 154.062(b) of the Texas Family Code.

"Reasonable and necessary health-care expenses not paid by insurance and incurred by or on behalf of a child" include, without limitation, any copayments for office visits or prescription drugs, the yearly deductible, if any, and medical, surgical, prescription drug, mental health-care services, dental, eye care, ophthalmological, and orthodontic charges. These reasonable and necessary health-care expenses do not include expenses for travel to and from the health-care provider or for nonprescription medication.

"Furnish" means:

    a.    to hand deliver the document by a person eighteen years of age or older either to the recipient or to a person who is eighteen years of age or older and permanently resides with the recipient;

    b.    to deliver the document to the recipient by certified mail, return receipt requested, to the recipient's last known mailing or residence address; or

    c.    to deliver the document to the recipient at the recipient's last known mailing or residence address using any person or entity whose principal business is that of a courier or deliverer of papers or documents either

20

within or outside the United States.

3. Findings on Health Insurance Availability- Having considered the cost, accessibility, and quality of health insurance coverage available to the parties, the Court finds:

Health insurance is available or is in effect for the child through Adana D. Alt's employment or membership in a union, trade association, or other organization at a reasonable cost of $100.00.

IT IS FURTHER FOUND that the following orders regarding health-care coverage are in the best interest of the child.

4. Provision of Health-Care Coverage -

As child support, Adana D. Alt is ORDERED to continue to maintain health insurance for the child who is the subject of this suit that covers basic health-care services, including usual physician services, office visits, hospitalization, laboratory, X-ray, and emergency services.

Adana D. Alt is ORDERED to maintain such health insurance in full force and effect on the child who is the subject of this suit as long as child support is payable for that child. Adana D. Alt is ORDERED to convert any group insurance to individual coverage or obtain other health insurance for the child within fifteen days of termination of her employment or other disqualification from the group insurance. Adana D. Alt is ORDERED to exercise any conversion options or acquisition of new health insurance in such a manner that the resulting insurance equals or exceeds that in effect immediately before the change.

Adana D. Alt is ORDERED to furnish Justin Jacobs a true and correct copy of the health insurance policy or certification and a schedule of benefits within 30 days of the signing of this order. Adana D. Alt is ORDERED to furnish Justin Jacobs the insurance cards and any other forms necessary for use of the insurance within 30 days of the signing of this order. Adana D.

21

Alt is ORDERED to provide, within three days of receipt by her, to Justin Jacobs any insurance checks, other payments, or explanations of benefits relating to any medical expenses for the child that Justin Jacobs paid or incurred.

Pursuant to section 1504.051 of the Texas Insurance Code, it is ORDERED that if Adana D. Alt is eligible for dependent health coverage but fails to apply to obtain coverage for the child, the insurer shall enroll the child on application of Justin Jacobs or others as authorized by law.

Pursuant to section 154.182 of the Texas Family Code, Justin Jacobs is ORDERED to pay Adana D. Alt cash medical support for reimbursement of health insurance premiums, as additional child support, of one hundred dollars ($100.00) per month, with the first installment being due and payable on March 1, 2014 and a like installment being due and payable on or before the first day of each month until the termination of current child support for the child under this order.

IT IS ORDERED that the cash medical support provisions of this order shall be an obligation of the estate of Justin Jacobs and shall not terminate on his death.

Pursuant to section 154.183(c) of the Texas Family Code, the reasonable and necessary health-care expenses of the child that are not reimbursed by health insurance are allocated as follows: Adana D. Alt is ORDERED to pay 50 percent and Justin Jacobs is ORDERED to pay 50 percent of the unreimbursed health-care expenses if, at the time the expenses are incurred, Adana D. Alt is providing health insurance as ordered.

The party who incurs a health-care expense on behalf of the child is ORDERED to submit to the other party all forms, receipts, bills, statements, and explanations of benefits reflecting the uninsured portion of the health-care expenses within thirty days after he or she

receives them. The nonincurring party is ORDERED to pay his or her percentage of the uninsured portion of the health-care expenses either by paying the health-care provider directly or by reimbursing the incurring party for any advance payment exceeding the incurring party's percentage of the uninsured portion of the health-care expenses within thirty days after the nonincurring party receives the forms, receipts, bills, statements, and explanations of benefits.

These provisions apply to all unreimbursed health-care expenses of the child who is the subject of this suit that are incurred while child support is payable for the child.

5.     Secondary Coverage - IT IS ORDERED that if a party provides secondary health insurance coverage for the child, both parties shall cooperate fully with regard to the handling and filing of claims with the insurance carrier providing the coverage in order to maximize the benefits available to the child and to ensure that the party who pays for health-care expenses for the child is reimbursed for the payment from both carriers to the fullest extent possible.

6.     Compliance with Insurance Company Requirements - Each party is ORDERED to conform to all requirements imposed by the terms and conditions of the policy of health insurance covering the child in order to assure the maximum reimbursement or direct payment by the insurance company of the incurred health-care expense, including but not limited to requirements for advance notice to any carrier, second opinions, and the like. Each party is ORDERED to use "preferred providers," or services within the health maintenance organization, if applicable. Disallowance of the bill by a health insurer shall not excuse the obligation of either party to make payment. Excepting emergency health-care expenses incurred on behalf of the child, if a party incurs health-care expenses for the child using "out-of-network" health-care providers or services, or fails to follow the health insurance company procedures or requirements, that party shall pay all such health-care expenses incurred absent (1) written

23

agreement of the parties allocating such health-care expenses or (2) further order of the Court.

7. Claims - Except as provided in this paragraph, the party who is not carrying the health insurance policy covering the child is ORDERED to furnish to the party carrying the policy, within fifteen days of receiving them, any and all forms, receipts, bills, and statements reflecting the health-care expenses the party not carrying the policy incurs on behalf of the child. In accordance with section 1204.251 and 1504.055(a) of the Texas Insurance Code, IT IS ORDERED that the party who is not carrying the health insurance policy covering the child, at that party's option , may file any claims for health-care expenses directly with the insurance carrier with and from whom coverage is provided for the benefit of the child and receive payments directly from the insurance company. Further, for the sole purpose of section 1204.251 of the Texas Insurance Code, Justin Jacobs is designated the managing conservator or possessory conservator of the child.

The party who is carrying the health insurance policy covering the child is ORDERED to submit all forms required by the insurance company for payment or reimbursement of health-care expenses incurred by either party on behalf of the child to the insurance carrier within fifteen days of that party's receiving any form, receipt, bill, or statement reflecting the expenses.

8. Constructive Trust for Payments Received - IT IS ORDERED that any insurance payments received by a party from the health insurance carrier as reimbursement for health-care expenses incurred by or on behalf of the child shall belong to the party who paid those expenses. IT IS FURTHER ORDERED that the party receiving the insurance payments is designated a constructive trustee to receive any insurance checks or payments for health-care expenses paid by the other party, and the party carrying the policy shall endorse and forward the checks or payments, along with any explanation of benefits received, to the other party within three days of

24

receiving them.

9. WARNING - A PARENT ORDERED TO PROVIDE HEALTH INSURANCE OR TO PAY THE OTHER PARENT ADDITIONAL CHILD SUPPORT FOR THE COST OF HEALTH INSURANCE WHO FAILS TO DO SO IS LIABLE FOR NECESSARY MEDICAL EXPENSES OF THE CHILD, WITHOUT REGARD TO WHETHER THE EXPENSES WOULD HAVE BEEN PAID IF HEALTH INSURANCE HAD BEEN PROVIDED, AND FOR THE COST OF HEALTH INSURANCE PREMIUMS OR CONTRIBUTIONS, IF ANY, PAID ON BEHALF OF THE CHILD.

*Miscellaneous Child Support Provisions*

No Credit for Informal Payments

IT IS ORDERED that the child support as prescribed in this order shall be exclusively discharged in the manner ordered and that any direct payments made by Justin Jacobs to Adana D. Alt or any expenditures incurred by Justin Jacobs during Justin Jacobs's periods of possession of or access to the child, as prescribed in this order, for food, clothing, gifts, travel, shelter, or entertainment are deemed in addition to and not in lieu of the support ordered in this order.

Support as Obligation of Estate

IT IS ORDERED that the provisions for child support in this order shall be an obligation of the estate of Justin Jacobs and shall not terminate on the death of Justin Jacobs. Payments received for the benefit of the child, including payments from the Social Security Administration, Department of Veterans Affairs or other governmental agency or life insurance proceeds, annuity payments, trust distributions, or retirement survivor benefits, shall be a credit against this obligation. Any remaining balance of the child support is an obligation of Justin Jacobs's estate.

25

<u>Termination of Orders on Marriage of Parties but Not on Death of Obligee</u>

The provisions of this order relating to current child support terminate on the marriage of Justin Jacobs to Adana D. Alt unless a nonparent or agency has been appointed conservator of the child under chapter 153 of the Texas Family Code. An obligation to pay child support under this order does not terminate on the death of Adana D. Alt but continues as an obligation to Sierra Jacobs.

*Medical Notification*

Each party is ORDERED to inform the other party within 24 hours of any medical condition of the child requiring surgical intervention, hospitalization, or both.

Within 30 days after the Court signs this order, each party is ORDERED to execute –

1.      all necessary releases pursuant to the Health Insurance Portability and Accountability Act (HIPAA) and 45 C.F.R. section 164.508 to permit the other conservator to obtain health-care information regarding the child; and

2.      for all health-care providers of the child, an authorization for disclosure of protected health information to the other conservator pursuant to the HIPAA and 45 C.F.R. section 164.508.

Each party is further ORDERED to designate the other conservator as a person to whom protected health information regarding the child may be disclosed whenever the party executes an authorization for disclosure of protected health information pursuant to the HIPAA and 45 C.F.R. section 164.508.

*Injunctive Relief*

The Court finds that, because of the conduct of Justin Jacobs, a permanent injunction against him should be granted as appropriate relief because there is no adequate remedy at law.

The permanent injunction granted below shall be effective immediately and shall be binding on Justin Jacobs; on his agents, servants, employees, and attorneys; and on those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

IT IS ORDERED that Justin Jacobs is permanently enjoined from:

1. ingesting any alcohol 24 hours prior to and during any period of possession of the child.

The Court finds that, because of the conduct of Adana D. Alt, a permanent injunction against her should be granted as appropriate relief because there is no adequate remedy at law.

The permanent injunction granted below shall be effective immediately and shall be binding on Adana D. Alt; on her agents, servants, employees, and attorneys; and on those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

IT IS ORDERED that:

1. Adana Alt or her agents or persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are enjoined from permitting the child, Sierra Danielle Jacobs, from being in the presence of, or within 500 feet of, Gilberto Eustaquio Buitron at any time.

*Service of Writ*

Petitioner and Respondent waive issuance and service of the writ of injunction, by stipulation. IT IS ORDERED that Petitioner and Respondent shall be deemed to be duly served with the writ of injunction.

*Required Information*

The information required for each party by section 105.006(a) of the Texas Family Code is as follows:

27

Name:      Justin Jacobs

       Social Security number:      withheld]

       Driver's license number:                   Issuing state:   Texas

       Current residence address:

       Mailing address:

       Home telephone number:

       Name of employer:

       Address of employment:

       Work telephone number:

Name:      Adana D. Alt

       Social Security number:      withheld

       Driver's license number:      0899342      Issuing state:   Texas

       Current residence address:      300 Carl Shipp, Liberty Hill, Texas 78642

       Mailing address:      300 Carl Shipp, Liberty Hill, Texas 78642

       Home telephone number:      512 -538-8138

       Name of employer:      Work Force Solutions

       Address of employment:      6505 Airport Blvd., Suite 101-c, Austin, Texas 78752

       Work telephone number:      512-597-7191

*Required Notices*

EACH PERSON WHO IS A PARTY TO THIS ORDER IS ORDERED TO NOTIFY EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY OF ANY CHANGE IN THE PARTY'S CURRENT RESIDENCE ADDRESS, MAILING ADDRESS, HOME TELEPHONE NUMBER, NAME OF EMPLOYER, ADDRESS OF EMPLOYMENT,

28

DRIVER'S LICENSE NUMBER, AND WORK TELEPHONE NUMBER. THE PARTY IS ORDERED TO GIVE NOTICE OF AN INTENDED CHANGE IN ANY OF THE REQUIRED INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY ON OR BEFORE THE 60TH DAY BEFORE THE INTENDED CHANGE. IF THE PARTY DOES NOT KNOW OR COULD NOT HAVE KNOWN OF THE CHANGE IN SUFFICIENT TIME TO PROVIDE 60-DAY NOTICE, THE PARTY IS ORDERED TO GIVE NOTICE OF THE CHANGE ON OR BEFORE THE FIFTH DAY AFTER THE DATE THAT THE PARTY KNOWS OF THE CHANGE.

THE DUTY TO FURNISH THIS INFORMATION TO EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY CONTINUES AS LONG AS ANY PERSON, BY VIRTUE OF THIS ORDER, IS UNDER AN OBLIGATION TO PAY CHILD SUPPORT OR ENTITLED TO POSSESSION OF OR ACCESS TO A CHILD.

FAILURE BY A PARTY TO OBEY THE ORDER OF THIS COURT TO PROVIDE EACH OTHER PARTY, THE COURT, AND THE STATE CASE REGISTRY WITH THE CHANGE IN THE REQUIRED INFORMATION MAY RESULT IN FURTHER LITIGATION TO ENFORCE THE ORDER, INCLUDING CONTEMPT OF COURT. A FINDING OF CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR UP TO SIX MONTHS, A FINE OF UP TO $500 FOR EACH VIOLATION, AND A MONEY JUDGMENT FOR PAYMENT OF ATTORNEY'S FEES AND COURT COSTS.

Notice shall be given to the other party by delivering a copy of the notice to the party by registered or certified mail, return receipt requested. Notice shall be given to the Court by delivering a copy of the notice either in person to the clerk of this Court or by registered or certified mail addressed to the clerk. Notice shall be given to the state case registry by mailing a

29

copy of the notice to State Case Registry, Contract Services Section, MC046S, P.O. Box 12017, Austin, Texas 78711-2017.

NOTICE TO ANY PEACE OFFICER OF THE STATE OF TEXAS: YOU MAY USE REASONABLE EFFORTS TO ENFORCE THE TERMS OF CHILD CUSTODY SPECIFIED IN THIS ORDER. A PEACE OFFICER WHO RELIES ON THE TERMS OF A COURT ORDER AND THE OFFICER'S AGENCY ARE ENTITLED TO THE APPLICABLE IMMUNITY AGAINST ANY CLAIM, CIVIL OR OTHERWISE, REGARDING THE OFFICER'S GOOD FAITH ACTS PERFORMED IN THE SCOPE OF THE OFFICER'S DUTIES IN ENFORCING THE TERMS OF THE ORDER THAT RELATE TO CHILD CUSTODY. ANY PERSON WHO KNOWINGLY PRESENTS FOR ENFORCEMENT AN ORDER THAT IS INVALID OR NO LONGER IN EFFECT COMMITS AN OFFENSE THAT MAY BE PUNISHABLE BY CONFINEMENT IN JAIL FOR AS LONG AS TWO YEARS AND A FINE OF AS MUCH AS $10,000.

*Warnings*

WARNINGS TO PARTIES: FAILURE TO OBEY A COURT ORDER FOR CHILD SUPPORT OR FOR POSSESSION OF OR ACCESS TO A CHILD MAY RESULT IN FURTHER LITIGATION TO ENFORCE THE ORDER, INCLUDING CONTEMPT OF COURT. A FINDING OF CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL FOR UP TO SIX MONTHS, A FINE OF UP TO $500 FOR EACH VIOLATION, AND A MONEY JUDGMENT FOR PAYMENT OF ATTORNEY'S FEES AND COURT COSTS.

FAILURE OF A PARTY TO MAKE A CHILD SUPPORT PAYMENT TO THE PLACE AND IN THE MANNER REQUIRED BY A COURT ORDER MAY RESULT IN THE PARTY'S NOT RECEIVING CREDIT FOR MAKING THE PAYMENT.

FAILURE OF A PARTY TO PAY CHILD SUPPORT DOES NOT JUSTIFY DENYING THAT PARTY COURT-ORDERED POSSESSION OF OR ACCESS TO A CHILD. REFUSAL BY A PARTY TO ALLOW POSSESSION OF OR ACCESS TO A CHILD DOES NOT JUSTIFY FAILURE TO PAY COURT-ORDERED CHILD SUPPORT TO THAT PARTY.

*Attorney's Fees*

IT IS ORDERED that attorney's fees are to be borne by the party who incurred them.

*Costs*

IT IS ORDERED that costs of court are to be borne by the party who incurred them.

*Discharge from Discovery Retention Requirement*

IT IS ORDERED that the parties and their respective attorneys are discharged from the requirement of keeping and storing the documents produced in this case in accordance with rule 191.4(d) of the Texas Rules of Civil Procedure.

*Additional Orders*

It is Ordered that Adana Alt complete the parenting class which she began in July 2014. IT IS FURTHER ORDERED that Michael Justin Jacobs begin a parenting class in Lubbock, Texas during September 2014 and complete the class as it is scheduled.

*Relief Not Granted*

IT IS ORDERED that all relief requested in this case and not expressly granted is denied. All other terms of the prior orders not specifically modified in this order shall remain in full force and effect. All child support obligations of Justin Jacobs contained in the Temporary Orders rendered by this court remain in full force and effect to the extent they have not been paid.

31

It is so ordered.

SIGNED and ENTERED this the __29th__ day of August, 2014.

_____

Judge, 395th Judicial District Court

Tab B

# Judge's Family Law Docket, Williamson County, Texas

| DATE | ORDERS |
|------|--------|
| 5-17-13 | **TEMPORARY RESTRAINING ORDER GRANTED:** hearing set for _Withdrawn_ |
| | _____M on_____, 20____. |
| | **HEARING FOR TEMPORARY ORDERS set for** _____M. on _____ /20___. |
| | **TEMPORARY ORDERS:** |
| | Temporary injunction granted. The _Petitioner/Respondent_ is appointed Temporary Managing Conservator of minor children and _Petitioner/Respondent_ is appointed Temporary Possessory Conservator. Temporary child support (and alimony) is set in the $_____ per (week), (each two weeks), (month) commencing on _____ day of _____, 20__. Inventory ordered filed on or before _____ day of _____, 20__. Temporary use of |
| | _____ |
| | _____ |
| | _____ |
| | awarded to _Petitioner/Respondent._ |
| | _____ |
| | JUDGE PRESIDING |
| | **TEMPORARY ORDERS APPROVED AND SIGNED.** 6/12/12 |

**FINAL DECREE:**

Evidence heard, divorce granted. Number of children involved under the age of eighteen_____.
The _Petitioner/Respondent_ is appointed Managing Conservator of the minor children and _Petitioner/Respondent_ is appointed Possessory Conservator. Child support set in the amount of $_____ per (week), (each two weeks), (month) commencing on _____ day of _____, 20__. through District Clerk's Office. Wife's former name restored to her_____
_____. Attorney's fees in the amount of $_____ awarded to _____
_____. Wages withholding ordered. Property settlement approved/or property divided as follows _____
_____
_____

JUDGE PRESIDING

**FINAL DECREE: APPROVED AND SIGNED.**
**WAGE WITHHOLDING APPROVED AND SIGNED.**

---

10-0968-F395          April 07, 2010

IN THE INTEREST OF
SIERRA DANIELLE JACOBS
A CHILD

395TH JUDICIAL DISTRICT COURT
PARENT-CHILD RELATIONSHIP

| DATE | |
|------|--|
| 3/29/11 | order allowing Mr. Winegarden to w/draw _mj_ |
| 4/27/11 | Final Hrg - Pet. pnst w/ counsel - Respondent DNA - Notice proven - Testmy Heard - last contact 11/10 - child's health insurance cancel 3/7/11 Final order sig'd _mj_ |
| 2/15/12 | Con Set TOs - Both parties pnst w/ counsel - Rule 11 Agreement Announced - $2500 Arbitr Atty Fees - CS 3/1/12 - 5/31/12 to 250 - June 1 re evaluate Mr. Dougay to do order - proposed schedule / poss _mj_ |
| 8/14/12 | Set for Non Enf - Agreement - Mr. pays pr $8455/12 CS 1339 - fees - 9798.42 total - non suit Mtn Enf _mj_ |
| 9/19/12 | order / Substitu sig'd _mj_ |
| 5/29/13 | Hrg on Temp Rng - Granted _mj_ |
| 6/14/13 | order sig'd _mj_ |
| 9/24/13 | Hrg on Bill of Review - Both parties pnst w/ counsel Testmy Heard - Argument Heard |
| 10/21/13 | Hrg on Mtn modify - Hrg on Mtn Enforce Enforce with Adjudicat - JMC - _gny rest Tru/Until_ 2 weeks IV35 - CS Efft 5/1/2013 $480 - |
| 10/30/13 | TOs sig'd _mj_ |
| 2/11/14 | Letter ruling |

# Tab C

# MICHAEL JERGINS
## District Judge
## 395th Judicial District
## Williamson County



November 14, 2014

Ms. Paige Frankenberry
Attorney at Law
4425 South Mopac, Ste 105
Austin, Texas 78735
Fax: 512-852-5937

Mr. Robert D. Ettinger
Attorney at Law
P.O.Box 50323
Austin, Texas 78763
Fax: 512- 478-9542

Re:    RE: ITIO Jacobs, 10-0968-F395

Dear Madam & Sir:

Enclosed are Findings of Fact and Conclusions of Law, filed this date.

Respectfully,

Michael Jergins
Judge, 395th Judicial District Court

405 Martin Luther King St., No. 15
Georgetown, Texas 78626
(512) 943-1395
Fax (512) 943-1187

FILED
at 11:2? o'clock A M
NOV 1 4 2014

*Lisa David*
District Clerk, Williamson Co., TX.

NO. 10-0968-F395

| | | |
|---|---|---|
| IN THE INTEREST OF | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| SIERRA DANIELLE JACOBS | § | WILLIAMSON COUNTY, TEXAS |
| | § | |
| | § | |
| | § | |
| A CHILD | § | 395TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes and files the following as original Findings of Fact and Conclusions

of Law in accordance with rules 296 and 297 of the Texas Rules of Civil Procedure.

*Findings of Fact*

1.     Adana Alt and Michael Jacobs are parents of Sierra Jacobs born, March 20,

2009.

2.     On April 7, 2010, Adana Alt filed a Petition to Adjudicate Parentage

against Michael Jacobs.  Hereafter original petitioner shall be referred to as Alt

or mother, and original Respondent as Jacobs, or father.

3.     On May 1, 2011, a default judgment was taken by Alt.

4.     On November 23, 2011, Jacobs filed a Motion to Modify.

5.     On February 15, 2012, the parties appeared in Court and entered agreed

temporary orders.

6.     On June 12, 2012, written temporary orders were entered.

7.     On July 19, 2012, Alt filed a Motion to Enforce the temporary orders.

8.     On August 14, 2012, the parties entered into a settlement agreement

1

resolving the Motion to Enforce. At that time Jacobs paid $8459.40 in child support and $1339 costs. The Motion to Enforce was non-suited.

9. On March 11, 2013, Jacobs filed a Bill of Review.

10. On October 15, 2013, a Bill of Review was granted as to the original judgment entered May, 2011. The Court let stand, as the currently applicable order, the Temporary Orders previously entered.

11. The Court found that the agreement as to child support entered August 2012, was valid, enforceable and res judicata as to all previous child support issues.

12. Subsequently, the Court entered orders relating to conservatorship, possession and child support. It was in the best interest of the child that Alt establish the domicile of the child, with a geographic restriction as requested by Jacobs. Jacobs was awarded possession and access that was in the best interest of the child given the parties live greater than 100 miles from each other

13. Sometime after the birth of the child and prior to May 1, 2011, Jacobs left the State of Texas and resided and worked in New Mexico. Alt had possession of the child at that time. Since at least the first quarter of 2011, the parents have not resided in the same city for any significant period.

14. Throughout the child's life, the child has resided primarily with Alt.

15. At all times Alt was awarded the exclusive right to consent to psychological

2

treatment of the child.

16. Since August, 2012, Ms. Lauren Scott was the child's counselor. The Court finds her to be a competent and neutral counselor. In the April 30, 2014 hearing, the Court affirmed that Ms. Scott was to be the child's counselor.

17. Throughout all times relevant in this case, father was aware of the identity of Ms. Scott as the child's counselor. Any failure on his part to participate in that counselor was the result of voluntary conduct on his part.

18. Alt notified Jacobs of the child's counseling and Jacobs stated that he would not participate in it.

19. Alt has a brother identified as Gilbert Buitron, who is a paroled sex offender. The Court has ordered the child not to be in presence of Gilbert Buitron.

20. During or prior to April, 2014, allegations were made that the child was allowed to be in the presence of Gilbert Buitron.

21. A hearing was held on April 30, 2014. Jacqueline Roberts, an employee of CPS testified. Lauren Scott, the child's counselor, testified. The child had been in the presence of Gilbert Buitron, at the maternal grandmother's residence. The Court placed the child in Jacobs' custody and reset the matter for a review in May.

22. The Court ordered that in that interim between the April and May hearings, the child was to undergo a forensic interview at the Williamson County

3

Children's Advocacy Center. This interview was to determine whether any abuse had occurred. The Court further ordered that Ms. Scott was to remain the child's counselor and conduct sessions with the child, Jacobs was to make the child available for the counseling sessions. The Court announced that the review hearing in May was to review evidence resulting from the forensic interview and any additional counseling sessions with Ms. Scott.

23. A hearing was held May 21, 2014. The child had been interviewed at the Children's Advocacy Center, and no outcry of abuse was made. There was no further evidence that the child had been in presence of Gilbert Buitron. No evidence that abuse has occurred was discovered by CPS or the child's counselor.

24. During the interim between the April and May hearings. Jacobs took the child to another counselor. At that time none of the orders in place gave him the authority to consent to any such evaluation or treatment. Father took the child to a therapist without consent of the mother or the Court. Any concerns about abuse had been addressed by the Court's specific order to conduct the forensic interview and continue counseling with Ms. Scott. Jacobs had no authority to allow any other interviews by a counselor.

25. Father relies on Texas Family Code Sec. 32.005, as authorization to allow him to take the child to a second counselor. This provision applies to experts who have reasonable grounds. The only way the reasonable grounds herein

4

could have been obtained would have been for the father to provide it. It is not in the best interest of the child to see multiple counselors. It is the best interest of the child to have one counselor. The Court's orders were to insure the best interest of the child.

26.     At the conclusion of the review hearing, it was in the best interest of the child to reside with Jacobs for the summer. The child was ordered to continue counseling with Ms. Scott and Alt was ordered to protective parenting classes.

27.     A review hearing was scheduled for August 20, 2014, and evidence was heard. There had been no further contact with Gilbert Buitron. Mom was successfully progressing in protective parenting classes.

28.     Given the totality of all the evidence presented, that it was in the best interest of the child to return to the orders entered by the Court after final hearing. It was again in the best interest of the child for Alt to be the primary conservator to establish residency and for the child to continue therapy with Ms. Scott.

*Conclusions of Law*

1.     The best interest of the child shall always be the primary consideration in determining questions of conservatorship and questions of possession of and access to the child.

2.     In determining which party to appoint primary managing conservator, the

5

Court shall consider the qualifications of each party without regard to the gender of the party or the child.

3.    Texas Family Code Sec. 32.005, applies to providers who have reasonable grounds that abuse has occurred. This statute protects providers, to allow them to proceed with an investigation, when they discover facts warranting reasonable grounds. To allow a parent to create such reasonable grounds, completely obliterates the purpose and validity of any Court order designating the parent with the right to consent to psychological treatment, or any Court direction as to who the counselor of the child should be.

*Findings of Fact as Conclusions of Law*

Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

Signed and Entered this 14 day of November, 2014.

Judge Michael Jergins
395th Judicial District Court

6

# Tab D



# Tab E


**Adana Alt**                                                    **August 17, 2014**

### Summary:

Assignment was to drive to 300 Carl Shipp Dr. Liberty Hill, TX and collect contents of trash prior to the weekly trash pickup at 6:00 AM for that location

**Investigation:** Drive to Subject's residence after Subject leaves in the morning, collect all trash, and take the trash to a separate location to analyze the contents – look for anything related to Subject's family, alcohol, cigarettes, drugs – legal or otherwise, etc.

| | | |
|---|---|---|
| 8/15/2014 | 4:40 AM | Started drive to Subject's residence |
| | 5:15 AM | Arrived at Subject's residence. The Subject was home, putting items in her car. I continued down the street and parked at a separate location in order to wait until Subject left. |
| | 5:19 AM | Noticed Subject drive down the street. I drove back to the Subject's residence. |
| | 5:20 AM | Arrived at the Subject's residence and collected 2 white plastic trash bags and 3 brown paper Dollar General bags. The only other contents in the trash bins were 2 pizza boxes. I noticed a car driving down the street towards my location, I got back in to my vehicle and as I drove away, noticed the Subject returning to the residence. |
| | 5:55 AM | Removed collected trash from vehicle and put in a safe location to analyze at a later time in the evening. |
| | 10:00PM – 11:00 PM | Sorted trash from Subject's residence. The 3 Dollar General bags contained 6 empty boxes of Franzia wine, while the 2 white plastic trash bags contained coke cans, 3 cans of Miller Lite filled with cigarettes, a water bottle filled with cigarettes, 11 empty cigarette packs, prescription bags from HEB containing prescription information and empty prescription bottles prescribed to the Subject; an empty bottle of "Pain Relief PM" DG Health brand acid reducer; empty nasal decongestant packets; an empty box of Clear Care contact solution; an empty bottle of Clear Care contact solution; an empty bottle of Hill Country Essentials contact solution; mail/envelopes; various cash register receipts, torn up mail; and assorted other trash. |
| 8/17/2014 | 9:00 PM – 11:00 PM | Analyze cigarette butts in beer cans and water bottle, piece together mail to see if any of it is relevant to the investigation. The only non-cigarette materials found in the cans were 5 acrylic finger nails that appeared to belong to a child. |
| | 11:00 PM – 12:00 AM | Draft report generated |



**Adana Alt**                                                                                              **August 17, 2014**

8/19/2014   11:00 PM – 12:00 AM    Final report generated

### Observations:

The cigarette butts found were the expected brand of the Subject (Marlboro 100s). Pieced together mail was not relevant to the investigation (credit applications).

The prescription packets found showed the Subject using her parent's address listed (140 Round Up Dr. Liberty Hill, TX) for her prescription orders from HEB.

During a comprehensive background check, the Subject's brother, who has a criminal record showing he was convicted of aggravated sexual assault and possession of child pornography video(s).

Concerning evidence found was the sheer volume of alcohol, prescription medications, and over-the-counter medication, which included the following:

**Atenolol**:  Generally prescribed for high blood pressure to be taken daily. Packet warnings caution that that this medication may cause dizziness or drowsiness and that it should not be mixed with alcohol, which may intensify dizziness and drowsiness.

**Fioricet** (generic, "BUT/APAP/CAF"): Generally prescribed to treat recurring headaches/migraines to be taken every six hours as needed. This medication contains barbiturates with a half-life of 35 hours, Packet warnings caution that this medication may cause dizziness or drowsiness and that it should not be mixed with alcohol, which may intensify dizziness and drowsiness.

**Tylenol PM** (generic, "Pain Relief PM"): Generally taken for headaches or other pain to be taken at bedtime. This medication contains the "sleep aid" Diphenhydramine HCl. Warnings for this product state that it *will* cause drowsiness and that that alcohol should be avoided while taking this medication.

Besides empty bottles of Atenolol, generic Fiorict, and Tylenol PM being recovered from the Subject's trash, a receipt showed that re-fills for all three of these medications were purchased on August 11, 2014, so it appears the Subject is taking the all of these medications regularly and simultaneously along with a large quantity of alcohol.

**Six 5-liter boxes of wine** (*equivalent to more than 40 regular bottles*) **and 3 large cans of Miller Lite**:: Receipts recovered in this trash collection that included alcohol purchases were one receipt on August 6, 2014 for one 5-liter wine box and one receipt on August 10, 2014 for two 5-liter wine boxes.

Tab F

# 'Setting 'Em Up': Personal, Familial and Institutional Grooming in the Sexual Abuse of Children

ANNE-MARIE McALINDEN
*Queen's University Belfast, UK*

## ABSTRACT

The term 'grooming' has been used to describe the offender's actions during the preparatory stage of sexual abuse. This article will argue that current discourses on grooming have created ambiguities and misunderstandings about child sexual abuse. In particular, the popular focus on 'stranger danger' belies the fact that the majority of children are abused by someone well known to them, where grooming can also occur. Current discourses also neglect other important facets of the sex offending pattern. They fail to consider that offenders may groom not only the child but also their family and even the local community who may act as the gatekeepers of access. They also ignore what can be termed 'institutional grooming' – that sex offenders may groom criminal justice and other institutions into believing that they present no risk to children. A key variable in the grooming process is the creation and subsequent abuse of trust. Given that the criminal law may be somewhat limited in its response to this type of behaviour, ultimately concerted efforts must be made to foster social and organizational awareness of such processes in order to reduce the offender's opportunity for abuse.

## KEY WORDS

grooming; institutional grooming; sexual abuse; trust

SOCIAL & LEGAL STUDIES Copyright © 2006 SAGE Publications
London, Thousand Oaks, CA and New Delhi, www.sagepublications.com
0964 6639, Vol. 15(3), 339–362
DOI: 10.1177/0964663906066613

Downloaded from sls.sagepub.com by guest on March 21, 2015

INTRODUCTION

ONE OF the most recent debates in the area of sexual offences against children has centred on behaviour known as 'grooming'. This term usually refers to the situation whereby a potential offender will set up opportunities to abuse by gaining the trust of the child in order to prepare them for abuse either directly or, as is the case more recently, through Internet chat rooms (Gillespie, 2001, 2004; Gallagher et al., 2003). It has recently been claimed that 'grooming is a ubiquitous feature of the sexual abuse of children' (Thornton, 2003: 144). However, despite the significance of this process in the onset of sexual abuse and the recent prominence of the term in public consciousness, it is a term which has not featured all that heavily in academic and policy-making debates.

Cases of sexual exploitation of children involving the Internet are risks to children that have received widespread official attention only in the last few years. Of these cases, those involving child pornography, or 'child abuse images' as the often preferred term, have by far received the greatest amount of attention.[1] By way of contrast, Internet initiated grooming and subsequent sexual abuse of children have lagged someway behind. Several jurisdictions have recognized the extent of the dangers of 'Internet grooming' for some time.[2] In the United Kingdom, however, the term 'grooming' has only just recently found expression in Section 15 of the Sexual Offences Act 2003, which covers the offence of meeting a child following sexual grooming. Moreover, the dangers of sexual grooming have also been recently recognized by the judiciary.[3] However, despite the fact that society as a whole is becoming more focused on grooming and its role in the sexual abuse of children, difficulties remain.

This article seeks to critically discuss some of these issues. It will be demonstrated that there are uncertainties and misconceptions about what sort of behaviour is covered by the term 'grooming'. In particular, the recent association of the term with the Internet and on-line abuse in both the popular imagination and official discourses is based on the image of the sex offender as a sexual predator or so-called 'stranger danger'. In fact, it has been well documented that children are most likely to be sexually abused by those with whom they have a family relationship (Grubin, 1998), where grooming can also take place. Moreover, the use of the Internet for 'on-line grooming' is simply one way in which offenders can get to know children and be no longer regarded as a 'stranger' by them. Many more offenders, however, make contact with victims and gain acceptance via off-line methods – through schools or clubs or by getting to know particular families. These ambiguities surrounding what amounts to sexual grooming also have implications for the criminalization of such behaviour.

Indeed, the current focus on the grooming of children has been largely reactive in nature and neglects other important facets of the sex offender's behavioural pattern. This behaviour, in fact, is much more pervasive than has previously been acknowledged: the sociological process of grooming has

Downloaded from sls.sagepub.com by guest on March 21, 2015

resonance in terms of not only extra-familial sexual abuse by strangers but also within the context of intra-familial abuse where children may be persuaded that inappropriate sexualized relationships with family members are 'both natural and common place' (Ost, 2004: 148). Moreover, current discourses do not fully consider that sex offenders may also groom not just the child but also their family or the wider community as a necessary pre-requisite to gaining access to the child. In addition, far more significantly perhaps, these discourses do not appear to recognize that sex offenders may also seek to groom criminal justice and other institutions into viewing them as posing no danger to children.

The structure of the article will be as follows: the first section will outline developments and difficulties to date within the area of grooming. These include the lack of settled meaning of the term and the consequent problems associated with a criminal law response. The second section will examine the sociological literature on the abuse of trust as a key variable in the grooming process. The third, fourth and fifth sections will critically examine the role and significance of grooming in the onset of child sexual abuse at the personal, familial and institutional levels respectively. They will analyse the importance of trust within these processes in preparing the child, their family and the wider community, and institutions in order to facilitate the abuse. Finally, the sixth section will endeavour to put forward a constructive solution to the problems associated with grooming. It will be argued that social and institutional awareness of the dynamics of grooming, particularly how sex offenders seek to create and then abuse trust, must be promoted in order to reduce the offender's opportunity to abuse and respond to the problem in a more proactive and holistic way.

## DEVELOPMENTS AND DIFFICULTIES TO DATE

Grooming is not a new concept. The term has been in use for some time by psychologists who have sought to analyse patterns of deviant sexual behaviour. However, the area has generally been under-researched and there is a good deal of confusion as to the exact meaning and scope of the term.

### LACK OF SETTLED MEANING

In general terms, the verb 'to groom' has been defined as 'to prepare, as for a specific position or purpose' (*Oxford Illustrated Dictionary*, 1975) or 'to prepare for a future role or function'.[4] However, within the context of sexual offending against children, the term 'grooming' has never been properly defined. As Gillespie (2004) argues, grooming is a transient process that is difficult to capture and virtually impossible to pinpoint when it begins and ends.

The problems of definition associated with this term may be due to a number of factors: first, some of the uncertainty is in part attributable to the

Downloaded from sls.sagepub.com by guest on March 21, 2015

fact that since only a relatively small amount of research has been carried out, understanding of the area is still fairly rudimentary. Second, as mentioned earlier, a related problem is that within popular and even official discourses grooming is immediately linked to the Internet and is used mainly to refer to on-line behaviour.[5] Crucially, this is contrary to the reality that the vast majority of abuse takes place by someone known to the victim rather than a predatory stranger (Grubin, 1998) and where the grooming is most often off-line. This latter misconception in the common usage of the term is due largely to media portrayal of the risk of sexual abuse and recent public education and awareness campaigns on the dangers of chat rooms and safe use of the Internet. Third, the enactment of recent legislation on grooming in several jurisdictions has not done anything to remove these ambiguities from the debate over the sexual grooming of children.[6] In fact, it may even be said to have added to the confusion. In the United Kingdom, for example, within the Sexual Offences Act 2003, the term grooming is nowhere defined. Moreover, this provision continues to be known as the grooming offence, even though it is not intended to be so. In fact, as will be explained further later, it is the behaviour following grooming that is to be captured by the offence, and not the grooming process itself.

*THE CRIMINAL LAW RESPONSE*

Section 15 of the 2003 Act introduces the offence of meeting a child following sexual grooming. It covers the behaviour of an offender who meets, or seeks to meet, a child with the intention of committing a sexual assault, if he has met or communicated with that child on at least two earlier occasions. This offence, however, is not restricted to on-line behaviour. It requires face-to-face meetings to either occur or be arranged in order for the offence to be triggered. It is the communication surrounding this meeting which can take place either on-line or off-line. This means that no actual abuse need take place before this offence is invoked. The purpose of Section 15 is not to act against those who have sexually abused children but to criminalize the preparatory acts involved in abuse and allow intervention well before actual physical exploitation takes place.

To this end, a further complementary measure under the Act may be invoked to address this particular form of predatory sexual behaviour. Sections 123–9 introduce the risk of sexual harm order – a new civil preventative order which can be used to prohibit specified behaviours, including the 'grooming' of children. It may be made by a magistrates' court on application by the police where a person has on at least two occasions engaged in sexually explicit conduct or communication with a child and where this is deemed necessary to protect the child from physical or psychological harm. It is possible for such an order to be made irrespective of whether such a person has previously been convicted of a sexual offence. This order effectively criminalizes acts which may be carried out for the purposes of sexual

Downloaded from sls.sagepub.com by guest on March 21, 2015

grooming, but only after an individual has been identified as posing a risk to children.

In debates about social ordering, the concept of risk increasingly furnishes a discursive framework within which 'responses-to-problems' are being considered (Beck, 1992). Indeed, 'risk penalty' which has characterized contemporary criminal justice debates more generally (Feeley and Simon, 1992, 1994; Braithwaite, 2000; Shearing, 2000) has been particularly evident in relation to concerns over the risk posed by sex offenders in the community where assessing, managing and reducing those risks has become a central concern (Kemshall and Maguire, 2003). Indeed, it has been argued that the concepts of risk management (Parton et al., 1997) and, more recently, preventative governance (Ashenden, 2004) have become the key signifiers for the regulation of child (sexual) abuse and managing sexual offenders in the community, both in terms of policy development and practical decision-making.

In tandem with these concerns, the general aim of these provisions is to prevent or deter contact between children and would-be abusers and, if it does occur, to make it more liable to detection and reporting. Since they will, in effect, empower the police to identify and tackle abusers before they are able to physically abuse a child, they have generally been welcomed as a positive advancement in child protection (Ost, 2004).[7] However, they have also been criticized from a practical standpoint.

Critics point to the potential difficulties of gaining sufficient evidence and of proving the existence of the requisite *mens rea* of harmful intent (Gillespie, 2002; Ost, 2004; Spencer, 2004). These difficulties stem from the fact that it may be very difficult to make a clear distinction between friendly behaviour towards a child and something that has a more sinister motive, especially in the early stages of the grooming process. This could lead to innocent conversations and actions being criminalized, which are outside the ambit of the danger it was intended to address (Gillespie, 2002: 419).[8] Alternatively, it may be impossible to use in practice, particularly in cases where the individual has no prior convictions.

Many sex offenders can now be tracked, to some degree at least, by examining the Internet and computer usage of those who may have been reported.[9] As discussed earlier, it is generally accepted, however, that the danger of on-line solicitation by a stranger is thought to be much lower than off-line risk from someone known to the victim. In cases of intra-familial and institutional child abuse, in particular, it is highly unlikely that the police will be able to detect all instances of grooming which occur prior to the actual abuse (Gillespie, 2002; Ost, 2004). These arguments point strongly towards the conclusion that sexual grooming is not easily captured by the criminal law which, as a result, will be somewhat limited in its response to this form of deviant sexual behaviour.

Indeed, sex offenders are often devious and manipulative and expert at avoiding detection or suspicion. Offenders can be very inventive in the way in which they obtain access to children, within their own or other families,

Downloaded from sls.sagepub.com by guest on March 21, 2015

or via the community and even organizations. Whatever the mode of deception, the establishment and breach of trust play a central role in the grooming process.

## AN ABUSE OF TRUST

In the past decade, the topic of trust has captured the attention of a number of scholars. Friedrichs (1996: 11–12) points out that although trust is a central cultural concern, there is no single meaning of the term. Many of the available definitions, however, can be related specifically to the behaviour of sex offenders as they groom both people and institutions. Luhmann (1988), Johnson-George and Swap (1982) and Coleman (1990) all define trust as a behaviour, or attitude, which permits risk-taking behaviour. The level of faith placed in sex offenders by parents or carers allows them to take risks with their children's well-being which in turn provides the offender with opportunities to undermine this trust. Luhmann (1988) and Cook and Wall (1980) centre their definitions on the concept of confidence, while both Dasgupta (1988) and Good (1988) focus on predictability. Similarly, Gambetta (1988) and Kee and Knox (1970) suggest that trust is inversely related to the willingness to become vulnerable to the actions of another person or group. All of these concepts are evidenced by the often unquestioned faith placed in sex offenders by children, parents and staff in institutions and their unwitting cooperation with the offender's deviant agenda. Moreover, the totality of these factors – confidence, predictability and the willingness of others to take risks – allows the offender to deliberately suspend suspicion and facilitate the continuum of abuse.

Ben-Yehuda is one of the most notable of the recent scholars in the area of betrayal and trust. In this respect, it is useful to consider some of the themes highlighted by his work and examine how they might aid an understanding of the dynamics of grooming.

### VARIED SOCIAL CONTEXTS

First, Ben-Yehuda (2001: 6–7) argues that trust is influenced by social structures and societal institutions and that violations of trust and loyalty – betrayal – can appear in varied and different social contexts including interpersonal, group, organizational (and even national) contexts (see also Luhmann, 1988; Friedrichs, 1996; Kramer et al., 1996; Oliver, 1997). This factor illustrates that trust has resonance not only at the micro-level within inter-personal relationships – such as those between offenders and children and their carers – but also at the macro-level in terms of how relationships operate between the offender and wider society and the institutions within which they may work (Coleman, 1990).

Downloaded from sls.sagepub.com by guest on March 21, 2015

*ESTABLISHING INTIMATE AND SOCIAL RELATIONSHIPS*

Second, Ben-Yehuda (2001: 6–7) argues that trust involves a particular type of relationship where the participants perceive that a genuine, authentic and truthful interaction exists. He further argues in this respect that trust invokes the concepts of reliability, faithfulness and responsibility and assumes such relationships as loyalty, friendship and belief (Ben-Yehuda, 2001: 11–13). These are the necessary pre-conditions that the offender must construct in order to establish intimate and social relationships with those he wants to groom. The offender pretends to be friendly and trustworthy to the specified relevant audience and manages to deceive them into believing that his falsified presentation of self is true. He tries to create shared interests and identities on a personal level and an imagined sense of community at the collective level. It is this sense of belonging or shared membership of the same group that makes the betrayal possible (Ben-Yehuda, 2001: 27–8).

*THE USE OF DECEPTION*

Third, there are a few basic characteristics of a culture that mask reality and which make betrayal possible. A breach of trust typically involves deception devices such as secrecy, manipulation, lying, cheating or concealment and the specific and deliberate motivation to do so (Ben-Yehuda, 2001: 6–7). As will be discussed later, sex offenders employ a range of devious techniques in the grooming process. With institutional grooming, in particular, it is the offender's job and related status which provide a ready vehicle for this deception. Offenders may use their work with children to facilitate and disguise their sexually abusive behaviour and are able to make use of existing environments of pervasive secrecy (Sullivan and Beech, 2002).

*A MORAL AND SOCIAL CONSTRUCT*

Finally, Ben-Yehuda (2001: 6–7) argues that trust is not only morally but also socially constructed. Even though trust may have different meanings in different contexts, because trust is considered sacred, its violation amounts to an infringement of a moral code which may be deeply engrained within society. This argument may help to explain why society has such a strong emotional and often punitive reaction to sex offenders generally. These reactions are typically more severe, however, towards those offenders who commit institutional abuse, where the very act of betrayal becomes a form of deviance in itself (p. 311). When sex offenders offend at the institutional level, they have misused their position and the trust placed in them by sexually offending against a child in their care. They have also violated inter-personal relationships and defaulted on their moral obligation and commitment to ensure the care, safety and well-being of the children for whom they are responsible.

Downloaded from sls.sagepub.com by guest on March 21, 2015

Many of these themes are reflected in the actual process of grooming at the personal, familial and institutional levels. Sex offenders actively seek to create and abuse 'trust' in varied social contexts. They try to establish intimate and social relationships which will facilitate abuse by making use of a range of deception techniques.

## 'PERSONAL GROOMING'

One of the most important findings to emerge from the wider research literature on sex offending against children is an understanding of the process of victimization for the many children who are sexually assaulted by both strangers and intimates. Information has come from the study of offenders in treatment programmes who have frequently acknowledged the grooming process (Budin and Johnson, 1989; Conte et al., 1989; Christiansen and Blake, 1990; Elliott et al., 1995; Smallbone and Wortley, 2000) and of victims (Berliner and Conte, 1990, 1995) and from both taken together (Phelan, 1995). Understanding this process may help to explain why a child may cooperate or even acquiesce in abusive sexual acts.

In this respect, several commentators have attempted to locate the term grooming within the overall framework of the onset of sexual abuse. Finkelhor (1994) has proposed the following four factors as being required for the sexual abuse of a child to occur: the offender's predisposition towards sexual contact with children; the ability to overcome their own inhibitions; the ability to overcome the victim's resistance to abuse; and the opportunity to offend. As will be explained further later, it is the latter two factors – overcoming the victim's resistance and providing the opportunity to offend – which bring 'personal grooming' into play.

The term 'grooming' itself was first underlined by Salter (1995). The expression is generally used to refer to the process by which a would-be abuser skilfully manipulates a child into a situation where he or she can be more readily sexually abused and is simultaneously less likely to disclose (Wyre, 2000; Van Dam, 2002). Salter (1995) alternatively uses the term 'emotional seduction' in this context:

> The establishment (and eventual betrayal) of affection and trust occupies a central role in the child molester's interactions with children . . . The grooming process often seems similar from offender to offender, largely because it takes little to discover that emotional seduction is the most effective way to manipulate children. (p. 74)

The grooming process can occur over a short period but more commonly occurs over a longer period to allow the child to feel comfortable. The patience of the offender can also be partly explained by the fact that it is not uncommon for them to be grooming several children at once. In this way, even if the child begins to feel uneasy and breaks off the relationship, there will be other potential victims readily available.

Downloaded from sls.sagepub.com by guest on March 21, 2015

Consistent with Matza's (1964, 1969) 'techniques of neutralization', sex offenders do not fully internalize any set of sexual or behavioural norms. Rather they have a learnt set of 'definitions favourable to violation'. As noted at the outset, the meaning of grooming in a legal context is uncertain which does seem to reflect something of the phenomenon itself. Personal grooming, however, involves a series of what are, in terms of the literature, fairly well-established stages for manipulating children and normalizing deviant sexual relationships (Budin and Johnson, 1989; Conte et al., 1989; Berliner and Conte, 1990, 1995; Elliott et al., 1995; Gallagher, 2000; Ost, 2002).

First, grooming the child can typically include befriending a potential victim by getting to know their interests and being helpful and confiding in order to gain their confidence and trust. Second, the offender will cultivate a 'special' friendship by bestowing a variety of inducements such as money, comics or sweets or even unexpected treats such as trips to the cinema or fast-food restaurants. This emphasis on the exclusivity of the relationship helps to 'distance' the child from their parents or others who may represent a source of safety and prevent the abusive behaviour from being discovered. It also enables the offender to control the victim through the giving or with-holding of rewards. In some cases the use of bribes or rewards may escalate into threats or the use of force to ensure the child's continued secrecy and compliance. Third, the offender will often use 'forbidden fruit' type activi-ties such as cursing, telling 'dirty jokes' or showing the child pornography to introduce sexual themes into their conversations. This latter stage not only begins to normalize sexual behaviour but may also be used to entrap the child further. The use of pornography in particular may encourage feelings of shame and guilt which the offender may exploit by persuading the child that they were willing accomplices in their activities. These factors in turn may also make the child less willing to tell others. Finally, the offender will exploit the child's naïvety and trust by introducing increasingly intimate physical contact such as play acting, tickling or wrestling and even hugging to grad-ually sexualize contact with the child. The use of touch is particularly import-ant as this determines whether or not the child is receptive and begins the process of desensitization – gradually the abuser will escalate boundary violations of the child's body which eventually culminates in enticing the child to acquiesce to engaging in sexual activity. Victims have also been groomed to introduce further victims to the process of grooming and abuse.[10]

The grooming procedure is extremely effective as the vast majority of children do not disclose the abuse. Recent research shows that fewer than 5 per cent of sex offenders are ever apprehended (Salter, 2003). Estimates also suggest that only 3 per cent of all cases of child sexual abuse (Finkelhor and Dziuba-Leatherman, 1994) and only 12 per cent of rapes involving children (Hanson et al., 1999; Smith et al., 2000) are ever reported to the police. As discussed earlier, a complex range of emotions such as fears of retribution or abandonment, and feelings of complicity, embarrassment, guilt and shame all conspire to silence children and inhibit their disclosures of abuse. Boys seem to have a particularly difficult time dealing with sexual abuse as they are even

Downloaded from sls.sagepub.com by guest on March 21, 2015

less likely to report it than girls (Hunter et al., 1992; Watkins and Bentovim, 1992).

The process is also significant, for to invoke the much-used phrase 'monsters do not get children, nice men do' (Long and McLachlan, 2002: 6). Contrary to the media-inspired popular belief, a sex offender is not instantly recognizable as the 'dirty old man in the raincoat'. Part of their skill is to ingratiate themselves with children and infiltrate themselves into unsuspecting families, communities and organizations. To do this successfully, they must pass themselves off as being very nice, usually, men who simply like children.[11] In fact, sex offenders, if they are to avoid suspicion, need to find ways in which they can legitimately have contact with children and acquire power over them. In this respect, sex offenders may not only groom children but also their families and local communities perhaps as the means of beginning an association with a child.

## 'FAMILIAL GROOMING'

The ambiguities surrounding the grooming process in both legal and sociological terms do not become that much clearer for being extended into the familial and institutional contexts. However, once more, indicators of the sex offender's behaviour in the preparatory stages of abuse are to be found in the literature.

Skilful offenders may also seek to gain access to the child by establishing a friendship with the child's parent or adult caretaker rather than, or in addition to, that with the child. In this respect, adults may be primed and controlled for victimization in similar ways to children.

In Salter's (2003) more recent work she explains how sex offenders, who often have good social skills, act with careful premeditation and use sophisticated deception techniques to avoid suspicion, sometimes playing double roles in the community. In this respect, the grooming of the child's family or community has a dual purpose: securing the confidence and trust and thus the cooperation of their carers in gaining access to the child; and reducing the likelihood of discovery or disclosure by creating an atmosphere of normality or acceptance.

Grooming behaviour, as with the ultimate child victim, is intended to make the victim's guardians feel comfortable with the offender. This causes parents and others to drop their guard, allowing the sex offender easy and recurring access to their children. This has worked to the extent that some offenders have been successful in persuading the child's parents to consent to their child having an unaccompanied outing or an overnight stay with the offender, which provides the abuser with an opportunity to offend with impunity (Salter, 2003: 5).

One of the first stages in the offender's deviant cycle which precludes the onset of sexual abuse is victim identification or selection. Aside from choosing a victim that has general appeal, ease of access and vulnerability play

Downloaded from sls.sagepub.com by guest on March 21, 2015

a pivotal role. Sex offenders sometimes plan their assaults around a category of child whom they believe they can safely victimize. This includes children with special needs and learning disabilities (Gallagher, 1998: 807–11). Research also suggests that sex offenders appear to single out and target children and families with obvious vulnerabilities (Conte et al., 1989; Elliott et al., 1995). For instance, they may select a dysfunctional family where the parents are having marital problems (Gruber and Jones, 1983; Finkelhor, 1984), where the mother is ill (Herman, 1981; Finkelhor, 1984) or where the child is being emotionally neglected in some way (Finkelhor, 1984; Bagley and Ramsey, 1986). Elliott et al. (1995) in interviews with 91 child sex offenders reported that they most often chose children who had family problems, were alone, lacked confidence and were indiscriminate in their trust of others. In other words, offenders will find and fill a void in the child's life.

Sex offenders will often select single-parent families where usually the woman herself is vulnerable either economically or emotionally (Herman, 1981; Bagley and Ramsey, 1986).[12] These include women who may be looking for a 'father figure' for their children or those who are drug-addicted who will trade their children for drugs (Salter, 1995: 39). One of the easiest ways to make contact with a child is to live with one. Offenders may target single mothers by placing or responding to advertisements in 'lonely hearts' columns in the eventual hope of forming a family relationship – either moving in with or even marrying that person in order to gain access to their children (NCIS, 2003). They may even aspire to find a partner with whom they can have their own children which, in their terms, would provide ready access to victims whom they can abuse.

Aside from the child's family, the community itself can also be primed and controlled through the grooming process. Many offenders tend to adopt a pattern of socially responsible and caring behaviour in public. They endeavour to build a good reputation and to create a strong social perception of themselves as being an upstanding member of the local church or community, as a nice man who is exceptionally kind to children or the type of person who would usually help out when needed (Salter, 2003).

Typical access methods also include choosing a career or volunteering for work that will place them in close proximity with children. Indeed, sex offenders are skilled in the process of what I will term 'institutional grooming' – in targeting and grooming entire organizations, as much as individual children, and those who work within them.

## 'INSTITUTIONAL GROOMING' AND ABUSE

The issue of 'professional perpetrators' (Sullivan and Beech, 2002) – sex offenders who use their employment as a cover to target and sexually abuse children with whom they work – has attracted widespread media publicity, provoked public outcry and provided the impetus for legislative and organizational change. However, despite the psychological literature which exists on

Downloaded from sls.sagepub.com by guest on March 21, 2015

grooming and the legislative and policy framework which exists to prevent unsuitable people from working with children, the two have never been properly integrated. Indeed, most of what is known about institutional abuse derives from case studies and official reports.

INSTITUTIONAL ABUSE

In the last two decades a number of tragic cases of 'institutional sexual abuse' in England and Wales, Northern Ireland and the Republic of Ireland have demonstrated the vulnerability of children in environments traditionally considered secure such as homes, clubs and schools (see *The Times*, 1996; *Guardian*, 1998a, 1998b; *Irish Times*, 1998). In Northern Ireland and the Republic some of the most high profile of these cases have, for the most part, centred on the wrongdoing of individuals rather than institutions. In relation to the former jurisdiction, the Kincorra scandal (DHSS (NI), 1982; HMSO, 1985; Moore, 1996)[13] and the cases of care worker Martin Huston (DHSS (NI), 1993)[14] and head master Lindsay Brown (DENI, 1999)[15] resulted in a series of public inquiries, reports and guidelines which underlined the importance of developing effective procedures to prevent unsuitable people from working with children. One of the most recent cases in Northern Ireland was the Barnardo's case in 2004 where Margaret Hewitt and Robert Anderson were found guilty of a total of 70 sexual offences against eight children which took place at a Barnardo's home between 1977 and 1981 (*BBC News On-line*, 2004). In the latter jurisdiction, paedophile priests in particular have been the objects of media concern (see *Irish News*, 1996; *Sunday Times*, 1999; *Irish Times*, 2000), with the highly publicised 'Fr Brendan Smyth affair' attracting the most widespread attention (Ferguson, 1995; Moore, 1995).

An examination of these and other cases suggests a number of common themes. The abuse normally took place over a number of years and its extent went unrecognized for some time; usually more than one victim was involved, and often more than one offender (Finkelhor et al., 1988; White and Hart, 1995; Gallagher, 1998, 1999; Waterhouse, 2000); the victims were afraid to disclose the abuse; or when they did, no action was taken, either because there was a conspiracy to keep allegations quiet or a ready acceptance of the denial by the alleged perpetrator (Sullivan and Beech, 2002: 161). The latter criticisms have been made in particular within the context of sexual abuse within churches or faith communities (Berry, 1992; Nolan, 2001). These factors are confirmed by the available literature on the prevalence of abuse within child care institutions which suggests that, predominantly, the complaints appear to be of a sexual nature, involving both boys and girls, and that the majority have not been reported (Gallagher, 1998; Barter, 1999).

In England and Wales the picture has been framed largely in terms of a number of public inquiry reports or official reviews, which have resulted from the disclosure of institutional physical and sexual abuse in care homes

Downloaded from sls.sagepub.com by guest on March 21, 2015

(see Corby et al., 2001). The inquiries have included the Leicestershire Inquiry into allegations of sexual abuse by management and staff in children's homes (Kirkwood, 1993); the Ty Mawr Inquiry following allegations of misconduct in Gwent children's homes (Williams and McCreadie, 1992); and the Waterhouse Report (2000) of the tribunal of inquiry into the abuse of children in care homes in North Wales. The reviews have included the Warner Report (1992) on the selection, development and management of staff in children's homes; the Utting Report (1998) on the safeguards for children living away from home; and the Nolan Committee Report (Nolan, 2001) on child protection policies in the Catholic Church in England and Wales. These inquiries and reviews have all highlighted systematic failures to respond to reports of abuse and have concluded that the extent of institutional abuse and the implications for the management of the problem are extensive.

As is typical of all child abuse inquiries, many of these appear to have made similar recommendations to protect children in the future, which have not always been acted upon (Parton, 2004). For example, several inquiries have questioned the accuracy of vetting procedures and the consistency with which various agencies use the system. The Warner Inquiry (1992) found that 10 per cent of the heads of homes and a third of care workers were able to take up their posts before any references were received. The Utting Report (1998), around six years later, also expressed serious concerns about the manner in which police checks were handled and highlighted that insufficient consideration was given to references. The Waterhouse Report (2000) also listed a catalogue of inadequate procedures and breaches of policy from recruiting staff informally without obtaining references to failure to check foster families or employees before they commence work. Indeed, the recent report of the Bichard Inquiry (2004) arising from the 'Soham murders' also highlighted 'systemic and corporate failures' in the way in which the police managed their intelligence systems (para. 8). As Sullivan and Beech (2002) argue, this raises questions not only about the speed and process of organizational change but also, more worryingly, whether any lessons have actually been learned.

Other recommendations have resulted in a plethora of recent legislative developments within a short few years, which have attempted to improve child care practice and prevent offenders from making contact with children through organizations. These have included the Sexual Offences (Amendment) Act 2000 which made it an offence for an adult to engage in any sexual activity with a child if they are in a position of trust.[16] The Criminal Justice and Court Services Act 2000 made it a criminal offence for convicted abusers to seek employment with children or for employers to knowingly appoint such people. The majority of the recent measures, however, are based on pre-employment vetting. For example, Part V of the Police Act 1997 established the Criminal Records Bureau to provide a more effective means of carrying out criminal record checks. In addition, the Protection of Children Act 1999 combined the Department of Health Consultancy Service Index and the Department of Education and Employment 'List 99' to make it easier for

Downloaded from sls.sagepub.com by guest on March 21, 2015

employers to check whether those who wish to work with children are known or suspected abusers.

Therefore, it would appear that given the body of legislation which exists and the number of public inquiries which have taken place, it has long been recognized that individuals may use their employment in order to gain access to children. The danger is that these developments have largely been reactive responses to the problem. Moreover, they have also been focused on developing external controls to prevent known sex offenders from making contact with children. What is needed, however, is greater understanding of the internal process of institutional grooming in order to develop proactive responses to problems before they occur.

The Utting Inquiry (1998), for instance, as one of the major reports in the last few years proposed a 'protective strategy' comprised of four main elements as follows: (1) a threshold of entry to paid and voluntary work with children which is high enough to deter committed abusers; (2) management which pursues overall excellence and is vigilant in protecting children and exposing abuse; (3) disciplinary and criminal procedures which deal effectively with offenders; and (4) an approved system of communicating information about known abusers between agencies with a need to know. However, this strategy does not fully acknowledge the characteristics of the offender and the nature of their behaviour within institutions on a number of levels. The focus on an entry threshold misses the point that sex offenders will use grooming techniques in order to cross any threshold in their quest to access children. Moreover, the emphasis on a vigilant management and swift disciplinary measures does not take account of the fact that sex offenders may actually constitute the management in an institution which may allow the subsequent onset of abuse to go undetected or unpunished. Finally, the value placed on information sharing is based on the known, identifiable and preventable risk and not the unknown, hidden and therefore the most dangerous one.

### 'INSTITUTIONAL GROOMING'

All of the inquiries and high-profile cases of institutional abuse cited earlier verify that sex offenders often actively seek situations that bring them into contact with children. It would appear that in common with the Internet, which has been used as a ruse to groom children for abuse, certain forms of employment may allow an abuser to gain ready access to children in a way that would not otherwise be possible.

These occupations relate to a wide variety of settings (Stanley, 1999). They go beyond the obvious religious work to include also secular paid and voluntary work (Smith, 1993) within schools (La Fontaine and Morris, 1991; Brannan et al., 1993) residential homes (Corby et al., 2001) and a range of community-based child care settings, including foster care placements (Browne and Lynch, 1999; Waterhouse, 2000) and nursery schools (Finkelhor

Downloaded from sls.sagepub.com by guest on March 21, 2015

et al., 1988; Hunt, 1994). Indeed, the picture painted by the inquiries and reviews is that the problem of institutional abuse is confined mainly to residential contexts. The reality, however, is that probably every profession or organization that has contact with children in terms of their care, education or social or leisure activities is vulnerable to infiltration by those who wish to abuse.

Within the institutional context, the relationships created with the child and other adult carers who might protect them are also based on the creation of loyalty and trust and their subsequent violation. As discussed earlier, a breach of trust typically involves a range of deception techniques that make betrayal possible. In this vein, sex offenders appear to use the special features of the institutional environment to facilitate abuse and prevent disclosure by children and other professionals (Brannan et al., 1993). These particular dynamics include features such as opportunity, anonymity, secrecy and power.

Indeed, institutions can create multiple opportunities for the manipulation and abuse of children and can allow the offender to take on a different persona and remain anonymous in terms of their deviant sexual tendencies. The organizational culture itself may be conducive to abuse of power and erosion of the primary functions of care and protection. Child care institutions appear to be self-protective, secretive and closed by nature. As such, they discourage the drawing of attention to any deficiencies in policies and procedures and the signs of abuse (Westcott, 1991: 15–17; Waterhouse, 2000; Sullivan and Beech, 2002: 162). Furthermore, if these organizations are held in high esteem by local agencies or parents, children may experience added difficulties in both resisting and disclosing the abuse (Gallagher, 2000: 810).

Moreover, the particular role which these offenders play within certain institutions may also make the environment more facilitative of abuse. The offender may be in a primary management position with free reign over the institution, with little checks and balances on their behaviour. It is this status or authority that may give them the necessary control over the organizational culture. In short, it may give them 'the power to betray' (Ben-Yehuda, 2001: 28) – it may provide an opportunity for those minded to abuse children to do so in a way that exposes them to less risk, thus reducing the likelihood of detection and potentially leading to an increase in abuse. Indeed, it has been said that it is this facet of the institutional setting which makes the behaviour of the professional offender closely akin to that of the intra-familial offender (Sullivan and Beech, 2002: 164).

As discussed earlier, a system of pre-employment vetting has been introduced for those working with children and young people. It can only ever be effective, however, where there is a clear record of offending and where the identity of the person being vetted is known and assured. The procedures put in place to date can do little to stop offenders when they are at their most dangerous – when their deviant sexual behaviour remains hidden and when they have managed to persuade those responsible for children, through grooming, that they are genuine, respectable and worthy of belief.

Downloaded from sls.sagepub.com by guest on March 21, 2015

### A CONSTRUCTIVE SOLUTION

Given the dichotomy between the widespread confusion surrounding the term grooming and the associated weaknesses of a legal response on the one hand, and the centrality of the grooming process to the sexual abuse of children on the other, there is a pressing need to think more constructively about devising an effective social response to this behaviour.

It has been demonstrated that recent attention afforded to the grooming of children for sexual purposes has focused almost exclusively on the Internet and the dangers of predatory sex offenders procuring victims on-line. It has been a central argument of this article, however, that this focus has been largely misplaced in that grooming can and usually does occur independent of the Internet. Moreover, it has also been argued that it is not only the child that is groomed in the first step to sexual abuse, but quite often their family, the community in which they live and even institutions in which there are children such as clubs, schools or care homes. With each of these forms of grooming, the abuse is made possible by the level of trust placed in offenders.

It is our misconceptions about sexual offenders, in large part generated by the media (Silverman and Wilson, 2002; Greer, 2003), that make us so vulnerable to them. Sex offenders rely on these mis-assumptions to carefully gain access to children. Societal acceptance of these myths assists sex offenders by silencing victims and encouraging public denial about the true nature of sexual assaults. It is only by dispelling the myths surrounding sexual offenders – including how they deceive their victims and manipulate them in order to gain their trust – that we can effectively deflect sex offenders and protect children (Salter, 2003). Part of the solution is educating children themselves to be wary. However, at the same time given the way in which sex offenders operate, society as a whole must also be informed.

There is a real need, therefore, to demythologize sexual offending and work together with all groups in the community to achieve a more effective, safer way of protecting children and of reducing the offender's opportunity to abuse. This underlines the need for a rigorous public-education programme driven by government and designed to provide accurate information. This would hopefully shift cultural attitudes, dispel the commonly held mistaken beliefs, and inform the public about and increase the understanding of the real nature of sexual offenders and sexual offending.

While it is wholeheartedly recognized that the enormity of this task cannot be underestimated, some tentative suggestions can be made. In this respect, Home Office research (Grubin, 1998) suggests that there are a number of issues which the community could usefully be educated about including: that contrary to media portrayal and popular belief, the abuser is rarely the 'dirty old man in the raincoat' whom we imagine lurking in the corner of the local playground or park; that the vast majority of sexual abuse – approximately 80 per cent – is perpetrated by people known to the child rather than a predatory stranger; that sex offenders typically offend alone rather than in networks or 'rings'; that sexual abusers are men and women and, in a growing

Downloaded from sls.sagepub.com by guest on March 21, 2015

number of cases, adolescents or children; and that there are different levels of risk and that not all sexual offenders pose the same degree of high risk.

Perhaps the most important of these findings is the one highlighted at the outset of this article – that most perpetrators assault children known to them, with these offences taking place in the home of either the offender or the victim. A further interesting study in this respect is another prepared for the Home Office which looked at 94 cases of physical and sexual abuse (Davis et al., 1999). All but one of the complainants knew their alleged abusers, of whom 48 per cent were family members or relations, 20 per cent were family friends or neighbours, 15 per cent were professionals (youth workers, teachers, doctors), and 6 per cent were acquaintances. In view of this stark reality, it is essential that children and all those responsible for them are also made aware that the danger often may not lie with strangers but with those closest to them. In this way, vigilance would be increased and risk and the opportunity for offending reduced.

Indeed, the theoretical logic behind such an approach is well grounded in the wider debates about risk and governance, as outlined earlier. Ericson and Haggerty's (1997) model of 'knowledge–risk–security', in particular, emphasizes the proactive 'management' of knowledge about offenders and the production of compensatory measures against risk (Hebenton and Thomas, 1996). In line with this model, the public, through community education and awareness programmes, would be admitted as consumers of this knowledge (Reiss, 1989). However, whereas legal responses to managing sex offenders in the community focus on knowledge of the whereabouts of known 'risky' *individuals*, such social responses would be based on knowledge of 'risky' *behaviour or methods*, which could also encompass previously unknown offenders. Such social knowledge, therefore, could add a further layer of protection between children and abusers.

At a practical level, the purpose behind this approach is much more fundamental. This 'opening-up' of knowledge and awareness on the part of the community is especially important when one considers the grooming process – that many sexual offenders are manipulative and devious by nature and will seek to infiltrate unsuspecting families for sexual purposes. Criminal justice interventions can do little to prevent this unless the offender has already come to their attention. Communities can, however, help by arranging networks of support and control where necessary (McAlinden, 2005: 388). Braithwaite (1999), for instance, uses the example of 'Uncle Harry', as a 'significant other' of the offender and says that 'Uncle Harrys' have a much more plural range of incapacitative keys that they can turn than a prison guard who can turn just one key.

Challenging the media's image that sex offences are committed exclusively by strangers, however, raises a number of difficult issues. Grooming has been the subject of a 'moral panic' (see Cohen, 1972; Hall et al., 1978) in the media and among politicians, and the new legislation common to many jurisdictions is in part a reflection of this. In extending the public understanding of grooming to familial and institutional contexts, there is a danger of simply

Downloaded from sls.sagepub.com by guest on March 21, 2015

increasing levels of suspicion, mistrust and surveillance (Foucault, 1977). If society is encouraged to look very closely for abuse, there might be an associated danger of undermining trust rather than seeking to safeguard it. This might further heighten the moral panic surrounding sexual crime, thus creating a society where no one trusts anyone (Hudson, 2005: 183).

Furthermore, it has also been argued that the public already accepts that the risk of sexual victimization by a stranger is slight but is reluctant to visualize the risk in domestic terms (Greer, 2003). They deliberately choose to construct 'sites of danger' as being linked firmly to the public space since any alternative undermines the traditional views of the family and home as the given sphere of safety and protection (Saraga, 2001). In short, care will need to be taken, therefore, to deliver this information in a sensitive and responsible way so as to avoid a compounding of current problems and, above all, to make sure that one panic about sex offending is not simply replaced by another.

## CONCLUSION

We are still very much only at the infancy stages in terms of understanding the entire grooming process, its role and significance in sexual deviance, the risk this behaviour poses to children and in constructing an adequate response to the problem. This analysis has argued that particularly because of the difficulties of drawing clear boundaries between innocent and more deviant relationships with children, criminal law and policy are somewhat limited in their response to what has become a dominant factor in the sexual abuse of children.

Given the centrality of trust to the grooming process, a key focus within child protection discourses must be to raise public consciousness of how sex offenders operate, in particular how they gain our trust. Such a collective response would represent proactive and anticipatory responses to grooming and not just reactive responses after specific problems occur. It would also hopefully increase the safety and welfare of children by limiting the offender's scope for offending. This knowledge has the potential to make children safer on a wider scale, not only within the community and within institutions, but also crucially within their own families where they are most at risk.

## NOTES

I would like to thank a number of colleagues in the School of Law at Queen's for their constructive criticism on an earlier draft of the article – Dr Caroline Keenan, and Professor Kieran McEvoy in particular who helped me sharpen my analysis. I would also like to thank the Editor and the anonymous reviewers for their helpful comments. Any errors or omissions remain my own.

Downloaded from sls.sagepub.com by guest on March 21, 2015

1.  One of the most high profile cases in this respect was the 'Wonderland' investigation involving several countries and police forces (*BBC News On-line*, 2001).
2.  For example, Australia, Canada and the United States have various offences to cover on-line grooming based on either coercion, enticement or luring a child with the intention of having sexual relations (for Australia's Northern Territory Law, see s. 201 of the Northern Territory of Australia Criminal Code Act, para. 3.4.2; for US Federal Law, see 18 USC 2422: Coercion and Enticement; for Georgia State Law, see Ga. Code Ann. § 16-12-100.2 (1999); for Canada, see s. 172.1 of the Criminal Code enacted by The Criminal Amendment Act 2001). However, for the most part, grooming in these jurisdictions remains firmly linked to the Internet and legislation has yet to be enacted to cover grooming which takes place off-line. Scotland and New Zealand, however, have also proposed legislation along similar lines to that in the United Kingdom.
3.  In *Re Attorney General's Reference (No. 41 of 2000)* [2001] 1 Cr App R (S) 372, one of the reasons why the Court of Appeal increased the defendant's original sentence for indecent assault and making indecent photographs of children was because he had sexually groomed a vulnerable child with special needs.
4.  *Web Dictionary*. See http://dictionary.reference.com/search?q=groom.
5.  Grooming was also associated primarily with on-line behaviour in parliamentary debates on the 2003 Act. See for example Baroness Blatch, *Hansard*, HL Debs, 13 February 2003, cols. 788–9; Lord Alli, *Hansard*, HL Debs, 13 February 2003, col. 795.
6.  See p. 340 and Note 2 above.
7.  These assumptions about the supposed benefits of the legislation also appear to have underpinned the legislative debates on the 2003 Act. See for example Sir Paul Beresford, *Hansard*, HC Debs, 12 June 2000, cols. 699–700; Lord Falconer, *Hansard*, HL Debs, 1 April 2003, col. 1257.
8.  These potential difficulties were also recognized when the legislation was being considered by Parliament. See, for example, Mr Oliver Letwin, *Hansard*, HC Debs, 19 November 2002, col. 508; Baroness Noakes, *Hansard*, HL Debs, 13 February 2003, cols. 777–8; Baroness Gould, *Hansard*, HL Debs, 13 February 2003, col. 786.
9.  Although statistics regarding the extent of on-line grooming are difficult to establish and evaluate, there have been some surveys of children's experiences on-line. A US survey found that approximately 1 in 5 youths aged between 10 and 17 'received an unwanted sexual solicitation or approach over the Internet in the last year' (NCMEC, 2000: 14). A similar figure, approximately 20 per cent, has also been produced in the UK (ICF, 2001).
10. One commentator has argued that the term 'grooming' is not a wholly appropriate one in light of what children are subjected to and should be replaced with the word 'entrapment' (Gallagher, 1998). Other jurisdictions have proceeded along similar lines. See Note 2 above.
11. In relation to the gendered nature of offending, less than 5 per cent of sex offences against children are known to have been committed by women (see Grubin, 1998; NCIS, 2003).
12. Several other studies, however, have identified separation from the father as a risk factor (see Finkelhor, 1984; Russell, 1986).
13. The Kincorra case involved the systematic abuse of boys through vice rings and prostitution in Kincorra hostel in East Belfast which finally came to light in the early 1980s but which could be traced back at least two decades.
14. Huston was convicted in 1992 on 25 counts of sexual offences against children. He had been on probation for two years between 1987 and 1989 for committing

Downloaded from sls.sagepub.com by guest on March 21, 2015

sexual offences, yet was able to find employment with a voluntary agency involving work with children.

15. Brown, the vice principal of a Bangor Grammar School, was convicted in 1999 of abusing nine boys over three decades.

16. This offence has now been extended considerably by the Sexual Offences Act 2003, ss. 16–24.

## REFERENCES

Ashenden, A. (2004) *Governing Child Sexual Abuse: Negotiating the Boundaries of Public and Private, Law and Science*. London: Routledge.

Bagley, C. and R. Ramsey (1986) 'Sexual Abuse in Childhood: Psycho-social Outcomes and Implications for Social Work Practice', *Journal of Social Work and Human Sexuality* 4: 33–47.

Barter, C. (1999) 'Practitioners' Experiences and Perceptions of Investigating Allegations of Institutional Abuse', *Child Abuse Review* 4: 392–404.

*BBC News On-line* (2001) 'Paedophiles Jailed for Porn Ring', 13 February.

*BBC News On-line* (2004) 'Pair Jailed for Child Sex Crimes', 21 September.

Beck, U. (1992) *Risk Society: Towards a New Modernity*. London: SAGE Publications.

Ben-Yehuda, N. (2001) *Betrayal and Treason: Violations of Trust and Loyalty*. Boulder, CO: Westview.

Berliner, L. and J. R. Conte (1990) 'The Process of Victimisation: The Victims' Perspective', *Child Abuse and Neglect* 14: 29–40.

Berliner, L. and J. R. Conte (1995) 'The Effects of Disclosure and Intervention on Sexually Abused Children', *Child Abuse and Neglect* 19: 371–84.

Berry, J. (1992) *Lead Us Not into Temptation*. London: Doubleday.

Bichard, Sir M. (2004) *The Bichard Inquiry Report*. London: Home Office.

Braithwaite, J. (1999) 'Restorative Justice: Assessing Optimistic and Pessimistic Accounts', pp. 1–27 in M. Tonry (ed.) *Crime and Justice: A Review of Research*. Chicago: University of Chicago Press.

Braithwaite, J. (2000) 'The New Regulatory State and the Transformation of Criminology', *British Journal of Criminology* 40: 222–38.

Brannan, C., R. Jones and J. Murch (1993) *Castle Hill Report: Practice Guide*. Shrewsbury: Shropshire County Council.

Browne, K. and M. A. Lynch (1999) 'The Experiences of Children in Public Care', *Child Abuse Review* 8: 353–6.

Budin, L. and C. Johnson (1989) 'Sex Abuse Prevention Programs: Offenders' Attitudes About Their Efficacy', *Child Abuse and Neglect* 13: 77–87.

Christiansen, J. and R. Blake (1990) 'The Grooming Process in Father–Daughter Incest', pp. 88–98 in A. Horton, B. Johnson, L. Roundy and D. Williams (eds) *The Incest Perpetrator: A Family Member No One Wants to Treat*. Newbury Park, CA: SAGE Publications.

Cohen, S. (1972) *Folk Devils and Moral Panics*. London: Paladin.

Coleman, J. S. (1990) *Foundations of Social Theory*. Cambridge, MA: Harvard University Press.

Conte, J. R., S. Wolf and T. Smith (1989) 'What Sexual Offenders Tell Us About Prevention Strategies', *Child Abuse and Neglect* 13: 293–301.

Cook, J. and T. Wall (1980) 'New York Attitude Measures of Trust, Organization, Commitment, and Personal Need Non-fulfilment', *Journal of Occupational Psychology* 53: 39–52.

Downloaded from sls.sagepub.com by guest on March 21, 2015

Corby, B., A. Doig and V. Roberts (2001) *Public Inquiries into Abuse of Children in Residential Care*. London: Jessica Kingsley.

Dasgupta, P. (1988) 'Trust as Commodity', pp. 49–72 in D. Gambetta (ed.) *Trust: Making and Breaking Co-operative Relations*. Oxford: Basil Blackwell.

Davis, G., L. Hoyano, C. Keenan, L. Maitland and R. Morgan (1999) *An Assessment of the Admissibility and Sufficiency of Evidence in Child Abuse Prosecutions: A Report for the Home Office by the Department of Law, University of Bristol*. London: Home Office.

Department for Education for Northern Ireland (DENI) (1999) *Pastoral Care in Schools: Child Protection*. Belfast: DENI.

Department of Health and Social Services (NI) (DHSS (NI)) (1982) *Report on Homes and Hostels for Children and Young People in Northern Ireland (The Sheridan Report)*. Belfast: DHSS.

Department of Health and Social Services (NI) (DHSS (NI)) (1993) *An Abuse of Trust: The Report of the Social Services Inspectorate into the Case of Martin Huston*. Belfast: DHSS (SSI).

Elliott. M., K. Browne and J. Kilcoyne (1995) 'Child Abuse Prevention: What Offenders Tell Us', *Child Abuse and Neglect* 19: 579–94.

Ericson, R. V. and K. D. Haggerty (1997) *Policing the Risk Society*. Oxford: Clarendon Press.

Feeley, M. and J. Simon (1992) 'The New Penology: Notes on the Emerging Strategy of Corrections and Its Implications', *Criminology* 30: 449–74.

Feeley, M. and J. Simon (1994) 'Actuarial Justice: Power/Knowledge in Contemporary Criminal Justice', pp. 173–201 in D. Nelken (ed.) *The Futures of Criminology*. London: SAGE Publications.

Ferguson, H. (1995), 'The Paedophile Priest: A Deconstruction', *Studies* 84: 247–56.

Finkelhor, D. (1984) *Child Sexual Abuse: New Theory and Research*. New York: Free Press.

Finkelhor, D. (1994) 'Current Information on the Scope and Nature of Child Sexual Abuse', *The Future of Children* 4: 31–53.

Finkelhor, D. and J. Dziuba-Leatherman (1994) 'Children as Victims of Violence: A National Survey', *Child Abuse and Neglect* 94: 413–20.

Finkelhor, D., L. Williams and N. Burns (1988) *Nursery Crimes: A Study of Sexual Abuse in Day Care*. Newbury Park, CA: SAGE Publications.

Foucault, M. (1977) *Discipline and Punish: The Birth of the Prison*. London: Penguin.

Friedrichs, D. O. (1996) *Trusted Criminals: White-collar Crime in Contemporary Society*. New York: Wadsworth.

Gallagher, B. (1998) *Grappling with Smoke: Investigating and Managing Organised Abuse – A Good Practice Guide*. London: NSPCC.

Gallagher, B. (1999) 'Institutional Abuse', pp. 197–210 in N. Parton and C. Wattam (eds) *Child Sexual Abuse: Responding to the Experiences of Children*. New York: Wiley.

Gallagher, B. (2000) 'The Extent and Nature of Known Cases of Institutional Child Sexual Abuse', *British Journal of Social Work* 30: 795–817.

Gallagher, B., K. Christmann, C. Fraser and B. Hodgson (2003) 'International and Internet Child Sexual Abuse and Exploitation: Issues Emerging from Research', *Child and Family Law Quarterly* 15: 353–70.

Gambetta, D. (1988) 'Can We Trust in Trust?', pp. 213–38 in D. Gambetta (ed.) *Trust: Making and Breaking Co-operative Relations*. Oxford: Basil Blackwell.

Gillespie, A. (2001) 'Children, Chatrooms and the Law', *Criminal Law Review*: 435–46.

Gillespie, A. (2002) 'Child Protection on the Internet – Challenges for Criminal Law', *Child and Family Law Quarterly* 14: 411–25.

Downloaded from sls.sagepub.com by guest on March 21, 2015

Gillespie, A. (2004) '"Grooming": Definitions and the Law', *New Law Journal* 154: 586–7.

Good, D. (1988) 'Individuals, Interpersonal Relations and Trust', pp. 32–47 in D. Gambetta (ed.) *Trust: Making and Breaking Co-operative Relations*. Oxford: Basil Blackwell.

Greer, C. (2003) *Sex Crime and the Media: Sex Offending and the Press in a Divided Society*. Cullompton: Willan.

Gruber, K. J. and R. J. Jones (1983) 'Identifying Determinants of Risk of Sexual Victimization of Youth', *Child Abuse and Neglect* 7: 17–24.

Grubin, D. (1998) *Sex Offending Against Children: Understanding the Risk*, Police Research Series Paper 99. London: Home Office.

*Guardian* (1998a) 'Sex Abuse Claim at Boys' Homes', 20 January.

*Guardian* (1998b) 'Scout Master Jailed for Reign of Child Abuse', 24 February.

Hall, S., C. Critcher, T. Jefferson, J. Clarke and B. Roberts (1978) *Policing the Crisis*. London: Macmillan.

Hanson, R. F., H. S. Resnick, D. G. Kilpatrick and C. Best (1999) 'Factors Related to the Reporting of Childhood Rape', *Child Abuse and Neglect* 23: 559–69.

Hebenton, B. and T. Thomas (1996) 'Sexual Offenders in the Community: Reflections on Problems of Law, Community and Risk Management in the USA and England and Wales', *International Journal of the Sociology of Law* 24: 427–43.

Her Majesty's Stationery Office (HMSO) (1985) *Report of the Committee of Inquiry into Children's Homes and Hostels (The Hughes Report)*. London: HMSO.

Herman, J. L. (1981) *Father–Daughter Incest*. Cambridge, MA: Harvard University Press.

Hudson, K. (2005) *Offending Identities: Sex Offenders, Perspectives on Their Treatment and Management*. Cullompton: Willan.

Hunt, P. (1994) *Report of the Inquiry into Multiple Abuse in Nursery Classes in Newcastle upon Tyne*. Newcastle upon Tyne: City Council of Newcastle upon Tyne.

Hunter, J. A, D. W. Goodwin and R. J. Wilson (1992) 'Attributions of Blame in Child Sexual Abuse Victims: An Analysis of Age and Gender Influences', *Journal of Child Sexual Abuse* 1: 75–89.

Internet Crime Forum (ICF) (2001) *Chat Wise, Street Wise: Children and Internet Chat Services*. Available at: http://www.internetcrimeforum.org.uk/chatwise_streetwise.html

*Irish News* (1996) 'Priest Abuses 10 Children', 14 December.

*Irish Times* (1998) 'Swimming Coach Gets 12 Years for Sex Abuse', 31 January.

*Irish Times* (2000) 'Priest Given 12 Years for Sex Assaults', 7 April.

Johnson-George, C. and W. Swap (1982) 'Measurement of Specific Inter-personal Trust: Construction and Validation of a Scale to Assess Trust in a Specific Other', *Journal of Personality and Social Psychology* 43: 1306–17.

Kee, H. W. and R. E. Knox (1970) 'Conceptual and Methodological Considerations in the Study of Trust', *Journal of Conflict Resolution* 14: 357–66.

Kemshall, H. and M. Maguire (2003) 'Sex Offenders, Risk Penalty and the Problem of Disclosure', pp. 102–24 in A. Matravers (ed.) *Sex Offenders in the Community: Managing and Reducing the Risks*. Cullompton: Willan.

Kirkwood, A. (1993) *The Report of the Inquiry into Aspects of the Management of Children's Homes in Leicestershire between 1973 and 1986*. Leicester: Leicestershire County Council.

Kramer, R. M., M. B. Brewer and B. Hanna (1996) 'Collective Trust and Collective Action: Trust as a Social Decision', pp. 357–89 in R. M. Kramer and T. Tyler (eds) *Trust in Organisations*. Thousand Oaks, CA: SAGE Publications.

Downloaded from sls.sagepub.com by guest on March 21, 2015

La Fontaine, J. and S. Morris (1991) *The Boarding School Line: January–July 1991: A Report from ChildLine to the DES*. London: ChildLine.

Long, B. and B. McLachlan (2002) *The Hunt for Britain's Paedophiles*. London: Hodder and Stoughton.

Luhmann, N. (1988) 'Family, Confidence, Trust: Problems and Alternatives', pp. 94–107 in D. Gambetta (ed.) *Trust: Making and Breaking Co-operative Relations*. Oxford: Basil Blackwell.

McAlinden, A. (2005) 'The Use of "Shame" with Sexual Offenders', *British Journal of Criminology* 45: 373–94.

Matza, D. (1964) *Delinquency and Drift*. New York: Wiley.

Matza, D. (1969) *Becoming Deviant*. Upper Saddle River, NJ: Prentice-Hall.

Moore, C. (1995) *Betrayal of Trust: The Father Brendan Symth Affair and the Catholic Church*. Dublin: Marino.

Moore, C. (1996) *Kincorra Scandal: Political Cover-up and Intrigue in Ulster*. Dublin: Marino.

National Centre for Missing and Exploited Children (NCMEC) (2000) *On-line Victimization: A Report of the Nation's Youth*. Available at: http://www.ncmec.org/download/nc62.pdf

National Criminal Intelligence Service (NCIS) (2003) *United Kingdom Threat Assessment of Serious and Organised Crime*. London: NCIS.

Nolan, L. (2001) *Report of the Review on Child Protection in the Catholic Church in England and Wales: A Programme for Action*. Available at: http://www.nolanreview.org.uk

Oliver, A. L. (1997) 'On the Nexus of Organizations and Professions: Networking through Trust', *Sociological Inquiry* 67: 227–45.

Ost, S. (2002) 'Children at Risk: Legal and Societal Perceptions of the Potential Threat that the Possession of Child Pornography Poses to Society', *Journal of Law and Society* 29: 436–60.

Ost, S. (2004) 'Getting to Grips with Sexual Grooming? The New Offence under the Sexual Offences Act 2003', *Journal of Social Welfare and Family* 26: 147–59.

Parton, N. (2004) 'From Maria Colwell to Victoria Climbié: Reflections on Public Inquiries into Child Abuse a Generation Apart', *Child Abuse Review* 13: 80–94.

Parton, N., D. Thorpe and C. Wattam (1997) *Child Protection: Risk and the Moral Order*. Basingstoke: Macmillan.

Phelan, P. (1995) 'Incest and Its Meaning: The Perspectives of Fathers and Daughters', *Child Abuse and Neglect* 19: 7–24.

Reiss, A. (1989), 'The Institutionalisation of Risk', *Law and Policy* 11: 392–402.

Russell, D. E. H. (1986) *The Secret Trauma: Incest in the Lives of Girls and Women*. New York: Basic Books.

Salter, A. (1995) *Transforming Trauma: A Guide to Understanding and Treating Adult Survivors of Child Sexual Abuse*. Newbury Park, CA: SAGE Publications.

Salter, A. (2003) *Predators, Pedophiles, Rapists, and Other Sex Offenders: Who They Are, How They Operate, and How We Can Protect Ourselves and Our Children*. New York: Basic Books.

Saraga, E. (2001) 'Dangerous Places: The Family as a Site of Crime', pp. 183–226 in J. Muncie and E. McLaughlin (eds) *The Problem of Crime*. London: SAGE Publications.

Shearing, C. (2000) 'Punishment and the Changing Face of Governance', *Punishment & Society* 3: 203–20.

Silverman, J. and D. Wilson (2002) *Innocence Betrayed: Paedophilia, the Media and Society*. Cambridge: Polity Press.

Downloaded from sls.sagepub.com by guest on March 21, 2015

Smallbone, S. and R. Wortley (2000) *Child Sexual Abuse in Queensland: Offender Characteristics and Modus Operandi*. Brisbane: Queensland Crime Commission, Project Axis.

Smith, D. R. (1993) *Safe from Harm: A Code of Practice for Safeguarding the Welfare of Children in Voluntary Organisations in England and Wales*. London: Home Office.

Smith, D. W., E. J. Letourneau, B. E. Saunders, D. G. Kilpatrick, H. S. Resnick and C. L. Best (2000) 'Delay in Disclosure of Childhood Rape: Results from a National Survey', *Child Abuse and Neglect* 24: 273–87.

Spencer, J. R. (2004) 'The Sexual Offences Act 2003: (2) Child and Family Offences', *Criminal Law Review*: 347–60.

Stanley, N. (1999) *Institutional Abuse: Perspectives Across the Life Course*. London: Routledge.

Sullivan, J. and A. Beech (2002) 'Professional Perpetrators', *Child Abuse Review* 11: 153–67.

*Sunday Times* (1999) 'Sins of the Father', 27 July.

Thornton, D. (2003) 'The Machiavellian Sex Offender', pp. 144–52 in A. Matravers (ed.) *Sex Offenders in the Community: Managing and Reducing the Risks*. Cullompton: Willan.

*The Times* (1996) 'Police Investigate Public School Paedophile Ring', 25 August.

Utting, W. (1998) *People Like Us: The Report of the Review of the Safeguards for Children Living Away from Home*. London: HMSO.

Van Dam, C. (2002) *Identifying Child Abusers: Preventing Child Sexual Abuse by Recognizing the Patterns of Offenders*. New York: The Haworth Press.

Warner, N. (1992) *Choosing with Care*. London: HMSO.

Waterhouse, R. (2000) *Lost in Care*. London: HMSO.

Watkins, B. and A. Bentovim (1992) 'The Sexual Abuse of Male Children and Adolescents: A Review of Current Research', *Journal of Child Psychology and Psychiatry* 33: 197–248.

Westcott, H. (1991) *Institutional Abuse of Children – From Research to Policy: A Review*. London: NSPCC.

White, I. A. and K. Hart (1995) *Report of the Inquiry into the Management of Child Care in the London Borough of Islington*. London: London Borough of Islington.

Williams, G. and J. McCreadie (1992) *Ty Mawr Community Home Inquiry*. Ebbw Vale: Gwent County Council.

Wyre, R. (2000) 'Paedophile Characteristics and Patterns of Behaviour', pp. 49–69 in C. Itzin (ed.) *Home Truths About Sexual Abuse Influencing Policy and Practice: A Reader*. London: Routledge.

Downloaded from sls.sagepub.com by guest on March 21, 2015

# Tab G

Journal of Sexual Aggression
(November 2006), Vol. 12, No. 3, pp. 287–299



Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

# Sexual grooming of children: Review of literature and theoretical considerations

Samantha Craven,[1],[*] Sarah Brown[1] & Elizabeth Gilchrist[2]

[1]Department of Psychology, Coventry University, Coventry, UK, and [2]Department of Psychology, University of Kent, Canterbury, Kent, UK

**Abstract**   *The current review aims to outline the existing understanding of sexual grooming. Issues of poor definition, the adoption of the term "grooming" and the prevalence of sexual grooming will be discussed. Consideration will be given to how prominent theories of child sexual abuse often neglect sexual grooming. This will be followed by a detailed account of the existing knowledge within the literature. Three types of sexual grooming were thus identified: self-grooming, grooming the environment and significant others and grooming the child. Based on these findings, a new definition of sexual grooming is suggested. Furthermore, the findings correspond well with current models of the sexual offence process. A more comprehensive understanding of sexual grooming is required to facilitate a preventative approach to child protection.*

**Keywords**   *Sexual grooming; theory of child sexual abuse*

## Introduction

The complex nature of the tactics used by child sex offenders in their efforts to sexually abuse children is increasingly evident in the accounts of the people affected by this predatory behaviour. Sexual grooming is a pertinent issue evident in society, but there is still little understanding about this phenomenon. This is reflected in problems relating to definition, which will be discussed in addition to the evolution of the term "grooming". This review will consider whether present aetiological theories of child sexual abuse can account for "sexual grooming" behaviour, and further determines what knowledge has already been established about the phenomenon of sexual grooming. Based on these findings, a new definition is presented and consideration is given to how current knowledge of sexual grooming relate to models of the sexual offence process.

## Definition

Professionals are yet to agree on a definition of sexual grooming of children (Gillespie, 2004). Previous literature has provided three specific definitions of grooming. The strengths and

⋆Corresponding author: Samantha Craven, Department of Psychology, Coventry University, Priory Street, Coventry CV1 5FB, UK. Tel: 02476 887 048. Fax: 02476 888300. E-mail: s.craven@coventry.ac.uk

ISSN 1355-2600 print/1742-6545 online © 2006 National Organisation for the Treatment of Abusers
DOI: 10.1080/13552600601069414

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

weaknesses of these definitions are discussed in turn below. First, O'Connell defines sexual grooming as:

> A course of conduct enacted by a suspected paedophile, which would give a reasonable person cause for concern that any meeting with a child arising from the conduct would be for unlawful purposes. (O'Connell, 2003, p. 6)

Second, Howitt suggests that:

> Grooming . . . is the steps taken by paedophiles to "entrap" their victims and is in someways analogous to adult courtship. (Howitt, 1995, p. 176)

These two definitions are problematic, because they both refer to the term paedophile. Most sexual offenders who target child victims use sexual grooming, not just those classified as paedophiles. The term "paedophile" is a very specific clinical diagnosis, clearly not applicable to all offenders, and the association of grooming behaviour with paedophilia may prevent some offenders from acknowledging their own grooming behaviours. In addition, people known to the offender may not identify the grooming behaviour because they do not consider the individual to fit their image of a "paedophile". The public perception of a paedophile is littered with stereotypes that they are "dirty old men" or strangers; these perceptions may affect an individual's judgement of whether the behaviour they have observed is grooming. These misperceptions distract from the truth that most victims know their abuser. It is important that the wording of a definition does not thwart the identification of sexual grooming and the subsequent prevention or ending of abuse.

Furthermore, the phrase "a course of conduct" requires subsequent definition. Additional problems include reference to "a reasonable person" and "cause for concern". Although legal precedent defines these phrases, they are ambiguous to the lay reader and hence they are open to misinterpretation and confusion. These definitions are confusing, at best, and at worst they reinforce the myth that strangers are the biggest risk to children. Consequently, this ambiguity may hinder the identification of the full range of sexual grooming behaviours.

Gillespie (2002) provides the third definition:

> The process by which a child is befriended by a would-be abuser in an attempt to gain the child's confidence and trust, enabling them to get the child to acquiesce to abusive activity. It is frequently a pre-requisite for an abuser to gain access to a child. (Gillespie, 2002, p. 411; based on van Dam, 2001)

This definition avoids the use of the term paedophile. It also provides some clarity about the purpose of sexual grooming behaviour and identifies some of the stages that it involves. This appears to be the most appropriate published definition to date. Further evaluation of this definition will follow consideration of previous literature and current understanding about sexual grooming.

## Prevalence

Canter, Hughes and Kirby (1998) provide evidence for the prevalence of the sexual grooming phenomenon. They used Small Space Analysis on a behaviour matrix of the interaction between 97 incarcerated child sex offenders and their victims. They identified three distinct behaviour repertoires of offender–victim interaction. The different types of offender–victim interaction acknowledged were aggressive, which was identifiable by the use of extreme

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

violence, threat and force; criminal–opportunist, which tended to be one-off offences on strangers; and intimate, which was categorized by the identified use of sexual grooming behaviours.

Forty-five per cent of Canter et al.'s (1998) sample were classified as being intimate offenders. Thus, 45% of the child sex offenders employed an intimate behaviour repertoire and sexual grooming behaviours. This figure is likely to be unrepresentative of the child sex offender population as a whole. Intimate offenders tend to cause less physical harm to their victims than the other categories of offenders and the very nature of the behaviour used to categorize the intimate offenders implies that they would be less likely to be reported, identified and convicted, because these grooming behaviours are used to avoid disclosure and conviction. Hence, it is likely that intimate offenders were under-represented in this prison sample.

Figures show that eight of 10 sex abuse victims know their abuser (Stop it Now, 2003). In such cases, offenders have substantial interest in preventing disclosure, because in the event of disclosure the victim would be able to easily identify them as their abuser. This is supported by offenders' accounts about the strategies they employed to victimize the children they sexually abused; fear of disclosure affected how and when they victimized their victims (Conte, Wolf & Smith, 1989).

## Aetiology of a motivation to abuse

Before an individual begins to groom a child, some level of motivation to abuse a child needs to be present. Furthermore, adequate theories of sexual offending should be able to account for the phenomenon of sexual grooming. Until recently there have been three dominant theories of child sexual abuse, namely Finkelhor's Pre-condition Model (1984); Marshall and Barbaree's Integrated Theory (1990); and Hall and Hirschman's Quadripartite Model (1992). In 2002, Ward and Siegert proposed a more comprehensive theory of child sexual abuse by "knitting together" the strengths of each of the above theories. They propose that there are five pathways to sexual offending against children; hence, the theory is called The Pathways Model. This review shall consider each of these only briefly, because Ward and colleagues have already provided in-depth reviews (see Ward, 2001, 2002; Ward & Hudson, 2001). Herein, more emphasis will be placed on how these theories relate to the phenomenon of sexual grooming.

### Marshall and Barbaree's Integrated Theory

Marshall and Barbaree's (1990) Integrated Theory of the aetiology of sexual offending proposes that the presence of vulnerabilities, which develop as a result of adverse early developmental experiences, leave offenders unprepared to deal with the surge of hormones at puberty, and unable to understand the emotional world. As a resultant, offenders satisfy their emotional and sexual needs inappropriately in deviant ways. This theory suggests that sexual offending occurs as a consequence of an individual's sex and aggression drives becoming fused, as these functions share the same structure in the brain. Ward and Siegert (2002) state that this need not be the case, as there are many functions that are close in proximity but that do not affect each other. Furthermore, this theory suggests that sexual offending would be aggressive. Therefore, it would seem that it does not account for the phenomenon of sexual grooming, because the process of sexual grooming is generally not aggressive in nature.

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

However, this criticism may be countered if a definition of aggression were to include indirect aggression, which sexual grooming could be considered to be.

### Hall and Hirschman's Quadripartite Model

Hall and Hirschman's (1992) Quadripartite Model was first developed as a theory of rape, but it was applied subsequently to child sexual abuse. This model suggests that someone commits an act of child sexual abuse because of four vulnerability factors and the presence of opportunity. The vulnerability factors are physiological sexual arousal, distorted cognitions that act to justify sexual aggression, affective dyscontrol, and personality problems. It is suggested that offending will occur when the presence of these vulnerability factors exceed a threshold, this could include one or all of these vulnerabilities. There are several problems with this model; first, it does not explain why someone chooses to offend against a child rather than an adult. Second, sexual grooming is not an impulsive act and the threshold would need to be maintained over a long period of time in order to explain sexual grooming, because it can occur over weeks, months or even years. Hence, this theory can account for sexual grooming if it is accepted that, for example, sexual arousal persists over long periods of time, so once sexually aroused to children/child the offender would be continually aroused to them. A further problem with this theory relates to the presence of opportunity; offenders often create their own opportunities to offend.

### Finkelhor's Pre-condition Model

Finkelhor's Pre-condition Model (1984) suggests that there are four pre-conditions to sexual offending. The first is the motivation to sexually abuse; it is suggested that this develops as a result of emotional congruence (a fit between the offender's emotional needs and the child's ability to meet them), deviant sexual arousal and blockage (the sexual needs of the offender not being met by appropriate adults). The second is to be able to overcome internal inhibitors; the third is to be able to overcome external inhibitors; and the fourth is to overcome the child's resistance. Before an incidence of abuse would take place, these pre-conditions need to be satisfied. Although Finkelhor does not use the term sexual grooming, others (e.g. Morrison, Erooga & Beckett, 1994; Sampson, 1994) have reviewed his work using this term. They referred to overcoming the child's resistance as grooming.

### Ward and Siegert's Pathways Model

Ward and Siegert's (2002) model is based on the dysfunction of one or more psychological mechanisms—emotional regulation, intimacy deficits, cognitive distortions and sexual arousal (deviant sexual scripts). All the aforementioned psychological mechanisms are involved to some degree. There is evidence of these dysfunctional mechanisms being present typically in child molesters, although to different degrees and for different functions. The five possible pathways are specified by whichever dysfunctional psychological mechanism is the most dominant; in turn this will affect the others. In the case of the fifth pathway, all the psychological mechanisms would be similarly dysfunctional. A sexual offence occurs when the above is present in conjunction with sexual need. In addition, Ward and Siegert still emphasize the importance of there being an opportunity to offend; however, the nature of sexual grooming is to create an opportunity to offend. Successful theory would need to account for this.

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

Despite Ward and Siegert presenting their Pathways Model as a comprehensive theory of sexual offending, it still only considers aetiology and no consideration is given to the offence process. In a comprehensive theory it is necessary to consider the whole journey from initial onset to the offence and beyond. In a similar way that the Transtheoretical Model (Prochaska & DiClemente, 1982) of change considers not only the action stage, where the overt behaviour is changed, but also the precontemplation, contemplation, preparation and maintenance stages, a theory of sexual offending against children needs to consider the whole journey. As demonstrated above, it is necessary that theories of aetiology are coherent with the phenomenon they are attempting to explain. While endeavouring to explain sexual offending it is important that sexual grooming is also factored into the equation, because it is part of the sexual offending phenomenon. Of the above theories, only Finkelhor's (1984) Pre-condition Model has taken this approach.

## Offence process

In addition to the Pre-condition Model (Finkelhor, 1984) there is one other model that considers the offence process of sexual offending. This is the Descriptive Model of the Offence Chain (Ward, Louden, Hudson & Marshall, 1995). Ward et al.'s model provides a much more detailed account of the offence process than the Pre-condition Model. While little evidence has been found to support Finkelhor's Pre-condition Model, Ward et al. used a grounded theory approach and developed their model directly from offenders' experiences. They identified nine stages of the offence chain. Stage one relates to the offender's background factors, including their perception of themselves and their life at the beginning of the offence chain and whether these factors caused positive or negative affect. Stage two describes distal planning of access to their victim; this could take the form of implicit, or explicit planning or chance. Contact with the victim takes place in stage three. Stage four involves cognitive restructuring, which will result in either positive or negative affect. Stage five entails proximal planning, which would either be self-focused, victim-focused or a mutual-focus. This leads to stage six and the sexual offence, which is followed by further cognitive restructuring at stage seven. This results in negative or positive evaluation and future resolutions regarding continued offending at stage eight. This resolution will be to either avoid future offending or to persist in an abusive pattern. Stage nine depicts the impact of these resolutions on the offender's life.

It is important to consider how sexual grooming fits into, and facilitates, the offence process, as this understanding is likely to aid the management of offenders and potential offenders by identifying the offence process prior to an sexual offence taking place. In addition, it is reasonable to suggest that motivation is not static but could be affected by later stages of the grooming and offence process, e.g. cognitive distortions developed later in the process could serve to reinforce prior motivation resulting in an entrenched deviant sexual interest. This may prove valuable to treatment programmes efforts of reducing motivation to offend.

## The grooming process

The current review has identified three types of sexual grooming present in the literature—self-grooming, grooming the environment and significant others and grooming the child. Each of these will be discussed to explore current understanding of sexual grooming. Understanding of the grooming process and an ability to identify sexual grooming behaviour

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

is crucial in order to prevent child sexual abuse. However, retrospective identification of sexual grooming, i.e. after a sexual offence has been committed, is much easier than prospective identification, i.e. before a sexual offence. Nevertheless, the latter is necessary in order to prevent the sexual abuse from taking place. The reason for this is because the behaviours used to groom a child for sexual abuse are not dissimilar to innocent behaviour intended to broaden a young person's experiences. The only difference may be the motivation underlying the behaviour.

### Self-grooming

van Dam (2001) reports that during treatment, offenders' talk about "grooming themselves". They were referring to the justification or denial of their offending behaviour. It therefore seems important to consider this as part of the grooming process. However, it may be more agreeable to refer to this phenomenon by another name, avoiding the use of the term "grooming". Nevertheless, self-grooming is likely to play a part in the move from being motivated to sexually abuse a child to the subsequent targeting of a child, through the justification or denial of the steps child sexual offenders take towards abusing a child. Furthermore, self-grooming is likely to be affected by the response from the community and the child, and the success or failure of the efforts to victimize the child. "Success" is likely to result in further justification or denial of their actions and more entrenched sexual interest in children and motivation to offend. "Failure", on the other hand, is likely to result in the desistence of offending or the offender developing/enahancing his skills/strategies to ensure success.

Justification and denial of offenders' behaviour manifests in cognitive distortions. Ward and Keenan (1999) propose that child sex offenders have cognitive distortions in the form of implicit theories, which relate to themselves, the victim and the world. Implicit theories help individuals to understand the world around them. Problems arise because offenders' implicit theories are maladaptive and supportive of sex with children. These implicit theories subsequently affect encoding and interpretation of future behaviours and events. Ward and Keenan have identified five implicit theories that account for most of the cognitive distortions held by child sex offenders: children as sexual objects; entitlement; dangerous world; uncontrollability; and nature of harm.

Of course, it is not only offenders who have maladaptive implicit theories. For example, many people have an implicit theory that children are at most risk from strangers, which is not consistent with research findings. However, it is easier to believe that strangers sexually abuse children than accept that friends and family do; hence, this implicit theory helps to shelter people from the harsh nature of reality. Offenders' implicit theories work in a similar way, because it is easier for offenders to believe that the child seduced them than to accept that they sexually abused a child.

### Grooming the environment and significant others

Grooming the child begins with identifying a vulnerable child (van Dam, 2001). Child sex offenders seem to have a special ability in recognizing vulnerable children (Conte et al., 1989). These vulnerabilities may be that the children have a poor relationship with their parents, do not have many friends (Berliner & Conte, 1990), or have already been victimized (Leberg, 1997). Alternatively, offenders may target women who were sexually abused as children, because the offender considers them easier to re-victimize.

In order to gain access to their victim(s), offenders groom the environment and their potential victim's significant others (e.g. parents, carers, teachers, etc). This may mean the offender integrating themselves into society and places where they are likely to meet children. This will often be a position of trust. Offenders then begin grooming the adults in this community, specifically those who are significant to their potential victim, with the aim of creating an opportunity to access and abuse a child or children. van Dam (2001) reports that offenders are frequently charming, very helpful, and have insider status. This is often an important factor in gaining access to potential victim(s). As offenders help out in the community, they are considering how their efforts will be rewarded later when they can then abuse the children in that community. Offenders are often able to "read the community like a book" in that they assess what they "need" and fulfil these needs accordingly (Hare & Hart, 1993). They can make themselves indispensable, too good to be true and will freely undertake jobs that others do not want to do (Leberg, 1997).

A desire on the part of parents to avoid cognitive dissonance may assist offenders' grooming efforts. A parent may suffer cognitive dissonance as a result of concerns about the trustworthiness of the offender alongside their hospitality and acceptance of the offender. When thoughts do not match behaviour, cognitive dissonance manifests, and often thoughts are changed to be consistent with behaviour (van Dam, 2001). Thus, offenders gain insider status long before they start abusing a victim (van Dam, 2001). Grooming is therefore a well-organized long-term activity (Sanford, 1982). Offenders groom the community so well that if a victim discloses their abuse, the community may support the offender rather than the victim, because they deem the offender to be more believable than the child.

In the case of intrafamilial child sexual abuse, offenders are already in a position of trust and integrated in an environment where they can access potential victims. Some offenders groom the environment by targeting single-parent families to gain this status (Elliott, Browne & Kilcoyne, 1995). Offenders may do this because they believe that these children are more vulnerable and because they believe it will be easier to create opportunities to be alone with the child. Alternatively, offenders may target children or young people who have absent parents, and hence have less protection. In this incidence there is no need for the offender to groom the parents. They can become the child's friend and more easily arrange to have time alone with the child.

Intrafamilial offenders often isolate the victim from their non-abusing parent, siblings and the outside world by developing an exclusive relationship with the child. For instance, they may encourage mothers to have more of a life outside the home, which then gives themselves increased opportunities to abuse their victims. Alternatively, they may isolate non-abusing parents from the outside world in order to prevent them from having people in whom to confide about any concerns (Leberg, 1997). Some offenders encourage mothers to develop an alcohol dependency, in part so that any future disclosures made lack credibility (Leberg, 1997). Other similar strategies employed to limit credibility include questioning the mother's parenting ability in front of friends and other family members. This may constitute part of their strategy for grooming the environment and significant others.

Grooming the environment and significant others can occur as a result of implicit or explicit planning; alternatively, access to a child may occur by chance. Ward and Hudson (2000) have developed a conceptual model of how child sex offenders' implicit planning or seemingly unimportant decisions (SUDs) implicate their offending behaviour by leading them to high-risk situations, i.e. contact with children. This appears to be automatic, because although offenders are conscious of their specific behaviours, they are often unconscious of the effect of implicit goals on these behaviours.

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

Gollwitzer and Schaal (1998, cited in Ward & Hudson, 2000) suggest that it is through automatic goal-dependent action plans that these SUDs manifest. Ward and Hudson (2000) propose that there are two such action plans: offence scripts and mental simulations. Offence scripts manifest as a result of associations that have developed between situations and behaviours; subsequently, in the presence of certain cues, offence scripts may be activated without any conscious awareness. This is a possible explanation of continued offending and relapse following treatment.

Automatic goal-dependent action plans can be activated regardless of whether an individual has committed any previous sexual crimes. This alternative involves mental simulation. Mental simulation is where an individual plans out in detail how he would commit an offence. As with offence scripts, the presence of certain cues may activate this implicit planning, resulting in the enactment of the individual's fantasies. The notion of implicit planning may provide a possible explanation why the majority of victims know their abuser, because the cues that activate the implicit planning are more likely to be present within the family or in relation to children in the immediate locality (i.e. the places where an individual spends the majority of his time).

It is reasonable to suggest that the fundamental human need to belong may present one possibility to further understand offenders' ability to identify a victim and groom the environment and significant others. Research has shown that a need to belong can affect very basic cognitive functions, e.g. attention and encoding of social information (Pickett, Gardner & Knowles, 2004). Pickett et al. found a positive relationship between a need to belong and sensitivity to social cues. Sexual offenders often come from neglectful, violent and dysfunctional backgrounds (Craissati, McClurg & Browne, 2002). This environment is unlikely to provide an abundance of opportunities for emotional closeness and thus offenders are likely to have a need to belong. In addition, a need to belong is related to low self-esteem (Pickett et al., 2004) and research to date suggests that child sex offenders typically have low self-esteem (Marshall, Anderson & Champagne, 1997). This is supportive of the idea that a need to belong facilitates offenders' identification and access to a victim, because of the associated increased sensitivity to social cues. Children may be approached because the offender perceives them to be less threatening than peers. Alternatively, offenders may be able to identify vulnerabilities in other people because they themselves are vulnerable and thus recognize these signs in others. This explanation would relate to offenders that commit offences following implicit planning. Offenders using explicit planning may also have a need to belong and the associated increased sensitivity to social cues, as a result of a need to belong to the family of community in order to groom and subsequently abuse a child. It is therefore suggested that, in the presence of a motivation to sexually abuse a child, a need to belong often facilitates the identification of a victim and grooming of the environment and significant others.

## Grooming the child

Grooming the child is the most commonly recognized form of sexual grooming. In addition to a desire for sexual gratification, there may or may not be a relational aspect to the grooming process, depending on the offender's motivation to abuse. Sexual grooming has been considered by some to be analogous to adult courtship (e.g. Howitt, 1995). In addition, Herman (1981) and Christiansen and Blake (1990) talk about sexually abusive fathers adopting the role of suitor towards their daughter. In the case of intrafamilial abuse, the offender promotes the child in place of the mother (Leberg, 1997). Alternatively, the offender may interact with the child on the child's wavelength (van Dam, 2001). Wilson (1999) found

that offenders who abused boys showed a preference for interacting at the child's level, and incest offenders tended to raise the victim's status to that of an adult, while offenders who abused girls were more concerned with sexual gratification. The types of behaviour that constitute grooming the child take two different forms—physical and psychological.

*Physical grooming* involves the gradual sexualization of the relationship between the offender and the victim (Berliner & Conte, 1990). *Psychological grooming* is used to achieve this increased sexualization. At first, the offender may justify the sexual behaviour through providing the child with his version of sex education, which states that sex between children and adults is acceptable and that the offender has a responsibility to train the child for later life (Berliner & Conte, 1990; Leberg, 1997). The abuser builds the child's trust (Christiansen & Blake, 1990; Leberg, 1997; Wyre, 1987, cited in Howitt, 1995; van Dam, 2001), makes him or her feel good (Warner, 2000) and then starts to violate boundaries (Christiansen & Blake, 1990; van Dam, 2001). This may involve intentionally entering the bedroom while the child or young person is undressed, or getting dressed together and exposing himself to the child.

Offenders often desensitize a child to touch by beginning with non-sexual touching such as tickling or stroking the child's head. Conversation may also become more sexual. Alternatively, offenders may confuse victims by continuing to talk to the child about a positive unrelated issue while they begin touching the child sexually (Leberg, 1997). The child may have no idea that something inappropriate is happening. The aim is to progress to sexual touching, first on top of clothes and later under or without clothes (Berliner & Conte, 1990; Christiansen & Blake, 1990; Leberg, 1997; van Dam, 2001). Thus, the intention is to make the child compliant with the offender's sexual demands and overcome the child's resistance (Finkelhor, 1984; Leberg, 1997; Warner, 2000).

In addition to using psychological grooming to increase compliance, it is also used to avoid disclosure. Children are groomed to want to be around the adult who is grooming them (Wolf, 1985). Offenders need to maintain the child's cooperation and secrecy to achieve this. One way that the offender does this is by isolating the child and alienating them from others (Warner, 2000). Leberg (1997) refers to this factor as something separate from grooming, others (e.g. van Dam, 2001) consider it to be part of the grooming process. Isolating the child creates a barrier which prevents the child from having a confidant in whom to disclose (Warner, 2000). In addition, the keeping of secrets acts as a source of further isolation (Lerner, 1993, cited in van Dam, 2001). Children are very good at keeping secrets when asked to. Peters (1991, cited in Ceci & Bruck, 1993) found that 82% of children in his study delayed or did not report an event that they had witnessed, because the thief in the scenario asked them not to tell anyone. The thief in this scenario was a stranger, to whom the children had no loyalty, and so it is likely that children would be even more likely to protect a known and loved adult.

Further strategies used by offenders to maintain the child's compliance include issuing threats and bribes (Berliner & Conte, 1990; Christiansen & Blake, 1990). Bribes may take the form of material gifts or extra privileges (Christiansen & Blake, 1990). In addition, offenders are skilled at using children's natural vulnerabilities against them. For instance, children very often have a strong desire to protect their parents. When the offender informs them that their parents would be very hurt if they found out what they had been doing, children may remain silent (Berliner & Conte, 1990). Offenders may also demonstrate their potential for violence through violence towards others, e.g. other family members. Thereby offenders reinforce the message that they will enact their threats about hurting the child and/or the child's family.

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

Offenders frequently make the child feel responsible for the abuse (Leberg, 1997; van Dam, 2001; Warner, 2000). They convince the child that they are to blame for letting the abuse happen and that they should have stopped it (Leberg, 1997). This is reinforced by stereotypes in society, which emphasize that men cannot control their sex drive (Warner, 2000). Additional guilt may be felt if the child has been made to perform sexual acts on the abuser or another child (Warner, 2000). However, this feeling of responsibility and guilt is overshadowed by the self-betrayal the child feels as their body reacts to sexual stimulation against their will (Warner, 2000) which children may interpret as evidence that they are enjoying themselves. This is internalized and resultantly may have an impact on the child's developing identity. Disclosure is avoided because the child feels that it is "all their fault", that he/she is bad and that no one will believe them (Warner, 2000).

Each victim's experience of grooming is different, because offenders adapt their strategies dependent on the child, whose response during the grooming process is important. It seems reasonable to suggest that offenders require some level of "empathy" during the grooming process to recognize reactions in the child, so that they can adapt their strategy accordingly. For example, during the desensitization process an offender would need to recognize the limits of the victim and to strategically increase those limits. It is proposed that empathy involves four components: (1) emotion recognition; (2) perspective-taking; (3) emotion replication; and (4) response decision (Marshall, Hudson, Jones & Fernandez, 1995). Continuing with the previous example, offenders recognize the distress in their victim and make a decision based on this, because they choose to stop temporarily as a strategic part of the desensitization process. Thus, offenders appear to have ability in components (1) and (4), which are the cognitive components, but not in the affective components (2) and (3). While early research on empathy in sex offenders concluded that they have empathy deficits, more recent research has found that this empathy deficit to be victim-specific (Fernandez, Marshall, Lightbody & O'Sullivan, 1999; Marshall, Hamilton & Fernandez, 2001; Marshall et al., 1995). This is inconsistent with the suggestion that the grooming process requires some level of empathy. However, Fernandez et al. (1999; Marshall et al., 2001) provide a possible explanation for this. They suggest that victim-specific empathy deficits manifest as cognitive distortions, which protect the offenders from negatively evaluating themselves, thus allowing them to continue abusing a child. Based on this suggestion, victim-specific empathy deficits arise as a consequence rather than a cause of the abuse. These cognitive distortions therefore facilitate self-grooming.

The manifestation of a cognitive distortion relating to a victim-specific empathy deficit may be facilitated by cognitive deconstruction. Cognitive deconstruction (see Ward, Hudson & Marshall, 1995) is a state entered into to escape negative experiences and negative self-evaluation. Cognitive deconstruction involves processing at a lower, more concrete, level, i.e. muscular movements, and rewards of behaviour, rather than social action. Resultantly, the individual has much more focus on feelings of pleasure and less awareness of the consequences of his behaviour. This concrete-level focus may reinforce cognitive distortions such as victims enjoyed the abuse because they became physically aroused, which justifies the offender's lack of empathy toward their victim.

Self-grooming, grooming the environment and significant others, and grooming the child are relevant to situational and preferential offenders, extra-familial and intrafamilial offences. It is important that the different types of sexual grooming apply to these different typologies and classifications of offenders because sexual grooming is not used solely by one group of offenders and, furthermore, these categories are not mutually exclusive (Itzin, 2001).

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

**Towards a new definition of sexual grooming of children**

The definitions of sexual grooming presented at the start of this review do not reflect the complexity of the sexual grooming of children, which is demonstrated in the previous discussion of the different types of sexual grooming. Based on the above findings it seems necessary to provide a new definition that attempts to encapsulate the complexity of sexual grooming, while still being easy to understand. We propose the following:

> A process by which a person prepares a child, significant adults and the environment for the abuse of this child. Specific goals include gaining access to the child, gaining the child's compliance and maintaining the child's secrecy to avoid disclosure. This process serves to strengthen the offender's abusive pattern, as it may be used as a means of justifying or denying their actions.

**Conclusion**

Despite the wide acceptance of the term, sexual grooming of children is not understood clearly, particularly in the public domain. Testimonies from both victims and perpetrators highlight the pertinence of the problem. Furthermore, the government in England and Wales has introduced legislation in the Sexual Offences Act 2003 regarding "meeting a child following sexual grooming" (see Part 1: section 152003). A greater understanding of the meaning, elements and process of sexual grooming is required to effectively utilize this legislation (for review see Craven, Brown & Gilchrist, in press).

Regardless of the prevalence and pertinence of sexual grooming, most aetiological theories of child sexual abuse neglect the phenomenon. The main reason for this is likely to be because prominent theories of child sexual abuse were devised more than 10 years ago, at a time when sexual grooming was not recognized as it is today. Therefore, it is necessary that theories be reconsidered based on this recent awareness. Ward (2001, 2002; Ward & Hudson, 2001; Ward & Siegert, 2002) has begun the process of theory knitting and development. While Ward and Siegert's Pathways Model is able to account for sexual grooming, it still focuses on the presence of opportunity rather than explicitly recognizing that offenders often create their own opportunities to offend.

The current review has identified three types of sexual grooming discussed in the literature: self-grooming, grooming the environment and significant others and grooming the child. Based on these findings an alternative definition has been suggested, which includes details about offenders' objectives, e.g. gaining access to a child, gaining the child's compliance, maintaining secrecy and avoiding disclosure.

A fuller understanding of sexual grooming is required. Consideration needs to be given to offender–victim interaction (before, during and after the offence), micro behaviours that may indicate to significant adults that a child is being sexually groomed, or indeed that they themselves are being groomed by an offender, and the seemingly impossible task of proving beyond reasonable doubt that the ambiguous behaviour of sexual grooming is sexually motivated. This would provide many benefits to child protection and the policing and treatment of child sex offenders with a specific focus on prevention of child sexual abuse rather than reactive responses to it. To optimize the impact of acquired knowledge and understanding, it is necessary to consider how these findings are disseminated to the relevant groups involved with children, e.g. parents, police, and social workers.

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

# References

Berliner, L. & Conte, J. R. (1990). The process of victimization: The victims' perspective. *Child Abuse and Neglect*, *14*, 29–40.

Canter, D., Hughes, D. & Kirby, S. (1998). Paedophilia: Pathology, criminality, or both? The development of a multivariate model of offence behaviour in child sexual abuse. *Journal of Forensic Psychiatry*, *9*, 532–555.

Ceci, S. J. & Bruck, M. (1993). Suggestibility of the child witness: A historical review and synthesis. *Psychological Bulletin*, *11*, 403–439.

Christiansen, J. R. & Blake, R. H. (1990). The grooming process in father–daughter incest. In A. L. Horton (Ed.), *The Incest Perpetrator: A Family Member No One Wants to Treat* (pp. 88–98). Thousand Oaks, CA: Sage Publications, Inc.

Conte, J. R., Wolf, S. & Smith, T. (1989). What sexual offenders tell us about prevention strategies. *Child Abuse and Neglect*, *13*, 293–301.

Craissati, J., McClurg, G. & Browne, K. (2002). Characteristics of perpetrators of child sexual abuse who have been sexually victimized as children. *Sexual Abuse: Journal of Research and Treatment*, *14*, 225–239.

Craven, S., Brown, S. & Gilchrist, E. (in press). Current responses to sexual grooming: Implication for prevention. *The Howard Journal of Criminal Justice*, 46.

Elliott, M., Browne, K. & Kilcoyne, J. (1995). Child sexual abuse prevention: What offenders tell us. *Child Abuse and Neglect*, *19*, 579–594.

Fernandez, Y. M., Marshall, W. L., Lightbody, S. & O'Sullivan, C. (1999). The Child Molester Empathy Measure: Description and examination of its reliability and validity. *Sexual Abuse: Journal of Research and Treatment*, *11*, 17–32.

Finkelhor, D. (1984). *Child Sexual Abuse: New Theory and Research*. New York: Free Press/London: Collier Macmillan.

Gillespie, A. (2002). Child protection on the internet—challenges for criminal law. *Child and Family Law Quarterly*, *14*, 411–425.

Gillespie, A. (2004). "Grooming": definitions and the law. *New Law Journal*.

Hall, G. C. N. & Hirschman, R. (1992). Sexual aggression against children: A conceptual perspective of etiology. *Criminal Justice and Behavior*, *19*, 8–23.

Hare, R. D. & Hart, S. D. (1993). Psychopathy, mental disorder, and crime. In S. Hodgins (Ed.), *Mental Disorder and Crime* (pp. 104–115). Thousand Oaks, CA: Sage Publications, Inc.

Herman, J. (1981). Father–daughter incest. *Professional Psychology: Research and Practice*, *12*, 76–80.

Home Office (2003). *Sexual Offences Act 2003*. Available at: http://www.hmso.gov.uk/acts/acts2003/20030042.htm (accessed November 2003).

Howitt, D. (1995). *Paedophiles and Sexual Offences Against Children*. Oxford, UK: John Wiley and Sons.

Itzin, C. (2001). Incest, paedophilia, pornography and prostitution: Making familial males more visible as the abusers. *Child Abuse Review*, *10*, 35–48.

Laws, D. R. & Marshall, W. L. (1990). A conditioning theory of the etiology and maintenance of deviant sexual preference and behavior. In W. L. Marshall, D. R. Laws & H. E. Barbaree (Eds.), *Handbook of Sexual Assault: Issues, Theories, and Treatment of the Offender* (pp. 209–230). New York, NY: Plenum Press.

Leberg, E. (1997). *Understanding Child Molesters: Taking Charge*. Thousand Oaks, CA: Sage Publications, Inc.

Marshall, W. L. & Barbaree, H. E. (1990). An integrated theory of the etiology of sexual offending. In W. L. Marshall, D. R. Laws & H. E. Barbaree (Eds.), *Handbook of Sexual Assault: Issues, Theories, and Treatment of the Offender*. New York: Plenum Press.

Marshall, W. L., Anderson, D. & Champagne, F. (1997). Self-esteem and its relationship to sexual offending. Psychology. *Crime and Law*, *3*, 161–186.

Marshall, W. L., Hamilton, K. & Fernandez, Y. (2001). Empathy deficits and cognitive distortions in child molesters. *Sexual Abuse: Journal of Research and Treatment*, *13*, 123–130.

Marshall, W. L., Hudson, S. M., Jones, R. & Fernandez, Y. M. (1995). Empathy in sex offenders. *Clinical Psychology Review*, *15*, 99–113.

Morrison, T., Erooga, M. & Beckett, R. C. (1994). *Sexual Offending Against Children: Assessment and Treatment of Males*. London: Routledge.

O'Connell, R. (2003). *A Typology of Child Cybersexploitation and Online Grooming Practices*. Available at: http://www.safer-internet.net/downloads/UCLAN_report_release.pdf (accessed September 2003).

Pickett, C. L., Gardner, W. L. & Knowles, M. (2004). Getting a cue: The need to belong and enhanced sensitivity to social cues. *Personality and Social Psychology Bulletin*, *30*, 1095–1107.

Prochaska, J. O. & DiClemente, C. C. (1982). Transtheoretical therapy: Toward a more integrative model of change. Psychotherapy: Theory. *Research and Practice*, *19*, 276–288.

Sampson, A. (1994). *Acts of Abuse: Sex Offenders and the Criminal Justice System*. London: Routledge.

Sanford, L. T. (1982). *The Silent Children: A Parent's Guide to the Prevention of Child Sexual Abuse*: McGraw-Hill.

Stop it Now (2003). *What we all need to know to protect our children*. Available at: http://www.stopitnow.org.uk/Stop%2002.pdf (accessed December 2003).

van Dam, C. (2001). *Identifying Child Molesters: Preventing Child Sexual Abuse by Recognizing the Patterns of the Offenders*. Binghamton, NY: Haworth Maltreatment and Trauma Press/The Haworth Press, Inc.

Ward, T. (2001). A critique of Hall and Hirschman's quadripartite model of child sexual abuse. *Psychology, Public Policy, and Law*, *7*, 333–350.

Ward, T. (2002). Marshall and Barbaree's integrated theory of child sexual abuse: A critique. *Psychology, Crime and Law*, *8*, 209–228.

Ward, T. & Hudson, S. M. (2000). Sexual offenders' implicit planning: A conceptual model. *Sexual Abuse: Journal of Research and Treatment*, *12*, 189–202.

Ward, T. & Hudson, S. M. (2001). Finkelhor's precondition model of child sexual abuse: A critique. *Psychology, Crime and Law*, *7*, 291–307.

Ward, T., Hudson, S. M. & Marshall, W. L. (1995). Cognitive distortions and affective deficits in sex offenders: A cognitive deconstructionist interpretation. *Sexual Abuse: Journal of Research and Treatment*, *7*, 67–83.

Ward, T. & Keenan, T. (1999). Child molesters' implicit theories. *Journal of Interpersonal Violence*, *14*, 821–838.

Ward, T., Louden, K., Hudson, S. M. & Marshall, W. L. (1995). A descriptive model of the offense chain for child molesters. *Journal of Interpersonal Violence*, *10*, 452–472.

Ward, T. & Siegert, R. (2002). Toward a comprehensive theory of child sexual abuse: A theory knitting perspective. *Psychology, Crime and Law*, *8*, 319–351.

Warner, S. (2000). *Understanding Child Sexual Abuse: Making the Tactics Possible*. Gloucester: Handsell.

Wilson, R. J. (1999). Emotional congruence in sexual offenders against children. *Sexual Abuse: Journal of Research and Treatment*, *11*, 33–48.

Wolf, S. (1985). A multi-factor model of deviant sexuality. *Victimology: An International Journal*, *10*, 359–374.

Downloaded by [Paige Frankenberry] at 22:27 21 March 2015

Tab H

Child Abuse & Neglect, Vol. 24, No. 2, pp. 273–287, 2000
Copyright © 2000 Elsevier Science Ltd
Printed in the USA. All rights reserved
0145-2134/00/$–see front matter


**Pergamon**

PII S0145-2134(99)00130-1

## SPOTLIGHT ON PRACTICE

# DELAY IN DISCLOSURE OF CHILDHOOD RAPE: RESULTS FROM A NATIONAL SURVEY

Daniel W. Smith

Department of Psychology, University of Arkansas, Fayetteville, AR, USA

Elizabeth J. Letourneau

United States Air Force Security Forces Center, Charleston, SC, USA

Benjamin E. Saunders, Dean G. Kilpatrick, Heidi S. Resnick, and Connie L. Best

National Crime Victims Research & Treatment Center, Medical University of South Carolina, Charleston, SC, USA

## ABSTRACT

**Objective:** This study sought to gather representative data regarding the length of time women who were raped before age 18 delayed prior to disclosing such rapes, whom they disclosed to, and variables that predicted disclosure within 1 month.
**Method:** Data were gathered from 3,220 Wave II respondents from the National Women's Study (Resnick, Kilpatrick, Dansky, Saunders, & Best, 1993), a nationally representative telephone survey of women's experiences with trauma and mental health. Of these, 288 retrospectively reported at least one rape prior to their 18th birthday. Details of rape experiences were analyzed to identify predictors of disclosure within 1 month.
**Results:** Fully 28% of child rape victims reported that they had never told anyone about their child rape prior to the research interview; 47% did not disclose for over 5 years post-rape. Close friends were the most common confidants. Younger age at the time of rape, family relationship with the perpetrator, and experiencing a series of rapes were associated with disclosure latencies longer than 1 month; shorter delays were associated with stranger rapes. Logistic regression revealed that age at rape and knowing the perpetrator were independently predictive of delayed disclosure.
**Conclusions:** Delayed disclosure of childhood rape was very common, and long delays were typical. Few variables were identified that successfully predicted disclosure behavior, but older age and rape by a stranger were associated with more rapid disclosure. This suggests that the likelihood of disclosure in a given case is difficult to estimate, and predictions based on single variables are unwarranted. © 2000 Elsevier Science Ltd

Preparation of this article was partially supported by National Institute of Drug Abuse Grant DA 05220–01A2, Dean G. Kilpatrick, principal investigator. Work on this research was begun while the first two authors were postdoctoral fellows at the National Crime Victims Research and Treatment Center, supported by National Institute of Mental Health Training Grant MH18869, Dean G. Kilpatrick, principal investigator.

Submitted for publication September 23, 1998; final revision received April 8, 1999; accepted April 14, 1999.

Requests for reprints should be sent to Daniel W. Smith, National Crime Victims Research and Treatment Center, Medical University of South Carolina, 165 Cannon St., P.O. Box 250852, Charleston, SC 29425. Electronic mail may be sent via Internet to smithdw@musc.edu.

*Key Words*—Child rape, Disclosure, Child sexual abuse.

ALTHOUGH SEXUAL ABUSE of children is a crime, prosecution of such cases is often problematic. Without any witnesses or corroborating physical or medical evidence (which is commonly absent; Myers, 1992), decisions about prosecution often rest on the credibility of statements made by victims. From a legal viewpoint, a victim's immediate disclosure of abuse to caretakers, followed by a prompt notification of legal authorities, often represents the ideal response to childhood sexual victimization. However, both clinical (Herman, 1981) and empirical (Finkelhor, 1979; Sauzier, 1989) evidence indicates that such quick responses occur only in a minority of cases, and in fact, some delay in disclosure is typical. Such delays are often used to impeach the credibility of victims's accusations (Myers, 1992). In essence, long delays in disclosure are argued to be inconsistent with behavior that would be expected from a person who has been victimized. This assumption may be particularly strong if the allegations involve harsh or violent assaults. Whether such assumptions are consistent with actual patterns of disclosure bears investigation.

To date, much of the literature regarding the disclosure of childhood sexual assault has focused on the long-term mental health correlates of disclosure and non-disclosure (e.g., Arata, 1998; Lamb & Edgar-Smith, 1994; Roesler, 1994; Wyatt & Newcomb, 1990). Studies of this type generally indicate that disclosures made in childhood, particularly disclosures of incest, are more negatively received by others than are disclosures made in adulthood (Lamb & Edgar-Smith, 1994; Roesler, 1994). This relationship may be confounded by the finding that most disclosures during childhood were made to parents, who were likely to be extremely upset by learning about incest (Roesler & Wind, 1994). In addition, results indicate that negative reactions following disclosure are associated with poorer adult psychological outcomes (e.g., Roesler, 1994), and that disclosure itself is not necessarily conducive to healing (Lamb & Edgar-Smith, 1994).

Other aspects of the disclosure phenomenon that have received empirical attention include the appropriateness of interview techniques aimed at eliciting information about abuse (e.g., Ceci & Bruck, 1993; Goodman & Bottoms, 1993) and the occurrence of recantation following initial disclosures of abuse (Bradley & Wood, 1996; Sorenson & Snow, 1991). Underlying both these latter issues is the widely accepted proposition that children normally find it difficult to disclose abuse. If children found it easy to make spontaneous, immediate disclosures, interview techniques would take on considerably less importance, and the motivations to deny abuse or recant disclosures would similarly diminish. These factors ought to stimulate significant interest in understanding the variables that affect young people's decisions about whether to disclose sexual abuse experiences, but unfortunately few empirical data that address this issue are available.

In order to make a disclosure, a child victim must make public an event that likely involves some combination of personal shame, fear, or anticipation of negative consequences (e.g., disbelief, stigmatization, blame) (Browne & Finkelhor, 1986). In addition, in cases of intrafamilial abuse victims often experience significant emotional conflict about making disclosures that implicate caretakers or other loved ones, and may fear family disruption (Lawson & Chaffin, 1992). These factors can be difficult to overcome, and as a result, children may not make immediate disclosures following sexual victimizations. Sauzier (1989) reported that 39% of 156 sexually abused children evaluated at a treatment clinic had never disclosed to anyone that they had been abused; abuse in these cases was discovered "accidentally" more than a year after its onset. Similarly, Lawson and Chaffin (1992) described a sample of children whose sexual victimizations were confirmed by the presence of medical findings. Many of these children had not disclosed until their medical examinations, and some still denied abuse even after positive medical diagnosis. Adult retrospective reports also reveal that child victims have difficulty disclosing sexual abuse. Herman (1981),

for example, reported that only a minority of her incest survivors had ever disclosed their victimization before reaching adulthood. Clearly, delayed disclosure, or even the lack of disclosure of childhood sexual abuse, is not uncommon.

Some children, however, do make purposeful disclosures very soon after the assault. In Sauzier's (1989) sample, for example, 24% disclosed within 1 week. Little research attention to date has focused on what may differentiate those children who make relatively rapid disclosures from those who delay their reports. Sauzier (1989) found that child age, gender, race, and family composition were unrelated to delays in disclosure, but penetration assault (i.e., rape), abuse by a biological parent, and single episodes of assault were associated with longer delay. Those children who made rapid reports were more likely to have experienced "minor" forms of abuse (attempted molestation, exhibitionism); however, a substantial number of children who never disclosed had also experienced these milder types of assaults. Similarly, aggressive perpetrator attempts to maintain victim compliance were associated with both immediate reporting and with long-term non-disclosure.

Using a different method and sample, Farrell (1988) attempted to identify characteristics that distinguished children who made intentional disclosures of incest from those whose abuse was discovered without a direct disclosure by the victim. Survey data from state protective service caseworkers revealed that abuse severity was unrelated to purposeful disclosures, but that child age was associated with intentional disclosure. Older children were more likely to disclose (regardless of age at time of abuse), as were victims of incest who had been abused for more than 24 months. However, these results should be interpreted very cautiously because of the selective nature of the sample (founded cases of incest described by caseworkers) and because no inferential statistics are provided in the report.

As valuable as these studies are, it must be remembered that all of the cases in these studies were identified during childhood and adolescence. Every participant in Sauzier's (1989) sample had been identified as a child sexual abuse victim within 18 months of abuse. Farrell's (1988) data included only cases that had been reported to, and founded by, a protective service agency. However, many victims of abuse are not reported or identified during childhood, either as the result of purposeful or accidental disclosures (Herman, 1981; Russell, 1986). Furthermore, some identified victims may never present for clinical evaluations. This observation raises questions regarding the applicability of Farrell's (1988) and Sauzier's (1989) findings to the larger population of child sexual assault victims, those whose abuse may not be reported to authorities or revealed within 18 months following the abuse. For example, do a significant number of children wait longer than 18 months before disclosing sexual abuse experiences? If so, do the correlates of these longer delays correspond to those identified by Sauzier (1989) and Farrell (1988)?

These questions are not possible to answer using clinical samples of child victims because, by definition, their abuse experiences will have been discovered by the time of the assessment. By asking adult women to report on their past experiences, however, longer periods of delayed disclosure can be identified. Two studies have utilized this methodology. Roesler (1994) analyzed disclosure among a sample of 188 men and women who reported histories of child sexual abuse. Although he was not specifically interested in length of delayed disclosure, Roesler's (1994) data indicated that roughly one-third of respondents disclosed in childhood (prior to age 16), whereas two-thirds did not disclose until they were adults (older than 16). Abuse severity (e.g., penetration, use of force) was unrelated to adult versus childhood disclosure in this sample. Arata (1998) also found that nearly one-third of her female college student respondents had disclosed their abuse in childhood (prior to age 14), but her data did reveal a significant relationship between the physical severity of abuse and disclosure: women reporting severe assaults were less likely to disclose. One possible explanation of these contradictory findings lies in the highly selective nature of the samples used. Roesler's (1994) data were collected from several diverse sources: people receiving treatment for child abuse sequelae, children's center volunteers, professional conference attendees, and callers to a national hotline following a celebrity's televised disclosure of her own incestuous

past. Arata's (1998) data, on the other hand, were collected from a convenience sample of college women. Thus, representative data regarding the length of time women may delay prior to disclosing child sexual abuse, as well as the correlates of such delays, are still needed. Data from a probabilistic national sample could be generalized with greater confidence than those obtained from clinical or convenience samples, and would therefore present a more comprehensive picture of the phenomenon of child rape disclosure than is available from previous research.

For this reason, data from a large nationally representative sample of adult women, the National Women's Study (NWS; Resnick et al., 1993), were analyzed for the present study. The NWS involved a three-wave telephone survey of 4,009 adult women in the United States that focused on the prevalence of interpersonal victimization, important characteristics of such violence, and the presence of various mental health consequences (post-traumatic stress disorder, major depressive disorder, and substance abuse) among women. Part of the telephone survey assessed retrospective reports of women's childhood experiences of sexual and physical victimization. In the second wave of the three wave design, women who reported having experienced sexual victimization prior to their 18th birthdays were asked a series of questions regarding the characteristics of the abuse experience. Included were queries regarding the length of time, if any, that the woman waited before telling anyone about her victimization, the identity of the person told, and several questions about the nature of the abuse.

The purpose of the present study was to gather information about the length of time that women who experienced a rape in childhood delayed before disclosing their experiences to others, and to whom such disclosures were typically made. We chose to examine retrospective reports of childhood rape experiences, as opposed to other types of childhood sexual victimizations, because we believed that asking about assaults that were more salient (i.e., those involving physical penetration) would minimize distortions of memory that might accompany retrospective reports of other events. An additional purpose of the study was to identify variables that differentiated women who made more rapid disclosures from those who delayed longer periods of time before disclosing. Based on the literature reviewed above, and on predictors of post-traumatic stress identified in previous studies of adult women crime victims (Kilpatrick et al., 1989), three types of variables were examined: victim characteristics (age at assault, race), assault characteristics (type of penetration, single versus series rapes, perception of life threat during rape, presence of a weapon during rape, victim injury during rape) and perpetrator characteristics (relationship to victim, use of threat, use of force).

## METHODS

*Participants*

Two sets of probability samples were selected for this study based on a multi-stage sampling system. First, in Wave I, a random sample of 2,009 respondents was selected from stratified samples of counties within areas defined as Central City, Standard Metropolitan Statistical Area (SMSA), and Non-SMSA within the four regions of the country. Within these sample sites, random digit dialing was used to solicit households to insure that both listed and unlisted telephone numbers were used. A second random sample of 2,000 women between the ages of 18 to 34 was selected. This oversampling of younger women was conducted because previous research has indicated that this age group has a higher reported rate of sexual assault than older women. All data were weighted by age and race to 1989 estimates of the apportionment of these attributes in the US population of adult women.

Demographic characteristics of all subjects from Wave I are presented by Resnick and colleagues (1993). Comparison of these data with the population parameters obtained from the US

Census Bureau indicated that the sample closely matched the demographic attributes of the population of US women. The Wave I sample of women was re-contacted 1 year later in the Wave II data collection phase. Of the Wave I respondents, 14.0% could not be relocated, and 6% refused to participate, resulting in an absolute interview completion rate for Wave II of 80%, and a Wave II sample size of 3,220. As with the Wave I data, the Wave II data were weighted to conform to the 1989 Census statistics.

The mean age of Wave II participants was 44.9 years ($SD = 17.5$). The majority of women (63%) were high school graduates. An additional 21% graduated from college, and 16% had fewer than 12 years of education. Most women were employed at least part-time or were students (58%), with similar percentages of women working as homemakers (18%) and retired/disabled (18%). An additional 4% were unemployed, and 2% reported other employment circumstances. In terms of income, 26% of women reported annual incomes at or below $15,000. Another 38% of the participants reported annual incomes between $15,000 and $35,000; 30% reported incomes of over $35,000, and 6% either refused to answer or were not sure of their incomes. Most of the women were married (62%) or living with a partner (4%); 14% were single/never married, 10% were widowed, 8% were divorced, and 2% were separated. The sample comprised 86% Caucasian women, 11% African Americans, and 3% other categories (fewer than 1% of women refused to provide racial status). Five percent of women identified Hispanic ethnicity.

### Measures

The telephone survey consisted of several measures designed to elicit information on demographics, psychiatric symptoms, substance use, and victimization history. The present study reports on data from the demographic and child rape victimization questions. Information about other aspects of the interview data is described in Resnick and colleagues (1993).

*Child rape.* Each respondent's history of child rape was assessed using a modified and shortened version of the Incident Classification Interview (Kilpatrick et al., 1989; Kilpatrick, Saunders, Best, & Von, 1987). This is a highly-structured, closed-response set of questions that asks about the occurrence of specific types of sexual events in a behaviorally specific manner. Respondents were asked about the occurrence of different types of rape incidents (e.g., vaginal, oral, and/or anal penetration by a penis, finger, or object) that occurred prior to age 18. These incidents had to be characterized by the use or threat of force, as defined by the participant, to be considered rape. For purposes of the present study, the endorsement of any penetration sexual assault prior to age 18 placed the respondent in the Child Rape group.

*Case characteristic data.* Each woman who reported a childhood rape incident was asked a series of questions to gather additional information about their first (if they reported more than one) or only childhood rape. Respondents were queried regarding their age at the time of the incident, the nature of their relationship to the perpetrator, and several characteristics of both the rape itself (presence of a weapon, use of threats and/or force by perpetrator) and their reactions to the rape (perception of life threat, receipt of physical injury).

*Disclosure.* In addition, all women who reported a childhood rape were asked the following questions: "Have you ever told anyone about this (these) incident(s)?" Subjects indicating they had disclosed to someone prior to the interview were also asked "Whom did you tell first?" and then "How long after the (first) incident before you told someone?" It should be emphasized that these questions assessed whether respondents told anyone about their child rapes, not whether they had told authorities. Reporting to authorities was assessed separately.

**Table 1. Perpetrator Relationship to Victim of Child Rape ($N = 288$)**

| Relationship | Percent |
| --- | --- |
| Father/Step-Father | 15.4 |
| Brother | 5.6 |
| Other Relative | 22.1 |
| Boyfriend/Friend | 22.4 |
| Other Acquaintance[a] | 22.0 |
| Stranger | 10.1 |
| Refused | 2.4 |

*Note*. [a]This category includes co-workers, neighbors, and other non-relatives that the victim knows.

*Procedure*

Structured telephone interviews were utilized to collect all data for the present study and lasted approximately 35 minutes. All interviews were conducted by Schulman, Ronca, and Bucuvalas, Incorporated (SRBI), a survey research firm with considerable experience managing similar types of surveys. All respondents were interviewed by trained female interviewers. All telephone interviews were conducted using a computer-assisted telephone interview (CATI) system that prompted interviewers with each consecutive question on a computer screen. The interviewer entered respondents' answers and the CATI program automatically provided the next probe or followed the programmed skip pattern.

Respondents were assured of the confidentiality of the information obtained in the interview, which respondents had the opportunity to end at any time simply by hanging up the phone. Respondents who had questions about the legitimacy of the survey were provided a toll-free telephone number to contact project representatives for additional information about the study. More comprehensive information about these procedures is available in SRBI's final report on the NWS methodology (Boyle, 1992).

*Results*

*Prevalence and characteristics of child rape events.* Of the 3,220 women interviewed in Wave II, 288 (9%) reported experiencing at least one event that met the study's definition of childhood rape. The average age at the time of the first or only rape was 10.9 years. The majority of women reported that their childhood rapes were single events (55%), although a considerable proportion of women reported series assaults (45%), defined as multiple, similar assaults by the same perpetrator over time. Consistent with much of the literature regarding adult rape, most women reported that they knew the perpetrator; only 29 (10%) identified the perpetrator as a stranger. Table 1 presents the identities of the perpetrators reported in this sample. Although a minority of women (41%) reported that the perpetrator explicitly threatened them during the rape, nearly three-fourths (73%) reported that the perpetrator used some type of physical force to complete the rape. Few women reported the presence of guns, knives, or other weapons (11%), although considerably more reported that they experienced fear that they would be killed or seriously injured (44%) during their rapes. Finally, fewer than one-third (29%) of child rape victims reported receiving any type of physical injury during their rapes.

*Disclosure of child rape.* Of the 288 women who reported a child rape, 81 (28%) stated that they had never told anyone about this sexual assault until specifically queried by the interviewer for this study. The remaining 207 women had told at least one other person about their childhood rapes

**Table 2. Victim Relationship to Initial Disclosure Confidant ($N = 288$)**

| Relationship to Victim | Percent |
|---|---|
| Close Friend | 22.5 |
| Mother | 20.7 |
| Other Immediate Family[a] | 8.0 |
| Husband | 7.4 |
| Police/Social Worker/Clergy | 6.6 |
| Other Relative | 5.5 |
| Not Sure | 1.2 |
| Never Told Until Interview | 28.1 |

*Note.* [a]This category includes sister, brother, and father, in descending order of endorsement.

prior to the interview. As shown in Table 2, among women who disclosed prior to their NWS interview, close friends were the most common person to whom victims made disclosures, followed by mothers and other immediate family members. Fewer than 10% of victims reported making their initial disclosure to social workers or law enforcement personnel. A slightly larger percentage of child victims reported that authorities were eventually notified about their child rapes, even though they were not the initial confidants. Overall, 12% of child rape victims stated that their assaults were reported to authorities at some point.

In response to the question "How long after the (first) incident did you wait before telling someone?" respondents were allowed to answer using their own units of time (e.g., days, weeks, or months). The only exception to this data reduction method occurred for 28 women who reported latencies greater than 100 months prior to disclosing (e.g., respondent waited 9 years or more before telling someone). Because of the CATI system used for this study, three digit responses could not be entered in the data set, so '99' was used as a default answer. Therefore, the latency data reflect an artificial ceiling at 99 months for those women who disclosed prior to the interview. Fifty-two (18% of 288) women stated that they were not sure, or could not estimate with any confidence, when they first told someone else about their experience. Table 3 presents the reported latencies to disclosure, reduced to common units of time, of the other 236 women (the 81 women who had never disclosed until the interview are included in Table 3; their latencies were calculated by subtracting their reported age at the time of rape from their current age). For all other analyses, however, disclosure latency responses were converted into months. Therefore, responses given in days were divided by 30, and those given in weeks were divided by four. The majority of women did not disclose immediately, or even within several months of their rape. Nearly half of women

**Table 3. Time Between First/Only Child Rape and Initial Disclosure ($N = 236*$)**

| Length of Time | $N$ | Percentage | Cumulative $N$ | Cumulative Percentage |
|---|---|---|---|---|
| Within 24 Hours | 42 | 17.8 | 42 | 17.8 |
| 1 Month | 21 | 8.9 | 63 | 26.7 |
| 6 Months | 17 | 7.2 | 80 | 33.9 |
| 12 Months | 9 | 3.8 | 89 | 37.7 |
| 24 Months | 12 | 5.1 | 101 | 42.8 |
| 36 Months | 6 | 2.5 | 107 | 45.3 |
| 48 Months | 6 | 2.5 | 113 | 47.8 |
| 60 Months | 10 | 4.3 | 123 | 52.1 |
| After 60 Months | 113 | 47.9 | 236 | 100.0 |

*Note.* *This includes the 81 women who had never disclosed until the research interview but excludes the 52 women who could not estimate the latency between rape and disclosure.

who remembered making their first disclosure waited longer than 8 years to do so. However, a sizeable minority ($N = 42$, 18% of 236) made immediate disclosures (i.e., within 1 day of the rape).

The 81 women who had never disclosed prior to the interview were compared to the other 207 child rape victims in a series of analyses of demographic (age at rape, race), rape (e.g., single versus series event), and perpetrator variables (identity, use of force, etc.). Few differences were detected between groups. Women who disclosed for the first time during the research interview were significantly less likely to report that a weapon was used during their rape (5% versus 13%), $\chi^2$ (1, $N = 288$) $= 3.87$, $p < .05$, and less likely to report that the perpetrator used some type of threat to gain their compliance with the rape (32% versus 45%), $\chi^2$ (1, $N = 288$) $= 4.09$, $p < .05$, than were women who had disclosed to someone else prior to the interview. No other perpetrator or crime variables, and neither of the demographic variables, differentiated between groups.

Similarly, the 52 women who could not remember when they had disclosed were compared to remainder of the sample. Those who were unsure of how long they waited before disclosing were significantly younger at the time of rape (8.9 years versus 11.3 years), $t(247) = 3.41$, $p < .001$, and less likely to have experienced force during the rape, $\chi^2(1, N = 288) = 6.2$, $p < .02$. No other differences were detected. Because they could not estimate the length of time prior to their disclosure, these 52 women were excluded from subsequent analyses predicting delayed disclosure.

*Prediction of delayed disclosure.* In order to identify the predictors of delayed disclosure, a three-step analytical strategy was followed. Although time is by definition a continuous variable, the method used to measure latency before telling in this study precluded its legitimate use as a continuous variable. Therefore, participants were first grouped according to a criterion for delayed disclosure. Once groups were established, then univariate analyses (either chi-square or $t$-test) were performed to identify victim, crime, and perpetrator characteristics that differed between groups. Third, variables that differentiated between groups in the univariate analyses were then included in multivariate logistic regression equations in order to identify their relative ability to predict group membership.

Examination of the delayed disclosure variable revealed a natural break in the data at 1 month, with approximately one-quarter ($N = 63$, 27%) of women having disclosed within this time frame. Therefore, this was chosen as the cutoff to represent delayed disclosure. Although this value is somewhat arbitrary, it is intuitively appealing because delays of 1 month might be considered "typical" or acceptable, but delays longer than 1 month might be problematic for a victim's credibility in a legal or forensic context. The final groups included 173 women in the group that delayed disclosure beyond 1 month (Long Delay) and 63 in the group that disclosed within 1 month (Short Delay).

A series of univariate tests were conducted to identify differences between the Long Delay and Short Delay groups on victim (white versus minority race, age at rape), crime (single versus series rape, perception of life threat, receipt of injury, presence of a weapon), and perpetrator variables (relationship to victim, use of threats, use of force). In terms of victim variables, Table 4 reveals that the Long Delay group was, on average, significantly (2.3 years) younger than the Short Delay group at the time of rape. Race was unrelated to length of time prior to disclosure.

Of the crime variables analyzed, only whether the rape was a single event versus series of assaults was related to group membership, with the Long Delay group more likely to experience series rapes. This relationship is not surprising because series rapes, by their ongoing nature, would be much less likely to have been terminated by a disclosure within a short period of time. Three-quarters (75.3%) of the 118 series child rapes reported by women in this study took place over a period of time longer than 1 year (the smallest measurable duration). Presence of a weapon, victim injury, and perceived life threat were unrelated to group membership.

Prior to analyzing the perpetrator variables, the perpetrator identity variable was transformed. To avoid conducting individual chi-square analyses for each type of perpetrator identified, data were

**Table 4. Comparison of Short Delay and Long Delay Groups on Victim, Crime, and Perpetrator Variables**

| Variable | Short Delay ($N = 63$) | Long Delay ($N = 173$) | Univariate Statistic[a] | Odds Ratio | df |
|---|---|---|---|---|---|
| Victim Characteristics | | | | | |
| Average age at rape | 12.9 | 10.6 | 3.80* | — | 229[b] |
| White race | 80.2 | 85.0 | 0.76 | 1.39 | 1 |
| Crime Characteristics | | | | | |
| Single rape | 74.8 | 50.1 | 11.45* | 2.95 | 1 |
| Perceived life threat | 41.4 | 45.5 | 0.33 | 1.19[c] | 1 |
| Received physical injury | 33.0 | 28.7 | 0.40 | 1.22 | 1 |
| Weapon present | 13.6 | 10.5 | 0.44 | 1.34 | 1 |
| Perpetrator characteristics | | | | | |
| Stranger | 22.0 | 5.3 | 14.60* | 5.02 | 1 |
| Related to victim[d] | 24.2 | 47.7 | 10.45* | 2.85[c] | 1 |
| Father/step-father | 12.0 | 17.6 | 1.05 | 1.56[c] | 1 |
| Used force | 68.8 | 80.3 | 3.48** | 1.85[c] | 71 |
| Used threats | 32.3 | 43.9 | 2.59** | 1.64[c] | 1 |

*Note.* [a]All statistics are Pearson $\chi^2$s except for Age at Rape, which is a statistic. Odds ratios are presented only for $\chi^2$ statistics.
[b]Five subjects were missing data for the Age at Rape variable, resulting in a lowered degrees of freedom for this analysis.
[c]For purposes of clarity, the odds ratios for variables that were associated with increased odds of Long Delay are presented as the inverse (i.e., 1/odds ratio) of the obtained values, rather than values less than 1.0.
[d]This category includes both immediate (e.g., father, brother) and extended family relatives.
*Denotes a significant test statistic at $p < .01$.
**Denotes test statistics that approach significance at $p < .10$.

collapsed into four categories: father/step-father, other relative, non-relative acquaintance, and stranger. A multi-category chi-square comparing the Short and Long Delay groups across these four classes of perpetrator identity was significant, $\chi^2(3, N = 236) = 19.9, p < .001$. As presented in Table 4, three follow-up univariate chi-squares revealed that perpetrators in the Short Delay group were over four times more likely to be strangers than were those in the Long Delay group (22% to 5%), whereas Long Delay perpetrators were twice as likely to be related to the victim (48% to 24%). Relatives included both immediate and extended family members. However, fathers and step-fathers were reported to be perpetrators equally often in the Long and Short Delay groups. Thus, for victims, being related to the perpetrator was associated with longer delays before telling, whereas having no relationship with the victim was related to more rapid telling. Both use of threats and use of force by the perpetrator were slightly more common in the Long Delay group, suggesting that these factors may have inhibited victim disclosure, but neither factor achieved conventional levels of significance (for force, $p = .06$, for threats, $p = .10$).

Short and Long Delay groups were also compared on their choice of confidants for initial disclosure. No differences were detected, $\chi^2 (3, N = 207) = 2.1$, *ns*. Both groups disclosed most frequently to close friends, followed by mothers, other relatives, and professionals, respectively.

Thus, one victim variable (age at rape), one crime variable (single versus series rape), and two perpetrator variables (biological relationship to victim, stranger to victim) were significantly different between groups at the univariate level. In order to identify the unique predictive value of each variable, a logistic regression analysis was conducted to predict membership in the Short Delay group using these four variables as independent variables. As seen in Table 5, both age at rape and stranger perpetrator variables remained significant in the final model. Odds ratios indicate that when the perpetrator was a stranger to the victim, the probability that the victim told someone about the rape within 1 month was 3.69 times greater than if the victim knew the perpetrator in some way (either as an acquaintance or a family member). Also, for each year of the victim's age, the probability of telling someone within 1 month increased by a factor of 1.11. Thus, both older

**Table 5. Logistic Regression Predicting Membership in Short Delay Group ($N = 231^{a}$)**

| Predictor | $B$ | Standard Error | Wald Statistic | Odds Ratio | 95% CI |
|---|---|---|---|---|---|
| Age at Rape | .10 | .04 | 5.24* | 1.11 | 1.02–1.21 |
| Single Assault | −.41 | .37 | 1.25 | 1.51 | 0.32–1.36 |
| Stranger Perp | 1.30 | .49 | 6.94** | 3.69 | 1.39–9.73 |
| Relative Perp | .39 | .40 | 0.95 | 1.48 | 0.67–3.28 |

*Note.* CI = Confidence Interval; Perp = Perpetrator. The Stranger Perpetrator variable was dummy coded 0 = Not a Stranger, 1 = Stranger. The Relative Perpetrator variable was dummy coded 0 = Unrelated, 1 = Related; however, for purposes of clarity, the inverse of the Relative Perp odds ratio is reported here. Disclosure groups were dummy coded 0 = Long Delay, 1 = Short Delay.
[a]The five participants with missing data for Age at Rape are excluded from this analysis.
*Denotes a significant Wald statistic, $p < .05$; **$p < .01$.

age and lack of relationship to the perpetrator predicted victims' disclosure of child rape within 1 month.

*Penetration type and disclosure.* In order to determine whether the type of penetration (e.g., penile-vaginal, penile-oral) was related to delayed disclosure, a separate analysis was conducted. Penetration type was not included in the larger analyses because this variable was not available for the entire sample of 288 women. Specifically, if any woman reported more than one type of penetration (penile-vaginal, penile-oral, penile-anal, or digital/object penetration of the vagina or anus) during her lifetime, it was unknown which type of penetration occurred during a childhood rape. However, for the 110 women who reported that they had experienced only one rape during their lifetime, and that this rape had occurred prior to age 18, penetration type could be determined. Of these, 16 could not confidently estimate the length of time that passed before they disclosed. Therefore, data regarding both disclosure latency and penetration type were available for 94 women. Table 6 presents the percentages of each penetration type in the Long Delay and Short Delay groups. Chi-square analyses reveal that penile-vaginal penetration was more common among those women who told within 1 month than among those who did not, and that, conversely, digital penetration was more common among non-disclosers. Rates of penile-anal and penile-oral penetration were comparable in both groups.

## DISCUSSION

This study examined a nationally representative sample of women who were raped in childhood and focused on describing their disclosure patterns and identifying variables that distinguished

**Table 6. Rates of Sexual Penetration Type Across Disclosure Groups ($N = 94$)**

| Penetration Type | Short Delay ($N = 34$) | Long Delay ($N = 60$) | $\chi^{2a}$ | Odds Ratio |
|---|---|---|---|---|
| Penile-Vaginal | 88.8 | 69.7 | 4.44* | 3.46 |
| Penile-Oral | 20.1 | 22.7 | 0.09 | 0.85 |
| Penile-Anal | 7.7 | 6.1 | 0.08 | 0.78 |
| Digital/Object | 22.7 | 48.1 | 5.88* | $3.15^{b}$ |

*Note.* Participants may have experienced multiple types of penetration during the same rape incident.
[a]For all $\chi^{2}$, $df = 1$, and $N = 94$.
[b]The inverse of the Digital/Object odds ratio is presented here.
*Denotes a significant test statistic at $p < .05$.

between those women who made relatively rapid (within 1 month) disclosures and those who did not. Results strongly support the proposition that delayed disclosure of child sexual assault is quite common. Moreover, the very long latencies prior to disclosure reported by women in this sample suggest that the phenomenon of delayed disclosure is more prevalent, and that the typical length of delay is longer, than previous research has revealed. Sauzier (1989) reported that 61% of her sample of clinically identified children had told someone about their sexual abuse before 18 months, the upper limit of that study, had passed. In the present sample, the corresponding figure is less than 40%, indicating that nearly two-thirds of the child rapes reported in the National Women's Study would not have been discovered within the 18 month time frame used by Sauzier (1989). Thus the present data provide the best picture to date of the disclosure patterns of women child rape victims.

From women's reports of their disclosing behavior it can be estimated that four out of five child rape victims do not tell anyone about their rapes within 24 hours. By the time 1 month has elapsed, roughly one in four victims has told someone, but almost half of all child rape victims do not disclose to anyone for more than 5 years. This suggests that children who actually do disclose rape experiences relatively quickly are atypical, and that professionals should not be surprised when girls and women make initial disclosures of rape several months, even years, after the reported rape took place. It is especially noteworthy that over one-quarter of the victims in this sample had never told anyone—not mothers, best friends, or husbands—about their assaults. While this group was less likely to have been exposed to weapons or perpetrator threats, all these women experienced non-consensual sexual penetrations; also, levels of force used by the perpetrator were similar to those reported by women who disclosed. Therefore, it is unlikely that these victims never told anyone because they deemed these experiences insignificant or unimportant. We can only speculate about the motivation these women had to disclose these experiences over the telephone to an unknown interviewer.

The attempt to identify variables that predicted immediate versus delayed disclosure was only partly successful. At the univariate level, victim's older age at rape, rape by a stranger, and having a single rape experience (as opposed to a series of similar rape events) were all associated with disclosure within 1 month, and having a family relationship with the perpetrator was associated with longer delay before disclosure. Several possible explanations may be generated to account for these relationships.

The finding that age at rape was associated with length of time prior to disclosure is at odds with previous results. Both Sauzier (1989), using child clinical cases, and Arata (1998), using college women, found age at victimization and disclosure delays to be unrelated. This discrepancy may be attributable to the differences in sampling and design between studies. One explanation for quicker disclosures among older victims is that they may be more aware of standards for sexual behavior and quicker to recognize the magnitude of the violation that rape represents. The average age of victims in the Short Delay group at the time of rape was 12.9 years, which is within the age range associated with puberty onset and the resulting development of sexual awareness. Herman (1981) postulated that the onset of puberty led many victims to disclose incestuous abuse that had been going on for some time. Alternatively, it is possible that older victims, by virtue of their greater social involvement outside the home, have more opportunities to disclose than younger children. Finally, older children and adolescents may possess sufficient self-assurance to risk potential disruption of their families lives by disclosing; younger children, on the other hand, may be more fearful of upsetting others (or perhaps of being blamed themselves) and consequently keep the assault secret.

The observed relationships between perpetrator identity and delayed disclosure replicate earlier research (Arata, 1998; Sauzier, 1989). Female children raped by relatives are twice as likely to keep the assault secret for more than a month than are those raped by non-relatives. Sauzier (1989) speculated that was due to a greater sense of loyalty or emotional bond to familial perpetrators

(especially parent figures): to disclose would be tantamount to breaking that bond. As Summit (1983) has pointed out, in cases of intrafamilial sexual abuse, the child victim is burdened with the responsibility of keeping silent and maintaining family togetherness. It is likely that some children recognize this fact on their own, and that in other cases the perpetrator explicitly establishes it. Although most often these dynamics are presumed to apply primarily to cases of father-daughter incest, similar processes may occur in any case in which the perpetrator is a family member. Having to confront a perpetrator who is a relative is likely to be a more upsetting experience for most families than confronting an extrafamilial perpetrator (Roesler & Wind, 1994). However, the findings of this study suggest that familial connection may not be the only type of relationship associated with delayed disclosure. Rapes perpetrated by strangers were much more likely to be disclosed to someone within 1 month than rapes by either family members or non-family acquaintances. This suggests that the presence of any kind of relationship with the perpetrator may lead children to delay telling someone about an experience of child rape.

Experiencing a single childhood rape was associated with more rapid disclosure, whereas series events were more common among women who delayed disclosure. Interestingly, Sauzier (1989) found the opposite relationship between single versus series events and time before telling. In her study, single episodes of abuse were associated with delayed disclosure. This discrepancy is difficult to explain, and in fact the counter-intuitiveness of this finding seems to have troubled Sauzier, who ultimately argued, based on clinical experience, that disclosure is easier for children who experience one-time assaults. Indeed, Arata (1998) speculates that children who do not tell immediately may be increasingly reluctant to disclose as abuse continues, perhaps out of fear of being blamed for not telling right away.

In the present study, other variables pertaining to the severity of the rape experience were found to be unrelated to delayed disclosure. Perpetrators' use of threats and force, victim injury, victims' subjective perceptions of life threat, and the presence of a weapon were all unrelated to delays in disclosure (although women who never disclosed until the interview were less likely to have been threatened or to have had a weapon present during their rape). Similarly, Arata (1998) found no overall relationship between disclosure and coercion variables in her college sample. In contrast, Sauzier (1989) found that aggressiveness and the use of manipulation and threat by the perpetrator seemed to inhibit disclosure. This discrepancy may be due to several factors, including the narrow range of events examined in the present study. Only rape events, which by definition involve force or the threat of force, were included in the analyses reported here, and this very likely restricted the range of perpetrator aggression that could be used to predict disclosure group membership. Had less violent or extreme forms of sexual assault been included, these variables may indeed have been associated with disclosure. Of course, it is also possible that due to the clinical nature of Sauzier's sample, the association between aggressiveness by the perpetrator and victim functioning was artificially increased.

On a broader level, however, the absence of any clear association between disclosure and indicators of assault severity in this study and the conflicting findings in some previous research suggest that children's decisions about disclosing rape experiences are not reliably related to the severity of their assaults. In some instances, severe assaults probably motivate help-seeking and rapid disclosure. In others, however, severity likely inhibits disclosure. This variability is very likely mediated by other characteristics of the assault, such as perpetrator identity or level of fear experienced by the victim, and the relationships among these factors and disclosure behavior are certainly complex. Therefore, generalizations about the likelihood of disclosure based solely on severity of assault (e.g., "if there was a weapon, children will surely tell" or "children who are threatened are too scared to tell") are unwarranted.

The logistic regression analysis revealed that both young age at time of rape and not knowing the perpetrator were independently associated with delayed disclosure. When included in a predictive model with these variables, single versus series rapes and victim's family relationship to

the perpetrator did not remain significant. Thus, even when the effects of other variables were controlled, older age at first rape was significantly predictive of disclosure within 1 month. Because age is a continuous variable, the resulting odds ratio (1.11) is somewhat difficult to interpret. Each additional year of age is associated with a 1.11 times increase in the odds of disclosure within 1 month, so the odds that a female 17-year-old rape victim would disclose within 1 month are 2.84 (1.11 raised to the 10th power) times greater than those for 7-year-old rape victim. Similarly, when the effects of other predictors are controlled, the odds that child victims who are raped by strangers will disclose within 1 month are 3.69 times greater than if the child were raped by someone known to them. Although these findings provide information pertinent to the prediction of child rape disclosure, neither odds ratio is so large that it permits firm conclusions about whether disclosure is likely or unlikely in a given case. In fact, although rape by a stranger was the best individual predictor of whether a child would tell someone else about her rape relatively quickly, only 10% of women in this nationally representative sample reported stranger rapes. Indeed, it is probable that each child's decision to tell or not tell is influenced by many variables not measured in the present study (e.g., personality style, family relationships), and future research must begin to identify their relative contributions.

Post-hoc analyses with a subset of women who experienced only one rape during their lifetime revealed relationships between disclosure and type of sexual penetration. Women who disclosed within 1 month were more likely to have experienced penile-vaginal penetration and less likely to have experienced digital penetration than those women who delayed disclosure. One possible explanation for this result is that experiences of digital penetration may be perceived as less serious, or may be so questionable in their seriousness that victims do not feel a need to disclose them. Forced penile-vaginal penetration, on the other hand, is more clearly a violation of sexual norms, which may in turn motivate disclosure.

The finding that close friends were the most common confidants contrasts with research showing that mothers are by far the most likely confidants (e.g., Sauzier, 1989) and is consistent with other retrospective reports indicating that close friends are frequent confidants (e.g., Roesler & Wind, 1994). However, the present data are the first to indicate that, even among women who disclosed immediately (i.e., during childhood), friends are the most common recipient of disclosure. It is possible that many victims, fearing the consequences of telling their mothers, made "trial" disclosures to friends and used those experiences to rehearse for subsequent disclosures to mothers. However, such speculations cannot be addressed by our data, which assessed only the identity of the first confidant. This finding underscores the importance of peer support among victims who choose to disclose and suggests that increased attention be focused on efforts to teach children appropriate ways to seek help for their friends who have been assaulted. When considered in light of the remarkably low percentage of childhood rapes that women said were ever reported to authorities (12%), this point takes on even greater significance.

This study has several important limitations. Most importantly, it is likely that some women in this study experienced childhood rapes but did not report them during the interview (Williams, 1994), though they may or may not have told others about their assaults. The predictors of disclosure may be different for this group of victims. Also, some women in this study may have fabricated stories of child rape, although this seems unlikely due to the amount of information gathered about reported incidents.

In addition, the retrospective design required women to try to remember how much time passed before they told someone about their child rape. It is not unreasonable to presume that women's memories of these periods of time are distressing, which when coupled with the passage of time between the rape and the research interview, inevitably introduces some degree of error into their recall (Bradburn, Rips, & Shevell, 1987). However, the impact of the error introduced by faulty memories is ameliorated somewhat by treating delayed disclosure as a categorical variable. Thus, if a respondent reported that she delayed 1 day before disclosing, when in actuality it was 1 week,

it would not significantly distort the predictive analyses. Of course, this does not eliminate the problem of memory distortion, which must be considered a potential limitation of any retrospective study.

Another limitation of the present study is that the sample includes only women. While research indicates that the great majority of child sexual abuse victims are female, increasing research attention is being paid to male victims (Haskett, Marziano, & Dover, 1996). It must be acknowledged that the results of this study may not be applicable to male victims, whose disclosure patterns may be influenced by a different set of variables. Future studies should examine these relationships among men.

Finally, the majority of child rapes reported by women in this sample occurred prior to the large scale child assault prevention education programs that were begun in the 1980's (cf. Daro, 1996). One of the main components of such programs is to teach children that assaults (including child sexual abuse) are wrong and should be disclosed to responsible adults. This information may have influenced (and may currently be influencing) young women's disclosure patterns. Indeed, other data from this sample indicate that younger women were more likely to report child rapes to legal or child welfare authorities than were older women, although reporting rates were still quite low among women under 30 (Saunders, Kilpatrick, Hanson, Resnick, & Walker, 1999). Whether this difference is due to different attitudes toward disclosure or to other variables cannot be determined. It must be acknowledged, however, that the patterns of disclosure identified in this sample of women, most of whom were not exposed to child assault prevention education programs, might be less descriptive of child rapes experienced by women who have been exposed to such programs, although this remains an empirical question worthy of additional attention.

Despite its limitations, this study demonstrates clearly that the large majority of women who experience childhood rapes do not disclose these events to others soon after they occur. In fact, it is possible that a large proportion of women may never tell about these experiences unless asked specifically, as was done in the National Women's Study. Nearly half of all women did not disclose within 5 years of their rape. That only two variables, age at first/only rape and rape by a stranger, were independently associated with disclosure within 1 month suggests that our understanding of what leads some children to disclose and others to keep silent remains poor and requires continued investigation.

## REFERENCES

Arata, C. M. (1998). To tell or not to tell: Current functioning of child sexual abuse survivors who disclosed their victimization. *Child Maltreatment*, **3**, 63–71.

Boyle, J. M. (1992). *National women's study: Final report on study methodology*. Unpublished manuscript.

Bradburn, N. M., Rips, L. J., & Shevell, S. K. (1987). Answering autobiographical questions: The impact of memory and inference on surveys. *Science*, **236**, 157–161.

Bradley, A. R., & Wood, J. M. (1996). How do children tell? The disclosure process in child sexual abuse. *Child Abuse & Neglect*, **20**, 881–891.

Browne, A., & Finkelhor, D. (1986). Impact of child sexual abuse: A review of the research. *Psychological Bulletin*, **99**, 66–77.

Ceci, S. J., & Bruck, M. (1993). Suggestibility of the child witness: A historical review and synthesis. *Psychological Bulletin*, **113**, 403–439.

Daro, D. (1996). Preventing child abuse and neglect. In J. Briere, L. Berliner, J. A. Bulkley, C. Jenny, & T. Reid (Eds.), *The APSAC handbook on child maltreatment* (pp. 343–358). Thousand Oaks, CA: Sage.

Farrell, L. T. (1988). Factors that affect a victim's self-disclosure in father-daughter incest. *Child Welfare*, **67**, 462–468.

Finkelhor, D. (1979). *Sexually victimized children*. New York: Free Press.

Goodman, G., & Bottoms, B. (1993). *Child victims, child witnesses: Understanding and improving testimony*. New York: Guilford Press.

Haskett, M. E., Marziano, B., & Dover, E. R. (1996). Absence of males in maltreatment research: A survey of recent literature. *Child Abuse & Neglect*, **12**, 1175–1182.

Herman, J. (1981). *Father-daughter incest*. Cambridge, MA: Harvard University Press.

Kilpatrick, D. G., Saunders, B. E., Amick-McMullan, A., Best, C. L., Veronen, L., & Resnick, H. S. (1989). Victim and

crime factors associated with the development of crime-related post-traumatic stress disorder. *Behavior Therapy*, **20**, 199–214.

Kilpatrick, D. G., Saunders, B. E., Best, C. L., & Von, J. (1987). Criminal victimization: Lifetime prevalence, reporting to police, and psychological impact. *Crime and Delinquency*, **33**, 479–489.

Lamb, S., & Edgar-Smith, S. (1994). Aspects of disclosure: Mediators of outcome of childhood sexual abuse. *Journal of Interpersonal Violence*, **9**, 307–326.

Lawson, L., & Chaffin, M. (1992). False negatives in sexual abuse disclosure interviews: Incidence and influence of caretaker's belief in abuse in cases of accidental abuse discovery by diagnosis of STD. *Journal of Interpersonal Violence*, **7**, 532–542.

Myers, J. E. B. (1992). *Legal issues in child abuse and neglect*. Newbury Park, CA: Sage.

Resnick, H. S., Kilpatrick, D. G., Dansky, B. S., Saunders, B. E., & Best, C. L. (1993). Prevalence of civilian trauma and posttraumatic stress disorder in representative national sample of women. *Journal of Consulting and Clinical Psychology*, **61**, 984–991.

Roesler, T. A. (1994). Reactions to disclosure of childhood sexual abuse: The effect on adult symptoms. *Journal of Nervous and Mental Disease*, **182**, 618–624.

Roesler, T. A., & Wind, T. W. (1994). Telling the secret: Adult women describe their disclosures of incest. *Journal of Interpersonal Violence*, **9**, 327–338.

Russell, D. E. H. (1986) *The secret trauma: Incest in the lives of girls and women.* New York: Basic Books.

Saunders, B. E., Kilpatrick, D. G., Hanson, R. F., Resnick, H. S., & Walker, M. E. (1999). Prevalence, case characteristics, and long-term psychological correlates of child rape among women: A national survey. *Child Maltreatment*, **4**, 187–200.

Sauzier, M. (1989). Disclosure of child sexual abuse: For better or for worse. *Psychiatric Clinics of North America*, **12**, 455–469.

Sorenson, T., & Snow, B. (1991). How children tell: The process of disclosure in child sexual abuse. *Child Welfare*, **70**, 3–15.

Summit, R. C. (1983). The child sexual abuse accommodation syndrome. *Child Abuse & Neglect*, **7**, 177–192.

Williams, L. M. (1994). Recall of childhood trauma: A prospective study of women's memories of childhood sexual abuse. *Journal of Consulting and Clinical Psychology*, **62**, 1167–1176.

Wyatt, G. E., & Newcomb, M. (1990). Internal and external mediators of women's sexual abuse in childhood. *Journal of Consulting and Clinical Psychology*, **58**, 758–767.

# Tab I

**TEXAS FAMILY CODE**
**SECTION 32.005**

**EXAMINATION WITHOUT CONSENT OF ABUSE OR NEGLECT OF CHILD.**

(a)  Except as provided by Subsection (c), a physician, dentist, or psychologist having reasonable grounds to believe that a child's physical or mental condition has been adversely affected by abuse or neglect may examine the child without the consent of the child, the child's parents, or other person authorized to consent to treatment under this subchapter.

(b)  An examination under this section may include X-rays, blood tests, photographs, and penetration of tissue necessary to accomplish those tests.

(c)  Unless consent is obtained as otherwise allowed by law, a physician, dentist, or psychologist may not examine a child:
    (1)  16 years of age or older who refuses to consent;  or
    (2)  for whom consent is prohibited by a court order.

(d)  A physician, dentist, or psychologist examining a child under this section is not liable for damages except for damages resulting from the physician's or dentist's negligence.

Amended by Acts 1995, 74th Leg., ch. 20, Sec. 1, eff. April 20, 1995;  Acts 1997, 75th Leg., ch. 575, Sec. 1, eff. Sept. 1, 1997.

Tab J



April 28, 2014

To Whom It May Concern:

This letter is to inform you of the days and times that Sierra Jacob's grandmother, Nancy Buitron picked her up from our facility. Starting from January 1, 2014, Mrs. Buitron picked Sierra Jacobs up on:

Monday January 13, 2014 at 4:25 pm
Tuesday January 14, 2014 at 5:33 pm

Wednesday January 22, 2014 at 5:20 pm

Tuesday February 4, 2014 at 5:08 pm
Wednesday February 5, 2014 at 4:43 pm

Tuesday February 11, 2014 at 4:08 pm

Tuesday February 18, 2014 at 5:30 pm
Friday February 21, 2014 at 3:50 pm

Monday February 24, 2014 at 4:56 pm
Wednesday February 26, 2014 at 5:06 pm

Tuesday March 25, 2014 at 5:10 pm

Tuesday April 15, 2014 at 5:10 pm

Please let me know if you have any questions. You can contact me at 512-515-0555.

Thank you,

Tristen Floyd, Director

PETITIONER'S #_____ 1
DATE:_____ 8-20-14 PT<s

# Sova Construction

P.O. Box 1909, Leander, Tx. 78646

Gilbert Buitron is working for Sova Construction. This was his schedule for the following days.

Thank You,

Johnny Sova

President

| Monday | 1/13/14 | Off |
| Tuesday | 1/14/14 | 2:00pm- 10:00pm |
| Wednesday | 1/22/14 | 2:00pm- 10:00pm |
| Tuesday | 2/04/14 | 2:00pm- 10:00pm |
| Wednesday | 2/05/14 | 2:00pm- 10:00pm |
| Tuesday | 2/11/14 | 2:00pm- 10:00pm |
| Tuesday | 2/18/14 | 2:00pm- 10:00pm |
| Friday | 2/21/14 | Off |
| Monday | 2/24/14 | Off |
| Wednesday | 2/26/14 | 2:00pm- 10:00pm |
| Tuesday | 3/25/14 | 2:00pm- 10:00pm |
| Tuesday | 4/15/14 | 9:00am- 5:10pm |